**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SHIRAN CANEL,<br><br>Plaintiff,<br><br>v.<br><br>SCHOOL OF THE ART INSTITUTE OF CHICAGO, and SANDIE YI,<br><br>Defendants. | Case No. _____ |

## COMPLAINT

Plaintiff Shiran Canel ("Shiran"), for her complaint against defendants School of the Art Institute of Chicago ("SAIC") and Sandie Yi ("Professor Yi"), alleges as follows:

## INTRODUCTION

1.      Shiran, an Israeli Jew, enrolled in SAIC's Art Therapy and Counseling master's program to obtain what was promised to be a world-class education in art therapy. She was passionate about pursuing this career path after watching her mother utilize art therapy to successfully overcome leukemia. She assumed there could be no better place than the esteemed School of the Art Institute of Chicago to learn how to channel art as a therapeutic intervention.

2.      But what she didn't know is that SAIC is (and has long been) a place of hostility towards Israelis and Jews.

3.      In her very first interaction with the school, Shiran felt the brunt of SAIC's discriminatory decay. In her admissions interview, she was denied the typical, mandatory panel of interviewers, and was instead subjected to the harassing inquisition of a single faculty interviewer who showed no interest in her academic qualifications and questioned her ability to work collaboratively alongside Arab and Palestinian classmates. The lone interviewer had nothing to

say about her portfolio of work, save for her painting of Jerusalem, which was used as a springboard to further prod her Israeli identity. Perhaps hoping the obviously Israeli Jewish candidate would just go away, the interviewer asked Shiran to ponder whether she could keep up with her coursework, given she was set to give birth to her second child a few months later.

4.      Shiran was denied admission and given no reason. She suspected the decision was the result of discrimination, and challenged it, prompting SAIC to change course. They granted her admission, conceding only that the initial, discriminatory decision "did not follow SAIC policy or expectations," and that the school "fell far short of [its] own standards." The "investigation" into her rejected application, though, was kept secret.

5.      Hoping to put the admissions debacle behind her, Shiran took SAIC at its word that "everyone at SAIC is treated in a non-discriminatory manner." In exchange for this and other promises, she paid her tuition and arrived on campus. She would quickly learn that SAIC's commitment of non-discrimination has a silent but robust exception for Jews and Israelis.

6.      SAIC has long tolerated, cultivated, and promoted animus towards Jews and Israelis.  This hostile and discriminatory animus takes the form of refurbished classic antisemitic tropes, the singling out of Israelis for a particular hatred, scrutiny, and dehumanization that is extended to no other group or country, and the exclusion of Jews and Israelis from the protections afforded, and guarantees made, to other students on campus.

7.      This modern antisemitism pulsates throughout SAIC and is premised upon the pernicious erasure of Jewish ancestry, history, and indigenousness, the complete denial of Jews' and Israelis' rights to safety and self-determination, and the empirically false narrative that Jews and Israelis are "colonizers," (which serves as a pretext to justify their murder). The discrimination is overwhelming and multi-faceted.

2

8.     Not surprisingly, then, following Hamas' October 7th terrorist massacre upon Israel, SAIC's campus came alive with hatred. Disdain towards Jews and Israelis flowed freely through the halls of the school; one professor decried Israelis as "pigs" and "irredeemable excrement" who should "all rot in hell."

9.     Shiran, like every Israeli, was intensely and intimately impacted by the terror attack, and vocally rejected the antisemitic mob mentality that quickly engulfed the school in its wake. Since October 7th, she has endured an endless tide of hatred, discrimination, and exclusion. Rather than taking steps to curb the abuse against Shiran, SAIC and its faculty have condoned and facilitated it, with Professor Yi taking a leading role in these discriminatory and exclusionary acts.

10.     The harassment and discrimination against Shiran is a moral stain on SAIC. But, more importantly here, it is illegal.

## PARTIES

11.     Shiran is an Israeli Jew enrolled in SAIC's master's Art Therapy and Counseling program. She has attended SAIC since August 2023.

12.     Defendant SAIC is a private, not-for-profit educational institution, located in Chicago, Illinois. SAIC is a wholly-owned subsidiary of the Art Institute of Chicago. At all times relevant to this Complaint, SAIC was and continues to be a recipient of federal funding, subjecting it to the provisions of Title VI.

13.     SAIC is also an "institution of elementary, secondary, or higher education" and a "place  of public accommodation" within the meaning of the Illinois State Human Rights Act.

14.      Over the past several years, grant and contract revenue that SAIC obtained from U.S.  governmental sources has totaled in the millions of dollars.

15.     Upon information and belief, Professor Yi is an assistant professor in the SAIC Department of Art Therapy. Professor Yi is a resident of the state of Illinois and is a citizen of the United States.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343 over the claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq.*). This Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as Plaintiff's federal claims.

11.     This Court has personal jurisdiction over Defendant SAIC because SAIC is based and operates in Illinois.

12.     This Court has personal jurisdiction over Professor Yi because she lives and works in this district.

13.     Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred and is where SAIC is located.

## FACTS

**A.      SAIC's atmosphere of hostility towards Jews and Israelis.**

14.     For years, SAIC has cultivated an atmosphere of disdain and hostility towards Israelis and Jews.

15.     In the more recent past, this environment has manifest in statements from large swaths of the school's faculty supporting Hamas' October 7th terrorist rampage while maligning Jews as "colonizers" of Israel despite Jews being indisputably indigenous to the land, and having developed

4

their robust history, religion, culture, and shared language (Hebrew) on that site for thousands of uninterrupted years.

16.     Not ten days after Hamas invaded Israel to conduct its mass murder, mutilation, rape, torture, and abduction of Israelis (targeting Jews, but taking whomever they could get), a substantial portion of SAIC's faculty penned an open letter justifying the atrocities and lying about what Israel is, and who Israelis and Jews are. While Israel was still counting its dead, these faculty members described their "uncompromising solidarity with the Palestinian people in their righteous struggle for self-determination" and referred to the Israeli victims of the terror attack as "settlers." Their word salad featured the usual "settler colonialist" slogans, and touted "decolonial resistance."

17.     SAIC's faculty thus, *en masse*, perpetuated the hateful smear that Jews are foreign colonizers squatting on land to which they have no connection, a lie easily disproven by opening a single book on the history of Jews or the land of Israel. In doing so, they engaged in the erasure of Jews, their ancestry and indigenousness, which is itself an act of discrimination. As discussed below, this post-October 7th campus hostility would greatly impact Shiran.

18.     But October 7th wasn't the start. SAIC publishes a newsletter that has long engaged in these smears and other openly antisemitic tropes, such as the renewed "blood libel" – that notion that Jews (today, via Israel) relish in murdering innocents, are bloodthirsty, and are uniquely evil.

19.     For example, on June 8, 2021, SAIC's newsletter published this:



20.     This imagery capitalizes on the classic antisemitic trope that Jews are "monsters" (in this case, Israel is described as a "horrible monster"), who intentionally stomp on innocent women and children, seemingly just for the fun of it. All the while grabbing at a bag of money (another favorite theme of antisemites).

21.     Four days later, SAIC's newsletter continued peddling in the hateful, dehumanizing "colonizer" lie, suggesting Israelis do not have the right to defend themselves against the undisputed and sustained campaigns of war and terror launched against the country since its founding – initially by every Arab neighbor, then later by terrorist organizations like Hamas and Palestinian Islamic Jihad (who, the month prior to this SAIC newsletter publication, launched over 4,000 rockets indiscriminately into civilian populations in Israel).



22.     SAIC's newsletter is also rife with hateful, discriminatory and antisemitic written pieces. And for all the attention SAIC devotes to that lone spot in the Middle East, it has not published a single article that refers to Israel neutrally (let alone favorably). The school's newsletter is an endless stream of hostility.

23.     SAIC -- and its Art Therapy program in particular – also publicly platforms student

theses that glorify violence against Jews and Israelis by fantasizing about what a more robust and effective tunnel network might look like in Gaza, to be used for purposes of "resistance" (*i.e.*, terrorism against Israeli civilians).

24. SAIC continues to host on its website a graduate exhibition from 2022 that imagines a Gaza with infrastructure that can "migrate its functions to subterranean levels in times of contingency, ensuring continuity…to operate and resist regardless of aboveground conditions of Israeli aggressions." Of course, this student presentation is simply a souped-up plan for more effective terror tunnels, which are terror tools used by Hamas to invade Israeli towns in order to butcher innocents; transport rockets and other weapons to kill Israeli civilians; and, as we now know, hide Israelis as hostages imprisoned against their will in these underground dungeons. As of the date of this filing, SAIC still promotes this gruesome work on its website. It is difficult to fathom the school giving such prominence to a thesis that proposed more efficient or aesthetic cross-burnings on lawns, or the means of terrorizing any other population of people. But for SAIC, when it comes to Israelis and Jews, anything goes.

25. SAIC's Art Therapy and Counseling program specifically also platforms hatred of Israelis and Jews. A former student of the program graduated with a thesis premised on the discriminatory lie that Israel is a genocidal colonial-settler state. Professor Leah Ra'Chel Gipson, an SAIC assistant professor and then Chair of its Art Therapy and Counseling Department, served as the thesis advisor on this project and hired the author, shortly after her graduation, as a lecturer in the Art Therapy and Counseling program. As discussed below, this same newly hired professor was dismissed shortly after the investigation into Shiran's rejected admissions bid, and Professor Gipson was removed from her position as department chair simultaneously.

26. The examples of hostility towards Jews and Israelis are endless. In 2018, a Jewish

student inquired as to whether matzah or kosher food would be available in the cafeteria during Passover. The school responded that there wouldn't be and indicated that advertising kosher food may make some students uncomfortable.

27.    That same year, a teacher of "Philosophy of Sex" who openly and publicly denies Israel's right to exist and calls for the end of Israel as a Jewish state, provided the following as a first example of problematic forms of BDSM: if someone wanted to act out a nazi/Jew scene where the nazi says "Lick my boot you dirty Jew." The professor explained this would be problematic if the submissive was actually Jewish. One of the Jewish students in class, appalled, reached out to school faculty: "Never in my time at SAIC did I think I would hear a teacher say in class 'dirty jew'…" She discussed how irrelevant his example was and noted how Holocaust re-enactments do not play any significant role in BDSM culture "for it to be a usual tool in the discussion." She noted the same professor had referenced Jews multiple times throughout the course which, she said, "was wild considering how few jews there are in the world…"

28.    The student's concerns were met with criticism that she used the wrong complaint mechanism.  The SAIC faculty member chastised her:  "The accusations you've made here are quite serious, and I don't think this particular approach (emailing other students and an outside organization) is the most appropriate way to resolve a grievance in a way that is both fair and just." Query whether SAIC faculty would react as callously to the legitimate grievances of other minority students about a professor's useless and gratuitous utterance of any other discriminatory slur.

29.    These are but a few examples of the pattern of hostility that has continued uninterrupted at SAIC through the present.

**B.    From the very outset, SAIC discriminated against Plaintiff for being Jewish and Israeli.**

30.    Earlier this year, Shiran submitted her application to SAIC's master's program of Art

8

Therapy and Counseling (sometimes called the "MAATC" program). The application was complete and was supported by a record of stellar academic performance and enthusiastic recommendations.

31.     As part of the admissions process, Shiran sat for an interview with an SAIC faculty member. In contrast to the mandatory interview process, which states that candidates "will meet with a faculty **panel** to discuss their application materials," Shiran was interviewed by a single faculty member. Shiran's interviewer focused on Shiran's ethnic background and nationality, and asked multiple inappropriate questions, like whether she could "how would you handle interacting with a Palestinian colleague" or whether the upcoming birth of her second child would undermine her ability to handle the rigors of the program.   Shiran responded to the interviewer's inappropriate questions fairly and honestly, explaining that she harbored no prejudice against Arabs or Palestinians and would have no trouble working collaboratively in a diverse classroom environment.

32.     The interviewer did not ask Shiran about the art piece she designated for discussion or her interest in art therapy. The only artwork in Shiran's portfolio the interviewer asked about was a painting of Jerusalem, which was only used to further hound Shiran about her Israeli nationality.

33.     After the interview, SAIC notified Shiran that her application was denied, providing no grounds for the denial.

34.     Shiran appealed this decision. She provided her account of the interview process and shared her concern that her denial of admission was the result of the Art Therapy Department's antisemitic discrimination against her.

35.     After some initial resistance, SAIC engaged outside counsel to conduct a review of Shiran's admission process and the decision to deny her admission. According to SAIC, it conducted a full investigation into the decision on Shiran's application specifically, as well as the Art Therapy Department's graduate admissions process more broadly.

36.     At the conclusion of the investigation, SAIC reversed its denial and granted Shiran admission to the program beginning Fall of 2023. SAIC did not reveal the specifics of what it uncovered through its investigation that led to its sudden about-face on Shiran's admission. SAIC shared only that it discovered that her admissions process "did not follow SAIC policy or expectations" and that SAIC "fell far short of [its] own standards." But, according to SAIC, "as is [its] practice, SAIC [would] not provide a written summary or report on the investigation." Although SAIC kept its findings secret, following the internal investigation it appears SAIC has removed Professor Leah Ra'Chel Gipson from her position as the Art Therapy Department's Chair, and dismissed the faculty member whose discriminatory thesis she oversaw shortly before hiring her.

37.     Following this shameful fiasco, SAIC's Provost, Martin Berger, reached out to Shiran to provide his "sincere apology" for "how the initial admissions process was handled." Shiran responded that, while she was thankful that SAIC reversed its decision, she continued to have "significant concerns about whether or not [she] can participate in the program without being subjected to discriminatory ideologies—and whether or not [she] can disagree with those ideologies without being subjected to various forms of retribution." Provost Berger provided his assurance that Shiran "would have the same right to hold and express [her] views without fear of repercussion as anyone else in the community." He further wrote, "I assure you that the institution will do everything in its power to ensure that all of our students have the latitude to freely express their thoughts, whether popular or not."

38.     Shiran's concerns have proven to be well-founded. Unfortunately, it appears Provost Berger's assurances were not.

**C.      Shiran suffers intensified hostility and discrimination following the October 7th Hamas terrorist attack on Israel.**

39.     On October 7, 2023, Hamas terrorists infiltrated Israel and murdered, tortured, raped,

and kidnapped Israeli civilians, resulting in the largest loss of Jewish life in a single day since the Holocaust.

40.     In a perverse reaction to the massacre, SAIC, its faculty, and a large part of its student body responded by increasing the volume and intensity of their anti-Israel rhetoric and protests.

41.     In the days after the attack, SAIC Professor Mika Tosca posted to social media that "Israelis are pigs. Savages. Very very bad people. Irredeemable excrement. . . . May they all rot in hell."



42.     Students used the bulletin boards in SAIC's hallways to post banners accusing Israel of committing genocide in Gaza (with no regard for the definition of that word) and created flyers on SAIC letterhead parroting pro-Hamas propaganda and notifying the student body about anti-Israel protests, lectures, and other activities.

43.     The pervasive anti-Israeli and antisemitic rhetoric from faculty and students dramatically increased Shiran's experience of hostility and lack of safety on SAIC's campus.

44.     At various points, Shiran reached out to SAIC faculty and administration to voice her concerns and to inquire whether SAIC would be taking any action to ensure her safety. Shiran did not

receive a response.

45.     On October 9, 2023, Shiran shared with the Department Chair, Professor Adelheid Mers, the many terrible ways she was personally affected by Hamas' terror attack. She wrote to him about her friend's younger sister who was murdered at the Nova music festival, where Hamas gunned down (and gang-raped) young festival-goers attending an all-night dance party; she wrote about her rabbi's nephew who was killed in combat; and she shared how her parents who live near the northern border are preparing for potential war with the terror organization, Hezbollah, and the trauma her family was suffering. When she followed up to ask about her safety given the apparent widespread support for Hamas and the tacit approval of the atrocities it committed against her friends and family, Professor Mers did not respond.

46.     On October 17, Shiran wrote to Provost Martin Berger, Dean Felice Dublon (acting provost), Professor Mers, and her program director and advisor, Professor Katherine Kamholz to ask if she is safe coming to school. Shiran shared a copy of Professor Tosca's post calling Israelis (*i.e.*, Shiran) "pigs," and "irredeemable excrement" who should "all rot in hell." "Violent words often lead to actual violence. How can I feel safe?" Shiran asked.

47.     Despite Shiran's repeated attempts to gain some measure of security from SAIC, the school never responded. As far as Shiran knows, SAIC took no action to address the concern regarding her safety on campus.

**D.     Shiran challenges an antisemitic student letter, as the discriminatory harassment against her continues.**

48.     On November 14, 2023, a group of students circulated a letter titled "FREE PALESTINE: Letter Regarding Palestine to the Art Therapy Department from MAATC Students" ("Anti-Israel Letter"). The letter was signed by thirty-seven current students and twenty four alumni.

49.     The letter complained that SAIC's "distinct lack of acknowledgement in our school

and classrooms of the ongoing genocide of the Palestinian people at the hands of the settler colonial state of Israel . . . has been deeply upsetting and unsettling." The letter also condemns SAIC as being implicated in "the genocide" for accepting donations from a Jewish family which the letter claims derived its wealth from its ownership stake in a large, weapons-contracting company. The letter makes no mention of Hamas' attack on Israeli civilians or the casualties suffered by Israel. According to the letter, "[n]aming the difference between anti-semitism versus anti-Zionism is a necessary part of this conversation as well."

50.     The Anti-Israel Letter made several requests of SAIC, including "a student led teach-in on Friday, November 17th for MAATC students and faculty"; "a series of Open Studios led by faculty . . . to create art for collective action and mobilization"; "faculty should be empowered to create space in our classrooms to learn about and discuss the genocide of Palestinians and the settler colonial state of Israel"; and "a commitment to continue an ongoing dialogue with students who support Palestinian liberation."

51.     Shiran prepared and circulated a response letter ("Response Letter") to faculty and students to address the antisemitic claims and statements made in the Anti-Israel Letter. In the Response Letter, Shiran rebutted the claims that Israel was a settler colonial state, that Israel was committing a genocide, and that antisemitism was meaningfully distinguishable from anti-Zionism.

52.     SAIC has responded to the Anti-Israel Letter by meeting with its signatories and by adopting several of its requests, including dedicating classroom time to discuss "the genocide of Palestinians." At the same time, SAIC has made no statement addressing the antisemitism in the letter, its callous disregard of Israeli victims of Hamas' attack, or the need for tolerance of perspectives from the Israeli side.

53.     On November 15, 2023, the day after the two letters were circulated, Professor Yi and

Professor Deborah Ann DelSignore announced that they "decided that [they] will combine the morning and afternoon classes [on Friday, November 17] and create a communal space for all of us to hold each other accountable through art, writing, and witness reading."

54.     Shiran wrote to her class she would not attend this "communal space" which she feared attending given that a large majority of her classmates signed the Anti-Israel Letter, and few if any classmates were willing to stand with Shiran in opposition to the majority's views, or to extend even a modicum of empathy for Shiran as she was freshly grieving the atrocities and aftermath of October 7th.

55.     Shiran had no intention of participating in a session that she told her professors resembled a medieval, anti-Jewish "disputation"; she enrolled in SAIC to learn about art therapy, not to be subjected to spaces in which faculty and peers sought to "hold [her] accountable" for their hateful and discriminatory views.

56.     Professor Yi responded to Shiran's e-mail "to provide some clarifications." Professor Yi claimed that she and Professor DelSignore had "no plans for diverting classes to talk about the conflicts in the Middle East. These two classes are designed to focus on art therapy assessment and art materials." She proposed that Shiran have a call with the two professors to answer her questions about Friday's session.

57.     That evening, on the call, Professors Yi and DelSignore assured Shiran they would do their best to not allow class time to devolve in the manner Shiran feared it would. They said they would clarify at the beginning that the joint class was not an opportunity to air one's views on "politics," but rather to use art and learn therapy skills. And that if any student broached such topics, they, as facilitators, would say "wait! no! that is not what this space is for."

58.     In light of these assurances and in a leap of faith, Shiran agreed to participate in

Friday's joint class. Shiran followed up with an email to the class to say that she would, after all, attend the joint class, sharing that faculty told her that the session "would focus on art making, not the situation in the middle east," and "that faculty would provide clear instructions regarding appropriate behavior."

59.     Nevertheless, the joint class spiraled precisely as Shiran feared. One classmate launched into a diatribe describing her hate and anger towards those who reject her narrative of an ongoing genocide in Gaza. As the student went on and on, Professors Yi and DelSignore sat silently, making no effort to curb the very behavior they promised to Shiran would not occur in class. Shiran too sat silently, stunned that her professors would so blatantly mislead her. After class, Professor DelSignore told Shiran that she needs to learn to hold space for other's feelings. Shiran realized she was lured into a situation she rightfully feared with false promises the professors had no intention of upholding. It was as though they savored her having to countenance the hostility.

60.     In subsequent classes, Professors Yi continued to facilitate additional, one-sided student-led conversations expressing vitriol towards Israelis. Shiran's professors repeatedly demonstrated sympathy towards her classmates' hostile and antisemitic musings, and they continued to demand that Shiran learn to hold space for her peers' feelings and to tolerate upsetting or triggering subject matter in a professional manner.

**E.     Shiran's classmates continue to harass and ostracize her, with no action from SAIC.**

61.     In a joint presentation for her Materials and Media in Art Therapy class, Shiran was assigned to present together with Jannah Sellars, a fellow classmate and an SAIC-paid graduate assistant. Jannah was a signatory to the Anti-Israel Letter. Despite their differences, Shiran had previously worked collaboratively with Jannah to create a presentation about both Hebrew and Arabic calligraphy as well as watercolors.

62. But, on November 16, 2023 Jannah announced she was not willing to work with Shiran. In Jannah's words, she was "simply unable to work closely with any individual who denies the genocide so clearly taking place before us."

63. Apparently, in this context, Professor Yi no longer felt strongly that her students needed to tolerate others' views and handle upsetting subject matter in a professional manner.

64. Instead, as Jannah informed Shiran, Professor Yi "graciously offered to allow us to split our presentation in half enabling us to present individually rather than jointly."

65. SAIC and Professor Yi thus facilitated Jannah's discriminatory refusal to work with Shiran. There were no attempts at discussion or resolution. The school and Professor Yi simply catered to the discriminatory request, without second thought.

66. The joint presentation suffered from the sudden change. For example, the calligraphy section of the joint presentation included discussion of Hebrew letter calligraphy. Jannah's version eliminated any mention of Hebrew letters.

67. Ultimately, Professor Yi gave Shiran a failing mark for "Professionalism: Collegial + Interpersonal skills" with regards to the joint presentation. Shiran also received failing marks on "Final Peer evaluation." The feedback shared by Shiran's classmates revealed their bias against her. Several of her classmates baselessly accused her of plagiarizing her work from Jannah, stating that it was "really frustrating to know that Jannah made the presentation" or that "there were errors in the slides that showed that they were co-opted or plagiarized from a different presentation." Some classmates expressly acknowledged that "most of [their] feedback has to do with outside factors." Even Professor Yi, who was fully aware of her own decision to indulge Jannah's animus, piled on: "I noticed that you mostly interacted with non-BIPOC-presenting students during skillshare. Overall, it seems that there was some discomfort during your presentation."

68.     Shiran has continuously experienced forms of explicit and subtle exclusion on campus. Some of her classmates blatantly ignore her when she speaks to them, refuse to share their art supplies when asked, submit negative and discriminatory peer feedback on her classwork, or simply avoid her altogether. None of Shiran's professors have made any effort to address this, despite being fully aware of it.

**F.      Shiran requests SAIC initiate a formal investigation, and Professor Yi immediately retaliates.**

69.     By November 17, 2023, after Shiran submitted several complaints to SAIC's faculty and administration regarding the increasing harassment and hostility, the director of SAIC's Title IX office reached out to Shiran to notify her that SAIC had engaged outside counsel to review Shiran's complaints of discrimination and harassment.

70.     Two weeks later, Shiran met with two attorneys hired by SAIC to investigate her claims. Shiran provided a detailed account of her experiences and offered to submit any additional supporting materials that would be helpful to the investigation. After the initial interview, on December 4, SAIC's attorneys explained that because Shiran's complaints implicate faculty (as well as students) they would be following SAIC's policies found in the Faculty Handbook which provided for a formal and informal resolution process. They asked Shiran to elect whether to proceed with the formal or informal process.

71.     Late evening on December 5, Shiran notified SAIC's attorneys that she wished to initiate the formal process to investigate her claims of discrimination by SAIC's faculty, including Professor Yi.

72.     Two days later, Professor Yi announced to the Materials and Media in Art Therapy class an abrupt change to their final assignment, just ten days before it was due – and even though the students had already submitted a draft of the original final assignment.

73.     Professor Yi decided to formally inject the traumatizing and emotionally charged issues of the past several weeks directly into the course's final assignment. The students would now be graded on how they responded to Professor Yi's provocations. Outrageously, although not surprisingly, the material was uniquely targeted at Shiran.

74.     Part 1 of the final assignment asked the class to provide reflection on the question "What did you learn about sitting through and making spaces for difficult conversations[1]/feelings this semester?"

75.     Part 2 of the new final assignment provided the following preface:

> Every decision we make as art therapists is political. Because both therapists' and clients' lives are always entangled and impacted by the larger socio-cultural, political and global systems. When clients create art and talk about their experiences in art therapy, it is inevitable for us to see, hear and talk about human suering [sic], trauma and pain. You can always trace clients' pain and its cause to the decisions made by people or institutions of power.
>
> [ . . . ]
>
> As therapists, we don't censor what clients bring to the sessions. We must stay impartial. Often, we encounter clients' cultures, upbringing, experiences, values and belief systems that are very dierent [sic] from our own. Sometimes we can also work with clients' experiences/backgrounds that are "too close to home" and we need to deal with our own complicated feelings, internalized racism /ableism / homophobia / supremacy and countertransference, etc. We must decenter ourselves and create a space for our clients in therapy. How do you reduce harm in therapy? Can you keep it professional and still empathize with clients even when the content of their art upsets or triggers you? How do you compartmentalize your own feelings and stay helpful to your clients?
>
> How we listen to and what we say about clients' art in art therapy sessions play a crucial role in clients' treatment and healing process. In this PART 2 reection [sic] assignment, you are going to demonstrate your ability to examine your own readiness for doing the hard work as an art therapist.

---

[1] In the preceding months, Professor Yi used the phrase "difficult conversations" as a euphemism to refer to discussions about Israel.

76.     The assignment instructed the class to review two groups of images provided by Professor Yi – **many of which were explicitly about Israelis**.

77.     The images in Group A purported to contain "depictions of genital, physical, verbal or sexual abuse, violence and trauma inicted [sic] on children and youth."

78.     Bizarrely (but not surprisingly), one of Professor Yi's choice images for this depiction—with no apparent academic value—was an Israeli father and son speaking in Hebrew, where the dad states: "You are a bad boy!" and the son replies, "Stop, dad, that is insulting":



79.     Professor Yi's surprise, new final assignment also explained that Group B images contained "depictions of gun, violence, truma [sic], displacement and colonization from children's view." Here, again, Professor Yi chose a collection of drawings **all of which** pertained exclusively to the Israeli military and Israeli soldiers engaged in seemingly senseless violence against Gazan families and children, even smiling while shooting:



A Bay Area children's museum shut down a planned exhibition of Gaza children's drawings. (Middle East Children's Alliance)



A piece in the Palestinian children's art exhibit, A Child's View from Gaza. **A Child's View from Gaza**



Israel lobby groups claimed the children's drawings were "anti-Semitic" in a bid to shut down the exhibition. (Middle East Children's Alliance)

80.    Professor Yi's sudden creation of this new assignment, and her preface to, and

selection of, an overwhelming amount of images about Israelis, was a transparently deliberate effort to further harass and isolate Shiran, who had just days before requested a formal investigation into Professor Yi's discriminatory behavior precisely on this basis.

81.     Professor Yi knew she could bank on the support of the majority of Shiran's classmates, who she knew already vocally and categorically despised Israelis; indeed, as described below, she later solicited the same mob of students to write to the department chair in support of the discriminatory and harassing assignment to help her avoid scrutiny.

82.     When Shiran complained about Professor Yi's retaliatory harassment, SAIC first directed Shiran to request an accommodation from Professor Yi. Only after Shiran informed SAIC's attorneys that she would seek emergency legal relief if the offensive material was not retracted, on December 13, SAIC directed Professor Yi to withdraw Part 2 of the final assignment, but took no meaningful steps to curb Professor Yi's outrageous behavior on a going-forward basis.

83.     Indeed, Professor Yi found ways to continue targeting Shiran and discriminating against her.

84.     On December 18, 2023, Professor Yi wrote to the class thanking those students "who raised questions and shared disappointments in the cancellation of the assignment ***Waived*** Final reflection paper: Part 2." She said she was "sorry to hear that many of you felt your learning was compromised." Professor Yi said she "would very much appreciate if you can write to department chair, Adelheid, and me about your perspectives." Apparently, for these students and Professor Yi, being forced to remove libelous imagery regarding Israelis was "disappointing" and compromised learning.

85.     Upon information and belief, since December 13, Professor Yi has also made changes to the course's grading standards to increase the weight given to peer evaluations and feedback, class

participation, and collegiality among classmates. Given the class's ostracization of and discrimination against Shiran, these changes were designed to, and did indeed, harm Shiran's grades and ability to pass the course.

86.     Shiran's pending claim to the school remains open.

## **LEGAL STANDARDS**

**A.     Federal law prohibits Defendants' discrimination against Jews and Israelis.**

87.     Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal funding or other federal financial assistance. Title VI protects all students, including Jewish students, in federally funded programs or activities. This plainly prohibits discrimination on the basis of Shiran's national origin as an Israeli and her national origin as a Jew.

88.     Moreover, in enforcing Title VI and identifying evidence of discrimination, "all executive departments and agencies [] charged with enforcing Title VI shall consider" the International Holocaust Remembrance Alliance's (IHRA) working definition of antisemitism, with reference to IHRA's list of Contemporary Examples of Anti-Semitism. Executive Order #13899 (Combating Anti-Semitism, Dec. 11, 2019; Fed. Reg. 84 FR 68779).

89.     These contemporary examples of antisemitism include:

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion;"

- "Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective—such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government, or other societal institutions;"

- "Denying the Jewish people their right to self-determination, *e.g.*, by claiming that the existence of a State of Israel is a racist endeavor;"

- "Applying double standards by requiring of [Israel] a behavior not expected or

demanded of any other democratic nation;"

- "Using the symbols and images associated with classic antisemitism (*e.g.*, claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis;"

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis;" and

- "Holding Jews collectively responsible for actions of the state of Israel."

90.     Since at least September 2004, it has been the policy of the Office of Civil Rights (OCR) of the U.S. Department of Education (DOE), the agency responsible for enforcing Title VI, to investigate claims related to antisemitism.

91.     In 2010, OCR explained its policy under Title VI clarifying that schools "may violate these civil rights statutes and the Department's implementing regulations when peer harassment based on race, color, national origin, sex, or disability is sufficiently serious that it creates a hostile environment and such harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees. School personnel who understand their legal obligations to address harassment under these laws are in the best position to prevent it from occurring and to respond appropriately when it does."

92.     OCR further clarified that "[w]hile Title VI does not cover discrimination based solely on religion, groups that face discrimination on the basis of actual or perceived shared ancestry or ethnic characteristics may not be denied protection under Title VI on the ground that they also share a common faith. These principles apply not just to Jewish students, but also to students from any discrete religious group that shares, or is perceived to share, ancestry or ethnic characteristics (e.g., Muslims or Sikhs). Thus, harassment against students who are members of any religious group triggers a school's Title VI responsibilities when the harassment is based on the group's actual or perceived shared ancestry or ethnic characteristics, rather than solely on its members' religious practices." OCR added that "[a] school also has responsibilities under Title VI when its students are

23

harassed based on their actual or perceived citizenship or residency in a country whose residents share a dominant religion or a distinct religious identity."

93.     OCR makes clear that schools "must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring."

94.     Most recently, the Biden Administration has confirmed the urgent necessity under Title VI to combat antisemitism. On January 4, 2023, the DOE, citing the "rise in anti-Semitic incidents," released a fact sheet entitled "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics," which notes that Title VI's protections extends to "students who experience discrimination, including harassment, based on their shared ancestry or ethnic characteristics or citizenship or residency in a country with a dominant religion or distinct religious identity."

95.     On May 25, 2023, President Biden released The U.S. National Strategy to Counter Antisemitism, which his administration described as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history." As part of that campaign, OCR released a letter reminding schools of their legal obligations under Title VI to provide all students, including Jewish students, a school environment free from discrimination and to take immediate and appropriate action to respond to harassment that creates a hostile environment. On September 28, 2023, as part of President Biden's National Strategy to Counter Antisemitism, eight federal agencies confirmed again that Title VI prohibits antisemitic forms of discrimination in federally funded programs and activities.

96.     In the wake of Hamas' October 7 terrorist attack against Israel, which, according to President Biden, contributed to an "alarming" rise in antisemitism at schools and on college campuses,

OCR announced that it was expediting its processing of discrimination complaints involving antisemitism, and at least seven bills have been introduced in both houses of Congress condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities. Such support has created a hostile educational environment for Jewish students, faculty, and staff. On October 18, 2023, the U.S. Senate passed a resolution condemning "antisemitic student activities," and on November 2, 2023, the U.S. House passed a resolution condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities.

97.     On November 7, 2023, OCR released a letter "remind[ing] colleges, universities, and schools that receive federal financial assistance of their legal responsibility under Title VI . . . to provide all students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics." The letter states: "It is your legal obligation under Title VI to address prohibited discrimination against students and others on your campus—including those who are perceived to be Jewish [or] Israeli . . . in the ways described in this letter."

**B.      State law prohibits Defendants' discrimination against Jews and Israelis.**

98.     The Illinois Human Rights Act, modeled after the Civil Rights Act of 1964, extends similar protections against antisemitism and anti-Israeli discrimination. The Act applies to any "publicly or privately operated university, college, community college, junior college, business or vocational school, or other educational institution offering degrees and instruction beyond the secondary school level." And the Act's protection against harassment covers "any unwelcome conduct by [ . . . a] higher education representative toward a student on the basis of a student's actual or perceived race, color, religion, national origin, ancestry, age, sex, marital status, order of protection status, disability, military status, sexual orientation, pregnancy, or unfavorable discharge from

military service that has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile, or offensive educational environment."

## COUNT I

**(Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)**
**(Against SAIC)**

99.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 98, as though fully stated herein.

100.     SAIC received financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

101.     Shiran is Jewish and Israeli, and her status as Jewish and Israeli (each independently) brings her within the scope of Title VI's protections. Shiran is currently enrolled as a student at SAIC.

102.     As described in this complaint, the acts and omissions of SAIC, its administrators, and its faculty have subjected Shiran to discrimination on the basis of her actual or perceived Jewish and Israeli shared ancestry, race, ethnic characteristics, or national origin.

103.     SAIC, its administrators, and its faculty had actual notice that harassment, over which SAIC had substantial control and the authority to remediate, was so severe, pervasive, and objectively offensive that it created a hostile environment that deprived Shiran of full access to SAIC's educational programs, activities, and opportunities.

104.     SAIC, its administrators, and its faculty have intentionally discriminated against Shiran because of her actual or perceived shared Jewish and Israeli ancestry, race or ethnic characteristics, or national origin, as exhibited by their deliberate indifference to the antisemitic discrimination and harassment of Shiran in violation of Title VI. Specifically, SAIC, its administrators, and its faculty failed to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Shiran, and the hostile environment that

Shiran has been forced to endure at SAIC because she is Jewish and Israeli.

105.    Additionally, SAIC has failed to take effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring. Such unlawful deliberate indifference caused Shiran to be subjected to a hostile educational environment.

106.    The environment at SAIC, which has been rendered hostile for Shiran because of her Jewish and Israeli identity and ancestry, is sufficiently severe, pervasive, persistent, and offensive such that it has deprived Shiran, as a Jewish and Israeli student, of equal access to the educational opportunities and benefits that SAIC provides to non-Jewish or non-Israeli students.

107.    SAIC, its administrators, and its faculty have actively and intentionally engaged in this pattern of severe or pervasive discrimination.

108.    SAIC, its administrators, and its faculty also directly and intentionally discriminated against Shiran, with Shiran's actual or perceived shared ancestry or ethnic characteristics a substantial or motivating factor in SAIC's actions.

109.    SAIC's actions or conduct had, and continue to have, a differential or disparate impact upon Shiran, as a Jewish and Israeli student.

110.    SAIC has failed to act or has acted with leniency or delay in applying its policies when a known or reported incident involved antisemitism or where the victim was a Jewish or Israeli student, including Shiran. As detailed above, SAIC's actions and conduct were, and continue to be, intended to treat Shiran differently as a Jewish and Israeli student as compared to incidents involving other similarly situated non-Jewish or non-Israeli students.

111.    SAIC's violations of Title VI were the actual, direct, and proximate causes of Shiran's injuries.

112.    As a result, Shiran has suffered, and continue to suffer, substantial damages in an

amount to be determined at trial.

113.    Shiran is also entitled to appropriate injunctive relief under Title VI, as SAIC had knowledge of, and has been and continues to be deliberately indifferent to, a racially hostile environment that is severe, persistent, and pervasive.

114.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

<u>**COUNT II**</u>

**(Violation of Illinois Human Rights Act, 755 ILCS 5/1-101 *et seq.*)**
**(Against SAIC)**

115.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 98, as though fully stated herein.

116.    Shiran is Jewish and Israeli and identifies as such.

117.    Shiran has been excluded from participation in and has been denied the full benefits of SAIC's educational and other programs and facilities based on her race, religion, national origin, and ancestry.

118.    As a result of SAIC, its administrators, and its faculty's actions, inactions, and conduct described herein, Shiran was treated differently because she is Jewish and Israeli than similarly situated non-Jewish or non-Israeli SAIC students.

119.    SAIC, its administrators, and its faculty have permitted severe and pervasive harassment, abuse, and intimidation of, and discrimination against Shiran, on the basis of her race, religion, national origin, and ancestry, by other SAIC students and faculty members. As a result of SAIC, its administrators, and its faculty's deliberate indifference, Shiran has been denied the full benefits and use of SAIC's educational programs and facilities.

120.    SAIC, its administrators, and its faculty have failed to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Shiran, and

28

the hostile environment that Jewish and Israeli students, including Shiran, are forced to endure at SAIC on account of being Jewish or Israeli.

121.    The hostile environment at SAIC is sufficiently severe, persistent, and pervasive that it can be said to deprive Jewish and Israeli students, including Shiran, of equal access to the educational opportunities and benefits offered by SAIC.

122.    SAIC, its administrators, and its faculty also directly discriminated against Shiran, based on Shiran's actual or perceived race, religion, national origin, or ancestry.

123.    SAIC's actions or conduct had, and continue to have, a differential or disparate impact on Shiran, as a Jewish and Israeli student.

124.    In applying its policies, SAIC, its administrators, and its faculty failed to act or acted with leniency or delay when a known or reported incident involved antisemitism or the victim was a Jewish or Israeli student, including Shiran. As detailed above, such incidents have not and continue to not be given the same treatment as compared to incidents involving other non-Jewish or non-Israeli students. Discrimination—based on Plaintiff's race, religion, national origin, or ancestry—was a substantial or motivating factor in SAIC's actions, which were intentional.

125.    SAIC, its administrators, and its faculty's actions were the actual, direct, and proximate causes of Plaintiff's injuries.

126.    As a result of the foregoing, Plaintiff has suffered, and continues to suffer, substantial damages in an amount to be determined at trial.

127.    Plaintiff is also entitled to appropriate injunctive relief under 775 ILCS 5/7A-104(a)(1), as SAIC, its administrators, and its faculty had knowledge of, and have been and continue to be deliberately indifferent to a racially hostile environment that is severe, persistent, and pervasive.

128.    Plaintiff is entitled to attorneys' fees and costs pursuant to 775 ILCS 5/8A-104(G).

## COUNT III

**(Breach of Contract)**
**(Against SAIC)**

129.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 98, as though fully stated herein.

130.    When Shiran applied to SAIC, she reviewed the school's brochures, catalogues, and other online materials to evaluate whether she wanted to pay for and participate in the program. Through these documents and other published materials made available to Shiran, SAIC made express and implied contractual commitments concerning the campus environment, the equal opportunity for all students to learn and thrive, and protections against abuse, harassment, intimidation, and discrimination.

131.    For example, SAIC's Non-Discrimination Statement touts how "The Art Institute of Chicago, including both the school and the museum, is committed to providing an inclusive and welcoming environment for its students, visitors, faculty, and staff, and to ensuring that educational and employment decisions are based on an individual's abilities and qualifications. The Art Institute of Chicago does not tolerate unlawful discrimination based on race, color, sex, marital status, religion, national origin, disability, age, sexual orientation, gender identity, military or former military status, or any other status protected by federal, state or local law, in its programs and activities, public accommodations or employment practices." (https://www.saic.edu/non-discrimination-statement).

132.    This is aligned with the other promises boasted throughout SAIC's website regarding how inclusive, welcoming, and tolerant the school is. One of the school's strategic initiatives is to "enhance belonging" and "continue to cultivate diversity and inclusion." (saic.edu/strategic-initiatives). The school's DEI program for academic affairs claims "SAIC is committed to assembling a diverse community of faculty, students, and staff and to nurturing and creating an environment in

which different perspectives and backgrounds can be heard, valued, and utilized." (saic.edu/diversity-equity-inclusion/academic-affairs).

133.    SAIC not only promised a nurturing and inclusive environment to Shiran, but further reassured her – in the Program Guide particular to her program -  that her peers would be held to the school's rules of conduct outlined in the SAIC Student Handbook. (https://www.saic.edu/sites/default/files/2023-08/23_24_MAATC_Program_Guide_0.pdf) ("MAATC students must adhere to the SAIC Rules of Conduct, which are outlined in the SAIC Student Handbook.")

134.    The Student Handbook re-affirms  all students' and faculty's obligation to uphold the standards of non-discrimination," reflects their "shared responsibility" to uphold a community based on "respect for the rights of others…" and "affirms that the responsibility to create an environment conducive to the freedom to learn is shared by all members of the academic community."

135.    Shiran was also able to see SAIC's robust on-paper definitions of "Discrimination" and "Harassment" in its Student Handbook. SAIC defines "Discrimination" as the "unequal, adverse treatment of an individual because of their protected legal status. This means that unequal, adverse treatment is prohibited if it is because of a person's race, color, gender, religion, national origin, disability, age, actual or perceived sexual orientation, gender-related identity, marital status, parental status, military or former military status, or any other basis protected by federal, state, or local law." SAIC defines "Harassment" as "one form of discrimination and is defined as unwelcome, hostile, or inappropriate conduct directed toward an individual because of their protected legal status. The determination of what constitutes illegal harassment varies with the particular circumstances, but it must be so severe, persistent, or pervasive that it affects an employee's ability to work or a student's ability to participate in or benefit from an educational program or activity, or it creates an intimidating,

threatening, hostile or abusive educational or working environment. It must include something beyond the mere expression of opinions, views, words, symbols, or thoughts that someone finds offensive.

136. Based on these representations, robust definitions, and policies, Shiran believed she was enrolling in (and paying for) an educational environment in which she would be free from discrimination and harassment on the basis of being Israeli or Jewish.

137. SAIC also provided course descriptions for the classes Shiran was to enroll in (and pay for). These course descriptions provided Shiran with an opportunity to evaluate what topics and areas of study interested her, and to gauge whether SAIC was a good choice for her to pursue her career and spend tuition dollars.

138. The Course Description for Professor Yi's Materials and Media in Art Therapy, states:

> This course is an examination of the qualities and properties of art materials, media, and processes, and their applications in the context of art therapy. Socially constructed understandings of the significance of materials and media, as well as the relevance of contemporary art practices to art therapy, are investigated through lecture, discussion, and experiential formats.

139. Shiran, therefore, had an expectation that she was enrolling in (and paying for) this course, providing this subject matter.

140. These representations, separately and in the aggregate, constitute contractual promises by the school to provide a welcoming and inclusive learning environment free of discrimination and harassment, and constitute contractual promises to actually provide the courses as described.

141. These written promises were buttressed and re-affirmed by SAIC's Provost. Following the discriminatory admissions incident, Provost Berger made representations to Shiran to persuade her to enroll, including that Shiran "would have the same right to hold and express [her] views without fear of repercussion as anyone else in the community." He also "assure[d] [her] that

the institution will do everything in its power to ensure that all of our students have the latitude to freely express their thoughts, whether popular or not."

142.    Likewise, Professors Yi and DelSignore made specific representations to Plaintiff as detailed in paragraphs 57 above, that Shiran need not fear attending a joint communal space because they would not allow it to turn into a forum for discussing (let alone bashing) Israel.

143.    In exchange for these and other promises, Shiran paid tens of thousands of dollars in tuition to SAIC. She complied with all of her obligations under her contract with SAIC.

144.    But SAIC did not live up to its contractual promises. It has breached its promise of a discrimination- and harassment-free environment; it has utterly failed at creating an inclusive academic environment for Shiran, and its professors – chiefly Professor Yi – have acted as cheerleaders for the abuse, rather than as safeguards against it.

145.    SAIC also breached its promise to give Shiran the class she signed up for. It is unclear how analyzing cartoons of an Israeli father and son fighting, or how analyzing drawings of libelous depictions of imaginary Israeli soldiers targeting innocents has anything whatsoever to do with the course as described. Instead, what Shiran got, was a sharp detour from the course she signed up and paid for. Shiran signed up for Materials and Media in Art, not for Hamas Propaganda 101.

146.    SAIC also has breached the implied covenant of good faith and fair dealing in every contract, by unfairly applying its policies and procedures in a discriminatory way for Shiran, improperly motivated by discriminatory animus against Shiran as a Jew and Israeli.

147.    Among other things, SAIC breached the implied covenant by responding to and treating incidents of abuse, harassment, intimidation, or discrimination against Shiran in a more lenient, tolerant, indifferent, forgiving, and nonchalant manner than it treats similar incidents raised by other minority students, and by failing to apply and enforce its student handbooks, university

bulletins, regulations, codes, policies, and procedures when responding to and treating incidents of abuse, harassment, and intimidation of, or discrimination against Shiran.

148.     As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff has been damaged in amounts to be determined at trial.

## COUNT IV

**(Violation of Illinois Consumer Fraud and Deceptive
Business Practices Act, 815 ILCS 505/1, et seq.)
(Against SAIC)**

149.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 98 and paragraphs 129 through 148, as though fully stated herein.

150.     SAIC made public statements and representations regarding the opportunities and benefits of enrollment at SAIC. These statements and representations were consumer-oriented and were aimed at, and had a broad impact on, a large consumer group, namely, prospective and current students of SAIC. These statements include those reflected, embodied, and set forth in SAIC's policies, procedures, student and faculty handbooks, and publicly available other materials.

151.     SAIC has not acted in accordance with, and has not followed through on, its statements against discrimination, abuse, and harassment, or its representations regarding the content, structure, and form of its educational offerings, and has instead engaged in false acts or practices that are deceptive or misleading in a material way, that were aimed at the consumer public (namely, prospective and current students), and that were likely to mislead a reasonable prospective or current student acting reasonably under the circumstances.

152.     SAIC falsely led Plaintiff to believe that SAIC would apply, enforce, and follow the rules and policies, and the commitments contained, reflected, embodied and set forth in SAIC's policies, rules, student and faculty handbooks, course descriptions, and other materials.

153.    SAIC falsely led Plaintiff to believe that if she paid tuition and fees to SAIC, and upheld any academic and conduct commitments placed upon her, then SAIC would uphold, adhere to, abide by, and comply with its stated rules and policies, and the commitments contained in its handbooks and publicity materials, to foster, ensure, maintain, and create an environment free of discrimination, abuse, harassment, and intimidation, and provide an adequate and appropriate setting and environment in which all students, of whatever race, ethnicity, and ancestry, could freely express their identity and ancestry, could learn and grow, and could participate fully and meaningfully in SAIC's educational and other programs.

154.    Shiran saw, heard, and was aware of SAIC's false and misleading statements and representations before and after she enrolled at SAIC.

155.    SAIC's false and misleading statements and practices caused Shiran injury by causing her to enroll at SAIC, to pay tuition and fees to SAIC, and to continue to maintain enrollment at SAIC and continue to pay tuition and fees to SAIC in order to complete her degree, based on the reasonable understanding that SAIC would apply, enforce, and follow through on its codes and policies, and the commitments contained therein, concerning protecting students from harassment, abuse, intimidation, and discrimination based on their race, ethnicity, and ancestry, would otherwise seek to protect students from such hateful and bigoted conduct, and would take actions and implement measures to adequately, appropriately, and sufficiently address such misconduct to foster, ensure, and maintain a safe educational and campus environment. SAIC did not take such actions.

156.    SAIC's failure, refusal, lack of ability and intention, and lack of commitment to combating, addressing, and ameliorating these deplorable actions, and to making good on and complying with its aforementioned statements, constitute deceptive practices or false advertising, and have caused Plaintiff to sustain actual damages, including the loss of the value of the tuition and fees

she has paid SAIC, emotional distress, loss of educational and extracurricular opportunities, economic injuries, and other direct and consequential damages.

157. Accordingly, Plaintiff is entitled to statutory and actual damages in amounts to be determined at trial and to punitive damages pursuant to 815 ILCS 505/10a.

158. Plaintiff is entitled to attorneys' fees and costs pursuant to 815 ILCS 505/10a(c).

## COUNT V

### (Intentional Infliction of Emotional Distress)
### (Against all Defendants)

159. Plaintiff repeats and realleges the allegations of paragraphs 1 through 98, as though fully stated herein.

160. SAIC and Professor Yi's intentional conduct in discriminating against Shiran was extreme and outrageous.

161. Their extreme and outrageous conduct, as outlined above, includes intentionally subjecting Shiran to a knowingly hostile environment; facilitating discrimination and harassment against Shiran by her peers, intentionally targeting Shiran by modifying course assignments for the purpose of harassing Shiran, and by allowing hateful anti-Israeli and antisemitic rhetoric to flourish all around Shiran at every turn of her academic experience.

162. Their extreme and outrageous conduct is exacerbated by the fact that they know that Shiran has been in a state of grief, shock, and mourning since atrocities of October 7th, one of the worst attacks against Jews and Israelis in history.

163. SAIC and Professor Yi intended their extreme and outrageous conduct inflict severe emotional distress, or they knew that that there was at least a high probability that their conduct would cause severe emotional distress.

164. SAIC and Professor Yi's extreme and outrageous conduct caused Plaintiff severe

emotional distress.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgement in her favor and against

Defendants as follows:

    a.    Injunctive relief preventing the School of the Art Institute of Chicago and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Jewish or Israeli students, including Plaintiff, in any way, and ordering SAIC to take all necessary and appropriate remedial and preventative measures to secure the rights covered by Title VI, including by, among other things, (i) terminating deans, administrators, professors, and other employees responsible for the antisemitic and discriminatory abuse permeating the school, whether because they engaged in it or permitted it, and (ii) suspending or expelling students who engage in discriminatory or antisemitic conduct;

    b.    An award of money damages in an amount to be determined at trial;

    c.    An award of punitive damages in an amount sufficient to deter such future conduct;

    d.    An award of attorneys' fees, costs and expenses, including under 42 U.S.C. § 1988;

    e.    Pre-judgment interest and post-judgment interest at the maximum rate allowable by law; and

    f.    Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

**SHIRAN CANEL**

By:    */s/ Steven P. Blonder*
         One of her attorneys

Steven P. Blonder (6215773)
Joanne A. Sarasin (6191817)
Laura A. Elkayam (6303237)
**MUCH SHELIST, P.C.**
191 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
(312) 521-2402
sblonder@muchlaw.com
jsarasin@muchlaw.com
lelkayam@muchlaw.com

Avraham E. Aizenman
Steelman Advocate
3840 Via De La Valle
Del Mar, CA 92014
(424) 242-4603
eli@steelmanadvocate.com
(to be admitted pro hac vice)

14187538