UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHIRAN CANEL, | |
| Plaintiff, | |
| v. | No. 23 CV 17064 |
| ART INSTITUTE OF CHICAGO, | Judge Georgia N. Alexakis |
| Defendant. | |

MEMORANDUM OPINION AND ORDER

Plaintiff Shiran Canel sues defendant the Art Institute of Chicago, alleging that, as a student at the School of the Art Institute of Chicago ("SAIC"), she endured a campaign of antisemitic and anti-Israeli abuse by SAIC's faculty, administration, and students, in violation of Title VI of the Civil Rights Act of 1964. [1]; 42 U.S.C. § 2000d *et seq*. She also raises several state-law claims. SAIC moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). [41]. For the reasons set forth below, the Court grants SAIC's motion as to the Title VI claim and declines to exercise supplemental jurisdiction over the state-law claims.

## I.   Legal Standard

SAIC's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint. *Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 458 (7th Cir. 2007). To survive a motion to dismiss under Rule 12(b)(6), plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court must

accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor (as it does throughout this opinion), but the Court need not accept legal conclusions, or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009).

## II.    Factual Background

The Court recounts plaintiff's allegations in chronological order.

### A.    Plaintiff's Admission to SAIC

Plaintiff's allegations begin with her attempt to gain admission to SAIC's Master of Arts in Art Therapy and Counseling program.[1] When plaintiff, who is both Jewish and Israeli, applied to SAIC in 2023, she was interviewed by a single faculty

---

[1] Plaintiff includes allegations that SAIC's faculty and students engaged in offensive conduct predating her 2023 application to, and enrollment in, SAIC. *See* [1] ¶¶ 18–29. As explained in greater depth below, to allege that she was exposed to a hostile educational environment in violation of Title VI, plaintiff must allege that *she* was subject to severe and pervasive harassment that denied her equal access to educational benefits. *Doe v. Galster,* 768 F.3d 611, 617 (7th Cir. 2014). Because these alleged incidents occurred before plaintiff's matriculation, and because plaintiff does not allege that these activities directly involved or affected her—let alone caused her to be denied access to educational resources and opportunities—the Court will not consider them in its analysis. *See also Katchur v. Thomas Jefferson Univ.*, 354 F. Supp. 3d 655, 664 (E.D. Pa. 2019) ("As Plaintiff was not a Jefferson student at the time of the alleged harassment, she could not have been exposed to a hostile educational environment at Jefferson.").

Plaintiff cites *Kane v. Loyola University of Chicago* to support her argument that these incidents are relevant to her claims. No. 22 CV 6476, 2024 WL 1157396, at *9 (N.D. Ill. Mar. 18, 2024); [51] at 10. But in *Kane*, the court considered whether the plaintiff had sufficiently alleged that the defendant university had a *policy* of deliberate indifference to reports of sexual misconduct. *Id.* This policy-focused question required the court to analyze evidence tending to show a general pattern of repeated behavior. *Id.* Here, the question is not whether SAIC had a policy of deliberate indifference to reports of antisemitism and anti-Israeli conduct. Rather, the question is whether SAIC acted with deliberate indifference to incidents of harassment directed against plaintiff. *E.g.*, [1] ¶¶ 102, 104–07, 108 –09. Allegations relayed by third parties—some years before plaintiff's first interactions with SAIC—are not relevant to this analysis.

interviewer, rather than the mandated panel of interviewers. [1] ¶¶ 1, 3, 31. This interviewer questioned plaintiff's ability to work alongside Arab and Palestinian classmates and to handle the rigors of the program following the upcoming birth of her second child. *Id.* ¶ 31. Following the interview, plaintiff was denied admission to SAIC. *Id.* ¶ 33. She appealed the denial. *Id.* ¶ 34.

In response, SAIC engaged counsel to investigate plaintiff's admissions process and "the Art Therapy Department's graduate admissions process more broadly." *Id.* ¶ 35. Following this review, SAIC granted plaintiff admission and admitted that the initial denial "did not follow SAIC policy or expectations." *Id.* ¶ 36. It did not share further results of this investigation with plaintiff. *Id.* SAIC's provost reached out to plaintiff with a "sincere apology" for the handling of her admissions process. *Id.* ¶ 37. Plaintiff expressed concern about "discriminatory ideologies" in the program. *Id.* The provost assured her that SAIC "will do everything in its power to ensure that all of [its] students have the latitude to freely express their thoughts, whether popular or not." *Id.*

## B. Plaintiff's October 9 and October 17, 2023 Emails

In August 2023, following her admission, plaintiff enrolled in SAIC's Master of Arts in Art Therapy and Counseling program. *Id.* ¶ 11. On October 7, 2023, Hamas committed terrorist attacks in Israel. *Id.* ¶ 39.

In the days after the attacks, SAIC professor Mika Tosca posted as follows on her personal social media page:

> Israelis are pigs. Savages. Very very bad people. Irredeemable
> excrement. The propaganda has been downright evil. After the past

> week, if your eyes aren't open to the crimes against humanity that Israel
> is committing and has committed for decades, and will continue to
> commit, then I suggest you open them. It's disgusting and grotesque.
> May they all rot in hell.

*Id.* ¶ 41. Around the same time, students posted banners in SAIC's hallways accusing
Israel of "committing genocide in Gaza" and created flyers on SAIC letterhead
"parroting pro-Hamas propaganda" and promoting "anti-Israel" protests, lectures,
and other activities. *Id.* ¶ 42.

On October 9, 2023, plaintiff wrote to her department chair about the ways she
had been personally affected by the October 7 attack. *Id.* ¶ 45. "When she followed up
to ask about her safety given the apparent widespread support for Hamas and the
tacit approval of the atrocities it committed against her friends and family," the
department chair did not respond. *Id.*

On October 17, 2023, plaintiff wrote to SAIC's provost, dean (and then acting
provost), her department chair, and her program director and advisor "to ask if she
was safe coming to school." *Id.* ¶ 46. She shared a copy of Professor Tosca's personal
social media post and wrote: "Violent words often lead to actual violence." *Id.* "[T]he
school" never responded and, as far as plaintiff knew, SAIC "took no action to address
the concern regarding her safety on campus." *Id.* ¶ 47.

Around this time, "a substantial portion" of SAIC's faculty penned an open
letter "justifying the atrocities and lying about what Israel is, and who Israelis and
Jews are." *Id.* ¶ 16. The letter described the signatories' "uncompromising solidarity
with the Palestinian people in their righteous struggle for self-determination," and
used words like "settler colonialist" and "decolonial resistance." *Id.*

### C. November 14, 2023 Letters

On November 14, 2023, a group of 37 SAIC students and 24 alumni signed and circulated a letter titled "FREE PALESTINE: Letter Regarding Palestine to the Art Therapy Department from [Masters of Art in Art Therapy and Counseling] Students." *Id.* ¶ 48. The letter complained of SAIC's failure to acknowledge the "ongoing genocide of the Palestinian people" and requested that SAIC take specific actions. *Id.* ¶¶ 49–50. The letter also "condemn[ed]" SAIC as "implicated in the 'genocide'" because it "accept[ed] donations from a Jewish family" that, the letter's authors maintained, had an "ownership stake in a large, weapons-contracting company." *Id.* ¶ 49. "SAIC" met with the letter's signatories and adopted several of their requests, including dedicating classroom time to discuss "the genocide of Palestinians." *Id.* ¶ 52. "At the same time," SAIC "made no statement addressing" what plaintiff describes as "the antisemitism in the letter, its callous disregard of Israeli victims of Hamas' attack, or the need for tolerance of perspectives from the Israeli side." *Id.*

The same day the "Free Palestine" letter was circulated, plaintiff authored and circulated a response letter to students and faculty. *Id.* ¶ 51. In her letter, plaintiff "rebutted the claims that Israel was a settler colonial state, that Israel was committing a genocide, and that antisemitism was meaningfully distinguishable from anti-Zionism." *Id.*

### D. November 17, 2023 Joint Class

The day after the two letters circulated on campus, two SAIC professors—Sandie Yi and Deborah Ann DelSignore—announced that they would combine classes

later that week, on November 17, 2023, to "create a communal space for all of us to hold each other accountable through art, writing, and witness reading." *Id.* ¶ 53. Plaintiff emailed her class that she would not attend because "a large majority of her classmates signed the Anti-Israel Letter [the November 14, 2023 "Free Palestine" letter], and few if any classmates were willing to stand with [plaintiff] in opposition to the majority's views." *Id.* ¶ 54. Professor Yi replied to plaintiff, clarifying that she and Professor DelSignore did not plan to "divert[] classes to talk about the conflicts in the Middle East," but rather intended to focus class on art therapy assessment and art materials. *Id.* ¶ 56. On a later call with plaintiff, both professors "assured [plaintiff] they would do their best to not allow class time to devolve in the manner [plaintiff] feared it would" and that if any student broached political topics, the professors would re-direct the conversation. *Id.* ¶ 57.

Plaintiff again emailed her class, this time indicating that she would join the combined class after all, premised on the professors' assurances that the class "would focus on art making, not the situation in the middle east" and "that faculty would provide clear instructions regarding appropriate behavior." *Id.* ¶ 58.

During the joint session, one student "launched into a diatribe describing her hate and anger towards those who reject her narrative of an ongoing genocide in Gaza." *Id.* ¶ 59. The professors did not intervene. *Id.* After class, Professor DelSignore told plaintiff that she needed to "learn to hold space for other's feelings." *Id.*

In later classes, "Professor[] Yi continued to facilitate additional, one-sided student-led conversations expressing vitriol towards Israelis"; and plaintiff's

6

professors "repeatedly demonstrated sympathy towards her classmates' hostile and antisemitic musings" while "continu[ing] to demand that [plaintiff] learn to hold space for her peers' feelings and to tolerate upsetting or triggering subject matter in a professional manner." *Id.* ¶ 60.

### E. Plaintiff's Joint Presentation

In a class with Professor Yi, plaintiff was assigned a project partner for a joint presentation. *Id.* ¶ 61. Plaintiff's project partner had signed the "Free Palestine" letter that circulated on November 14, 2023. *Id.* Two days later, on November 16, the project partner told plaintiff that she was "simply unable to work closely with any individual who denies the genocide so clearly taking place before us." *Id.* ¶¶ 61–62.

Professor Yi "facilitated [the] discriminatory refusal to work with plaintiff" by allowing plaintiff and her project partner to split their presentation in half and present individually, rather than jointly. *Id.* ¶ 64. For plaintiff's portion of the presentation, she received a failing mark for "Professionalism: Collegial + Interpersonal skills." *Id.* ¶ 67. She also received failing marks on her final peer evaluation. *Id.* In that evaluation, some of plaintiff's peers accused her of plagiarizing her presentation, while others noted that their reviews were influenced by "outside factors." *Id.* Professor Yi noted that plaintiff "mostly interacted with non-[Black, Indigenous, and people of color]-presenting students during skillshare" and that there was "some discomfort during [plaintiff's] presentation." *Id.*

As a whole, plaintiff's complaint describes a lonely educational experience. Plaintiff alleges that her classmates "blatantly ignore her when she speaks to them,

refuse to share their art supplies when asked, submit negative and discriminatory peer feedback on her classwork, or simply avoid her altogether." *Id.* ¶ 68. She alleges that her professors were "fully aware" of this behavior yet failed to address it. *Id.*

### F. Initiation of Investigation

By November 17, 2023, plaintiff asserts that she had submitted "several complaints to SAIC's faculty and administration regarding the increasing harassment and hostility." *Id.* ¶ 69. Plaintiff offers no details as to the date, content, or recipients of these complaints. On November 17, 2023, the director of SAIC's Title IX office reached out to plaintiff to notify her that SAIC "had engaged outside counsel to review [her] allegations of discrimination and harassment." *Id.*

Two weeks later, on approximately December 1, 2023, plaintiff met with two of the attorneys and provided a "detailed account" of her experiences. *Id.* ¶ 70. On December 4, 2023, the attorneys explained that, because plaintiff's allegations implicated both faculty and students, they would be following SAIC's policies found in the Faculty Handbook, which provided for either a formal or informal resolution process. *Id.* The attorneys allowed plaintiff to elect which process she preferred. *Id.* Late the next evening, plaintiff told the attorneys that she wished to initiate the formal process "to investigate her claims of discrimination by SAIC's faculty, including Professor Yi." *Id.* ¶ 71.

Though the investigation remained open when plaintiff filed her complaint on December 22, 2023, *id.* ¶ 86, at a December 2024 hearing in this matter, the parties

informed the Court that the investigation had since concluded, *see* [103] at 23.[2]

### G.     Changes to Final Assignment by Professor Yi

On December 7, 2023, Professor Yi announced an alteration to the class's final paper. [1] ¶ 72. The first part of the final assignment now asked the class to reflect on the following question: "What did you learn about sitting through and making spaces for difficult conversations/feelings this semester?" *Id.* ¶ 74. The second part contained a lengthy preface in which the professor acknowledged that "[e]very decision we make as art therapists is political" and "[therapists] must stay impartial." *Id.* ¶ 75. The prompt asked students to "demonstrate [their] ability to examine [their] own readiness for doing the hard work as an art therapist." *Id.* It then instructed the students to review two groups of children's drawings. *Id.* One group of drawings, which contained "depictions of genital, physical, verbal or sexual abuse, violence and trauma" inflicted on children, included a depiction of "an Israeli father and son speaking in Hebrew, where the dad states: 'You are a bad boy.'" *Id.* ¶¶ 77–78. The second group of drawings depicted Israeli soldiers perpetrating violence. *Id.* ¶ 79.

Plaintiff understood Professor Yi's assignment to be part of an effort "to further harass and isolate" plaintiff, days after she had requested a formal investigation into, among other things, Professor Yi's conduct. *Id.* ¶ 80. Plaintiff complained to "SAIC"

---

[2] The Court understands that since plaintiff filed her complaint much has transpired regarding her educational experience at SAIC. *See generally* [29], [39], [103] (transcripts of proceedings in the district court concerning this and previous motions, during which the parties referenced more recent factual developments). The analysis in this opinion, however, is limited to the facts alleged in the operative complaint. The Court raised the possibility with plaintiff of filing an amended complaint that more accurately reflected the current state of affairs, but plaintiff opted to stand on the original complaint. [103] at 28–31.

about the final assignment. *Id.* ¶ 82. She does not specify the recipient of her complaint. *Id.* "SAIC" directed plaintiff to request accommodations from Professor Yi. *Id.* Plaintiff refused, and informed SAIC's attorneys that she would seek emergency legal relief if the assignment was not retracted. *Id.* On December 13, 2023, "SAIC" directed Professor Yi to withdraw the second part of the final assignment but, according to plaintiff, "took no meaningful steps to curb Professor Yi's outrageous behavior on a going-forward basis." *Id.*

On December 18, 2023, Professor Yi wrote to the class, thanking the students "who raised questions and shared disappointments" regarding the withdrawn portion of the assignment. *Id.* ¶ 84. Professor Yi requested that students send her and the department chair feedback concerning the assignment. *Id.* Additionally, sometime "since December 13, [2023]," Professor Yi changed her course's grading standards to increase the weight given to peer evaluation, class participation, and collegiality. *Id.* ¶ 85. These changes "harmed [plaintiff's] grades and ability to pass the course." *Id.*

## H.    This Litigation

Plaintiff filed her complaint on December 22, 2023. [1]. Shortly after filing her complaint, plaintiff moved for a preliminary injunction and expedited discovery. [9], [10]. The court earlier assigned to this matter denied plaintiff's motion for expedited discovery, [35], and following discussions with SAIC, plaintiff withdrew her motion for a preliminary injunction [44].

Plaintiff's complaint named SAIC and Professor Yi as defendants. *Id.* The earlier district court granted a motion to dismiss that Professor Yi had filed,

dismissing the claims against her in their entirety. [71]. SAIC now moves to dismiss the remainder of the complaint. [41]. The parties fully briefed the motion to dismiss, [51], [57] and appeared before the Court for argument on the matter, [101]–[103].

## III. Analysis

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Although on its face Title VI does not address discrimination on the basis of religion, courts recognize that "antisemitism can amount to racial discrimination, and thus form the basis for a Title VI claim." *See Nahavandi v. Bd. of Tr. of California State Univ.*, No. 2:24-CV-03791-RGK-MRW, 2024 WL 4403886, at *3 (C.D. Cal. Sept. 5, 2024) (citing *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987)); *see also T.E. v. Pine Bush Central School Dist.*, 58 F. Supp. 3d 332, 354 (S.D.N.Y. 2014) (holding that "regardless of whether they assert their claims on 'national origin' or 'race,' Plaintiffs are within their rights to assert a claim under Title VI based on anti-Semitic discrimination").

Plaintiff alleges that she experienced discrimination under Title VI because she is Jewish and because she is Israeli. *E.g.*, [1] ¶ 101. The Court will construe plaintiff's Title VI claim as having two components: a hostile educational environment claim and a direct discrimination claim. The Court analyzes each in turn.

A.    **Hostile Environment**

To establish a hostile educational environment claim under Title VI, a plaintiff must show that: (1) the student participated in a federally funded program; (2) the alleged hostile environment was so severe, pervasive, and objectively offensive that it deprived the student of access to educational benefits; (3) the school had actual knowledge of the conduct; and (4) the school was deliberately indifferent toward the conduct. *Galster*, 768 F.3d at 617.

The parties do not dispute the first requirement. With respect to each incident alleged in her complaint, the Court next considers whether plaintiff's allegations, taken as true with all reasonable inferences drawn in her favor, satisfy the remaining three requirements.

1.    **Plaintiff's Admission to SAIC**

Plaintiff's first allegation concerns her admissions interview with, and subsequent rejection from, SAIC. [1] ¶ 33; [51] 7–8. As recounted earlier, when plaintiff was interviewed for admission to SAIC, she was only interviewed by one faculty member, rather than the mandated panel, [1] ¶ 31; the interviewer inquired about her ability to work with Palestinian classmates and complete coursework following the birth of her second child, *id.*; and plaintiff was denied admission, *id.* ¶ 33. Following plaintiff's appeal of the denial, SAIC engaged outside counsel; investigated plaintiff's admissions process and the art therapy and counseling program's admissions process more broadly; reversed plaintiff's denial and admitted her; acknowledged that her interview process did not follow SAIC's policies or

expectations; and offered plaintiff a "sincere apology." *Id.* ¶¶ 34–37.

For purposes of this motion to dismiss, the Court will assume that plaintiff's admissions interview and initial denial constituted harassment that was "so severe, pervasive, and objectively offensive" that it deprived her of access to educational opportunities. The Court likewise assumes, for purposes of establishing "actual knowledge," that an SAIC official with authority to institute corrective measures on SAIC's behalf knew of the admissions interview and initial denial. *See Doe v. St. Francis Sch. Dist.,* 694 F.3d 869, 871 (7th Cir. 2012); *Doe A v. Plainfield Cmty. Consol. Sch. Dist. 202*, No. 21 C 4460, 2022 WL 1641684, at *5 (N.D. Ill. May 24, 2022) ("Plaintiffs must adequately allege that a school official with authority to take corrective measures on behalf of … Defendants had actual notice of and was deliberately indifferent to [the misconduct].").

Still, plaintiff must allege that SAIC's response to this misconduct was "deliberately indifferent." *Id.* An institution is not deliberately indifferent under Title VI if it responds quickly and reasonably, in light of the circumstances it actually knows about, to any incidents of "severe, pervasive, and objectively offensive" conduct. *See Jauquet v. Green Bay Area Cath. Educ., Inc.,* 996 F.3d 802, 809 (7th Cir. 2021).[3] This standard "requires that the school's response not be *clearly* unreasonable, which is a higher standard than reasonableness." *Moore v. Freeport Cmty. Unit Sch. Dist. No. 145*, 570 F. Supp. 3d 601, 607 (N.D. Ill. 2021) (emphasis

---

[3] *Jauquet* involves a claim brought under Title IX, not Title VI, but as the Seventh Circuit has recognized, the two statutes "are so similar that a decision interpreting one generally applies to the other." *See Galster*, 768 F.3d at 617.

added). A school's response will "suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *C.S. v. Madison Metro. Sch. Dist.,* 34 F.4th 536, 543 (7th Cir. 2022).

A response need not be perfect or even successful to clear this bar. *Id.* A "negligent response," for example, "is not unreasonable, and therefore will not subject a school to [Title VI] liability." *Moore,* 570 F. Supp 3d at 607. Nor do victims have license to demand specific remedial actions from the school. *Id.* Depending on the circumstances, even a decision not to impose any remedial measures at all is not necessarily clearly unreasonable or deliberately indifferent. *Id.*; *see also Jaquet,* 996 F.3d at 809. In short, the question is not whether the school's response satisfied the plaintiff; rather, the question is whether the school responded in a way that was clearly unreasonable. The Court may make this determination as a matter of law at the motion to dismiss stage. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649 (1999) ("[T]here is no reason why courts, on a motion to dismiss … could not identify a response as not 'clearly unreasonable' as a matter of law."); *see also Moore*, 570 F. Supp. 3d at 609.

According to the complaint, once SAIC was made aware of the discriminatory conduct through plaintiff's appeal, it initiated an investigation with outside counsel; reversed its decision; conceded that the discriminatory conduct "did not follow SAIC policy or expectations"; and acted swiftly enough that plaintiff was able to start her semester on time. [1] ¶¶ 11, 35–36. In other words, SAIC acted promptly, committed

14

resources to investigating plaintiff's claim, admitted fault, and redressed plaintiff's injury. These actions are not "clearly unreasonable" and certainly do not constitute an "'official decision' to permit discrimination." *Madison Metro. Sch. Dist.,* 34 F.4th at 543. SAIC's response was not deliberately indifferent.

Plaintiff complains that she was "never made privy to any of the specifics of the investigation, or the extent to which it was thorough." [51] at 7 n.2; [1] ¶ 36. But Title VI does not give plaintiff license to demand specific remedial actions and does not guarantee her access to the ins and outs of investigations. *Jaquet*, 996 F.3d at 809. Plaintiff also argues that SAIC's remedial actions in response to her admissions interview do "not in any way show that [SAIC] was *not* deliberately indifferent to the hostile environment [plaintiff] endured once she became a student." [51] at 7–8. But this criticism does not help the Court understand why plaintiff believes SAIC's response to *her admissions interview* demonstrated deliberate indifference. If anything, plaintiff seems to concede that her real bones of contention lie with the incidents that took place following her enrollment at SAIC. The Court turns to those incidents next.

### 2. Plaintiff's October 9 and October 17, 2023 Emails

Plaintiff's next pertinent allegation concerns the two emails she sent SAIC administrators and faculty in October 2023, shortly after the Hamas terrorist attacks in Israel and events at SAIC that motivated her emails.

As described in greater length above, following the attack, Professor Tosca posted a message on her personal social media page describing Israelis as, among

other things, "irredeemable excrement" and adding "[m]ay they all rot in hell." [1] ¶ 41. Students posted banners and flyers on campus that, among other things, accused Israel of "committing genocide in Gaza." *Id.* ¶ 42. (Plaintiff does not specify when precisely Professor Tosca posted her message and when precisely students posted these banners and flyers, but the Court will reasonably infer, based on the timeline laid out in the complaint, that these acts preceded the first of plaintiff's two emails.) On October 9, plaintiff emailed her department chair to ask about her safety "given the apparent widespread support for Hamas," and the chair did not respond. *Id.* ¶ 45. Next, on October 17, plaintiff emailed SAIC's provost, dean (and then acting provost), her department chair, and her program director, asking if she was safe coming to school in light of Professor Tosca's social media post. *Id.* ¶ 46. In this second instance, plaintiff alleges "[t]he school" never responded, which the Court understands to mean that none of the email's direct recipients responded to plaintiff. *Id.*

Based on the language of the complaint, it is difficult for the Court to pin down the precise crux of plaintiff's allegations surrounding her October 2023 emails and the events that prompted the emails. One possibility is that plaintiff believes Professor Tosca's social media post and the student banners and flyers constituted "severe, pervasive, and objectively offensive" harassment that deprived her of access to educational benefits and that SAIC's response, or lack thereof, to those acts constituted "deliberate indifference." That seems to be the thrust of the conclusory allegations at Paragraphs 103 through 107 of the complaint and in portions of plaintiff's response to SAIC's motion to dismiss. *See, e.g.*, [51] at 4. Another possibility

16

is that plaintiff believes that "severe, pervasive, and objectively offensive" harassment at SAIC—as exemplified by Professor Tosca's offensive statements and the "apparent widespread support for Hamas" on campus, [1] ¶ 45—prompted her to request specific security measures that SAIC then unreasonably ignored or denied, thereby demonstrating its deliberate indifference. A different portion of plaintiff's response advances an argument that appears to match this second possibility. *See* [51] at 4–6 (plaintiff describes her emails as "repeated requests to the administration and faculty to share what, if anything, would be done to ensure her safety on campus after explosive, vitriolic, and discriminatory hostility unfolded post-October 7th" and SAIC's failure to respond to her email as representation of the school's "overall" deliberate indifference to plaintiff's "reports of discriminatory harassment").

Under either theory, however, plaintiff fails to state a hostile educational environment claim in connection with the events surrounding her October 9 and 17 emails. The Court will assume, without deciding, that by alleging that she emailed individuals such as SAIC's provost, dean (and then acting provost), her department chair, and her program director, SAIC had the requisite actual knowledge of the conduct at issue: plaintiff's emails as well as the social media post, the banners, and flyers that prompted them.[4] Still, for SAIC to have been deliberately indifferent—by not taking actions to dispel the campus's "widespread support for Hamas," by failing

---

[4] The Court understands that SAIC disputes this premise—at least to some degree. *See* [103] at 6–9 (acknowledging that the provost and the dean, as acting provost at the time of the relevant events, would be individuals with authority to institute corrective measures and thus individuals via whom actual knowledge could be imputed to SAIC, but disputing that conclusion with respect to the department chair and the program director).

to respond to plaintiff's emails, or by failing to provide her with security measures—plaintiff must first allege that something actionable occurred to which an SAIC official demonstrated deliberate indifference. Put more precisely, as a predicate matter, plaintiff must allege that an SAIC official was aware of "severe, pervasive, and objectively offensive" harassment that deprived her of access to educational opportunities. Yet plaintiff has not done so.

With respect to Professor Tosca's act, plaintiff does not allege how that undoubtedly offensive social media post so eroded her experience at SAIC that she was denied equal access to its resources or opportunities. To prevail on her Title VI claim, plaintiff is required to make this allegation. *See Jauquet*, 996 F.3d at 810 (dismissing complaint that did "not specify what program or benefit Student A was not able to access because of the … differences in the school's expectations for [male vs. female] students"). Here, the post was not directed toward plaintiff. It was not communicated through official school channels. Plaintiff does not specify when or how or how often she encountered the post, or what (if any) action SAIC took once it became aware of the post. She does not allege that she was enrolled in any of Professor Tosca's classes. Perhaps most significantly, plaintiff never contends that Professor Tosca's post had any kind of "concrete, negative effect" on her education, like a measurable drop in her grades or an increase in her absenteeism. *See Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163,* 315 F.3d 817, 823 (7th Cir. 2003). Thus, even assuming that someone in a position of authority at SAIC ignored Professor Tosca's social media post or plaintiff's email concerning the post, plaintiff

18

still has failed to allege a Title VI claim in connection to it.[5]

With respect to the student banners and flyers, plaintiff's allegations suffer from the same defect: She fails to allege how these acts denied her access to SAIC's resources or opportunities. Again, she offers sparse details on the banners and flyers. The complaint says little about where and when they were posted and says nothing about how often plaintiff encountered them. [1] ¶ 42. And again, plaintiff does not allege a drop in grades, an increase in absenteeism, or some other "concrete, negative effect" on her education as a result of their display and distribution. *Gabrielle M.*, 315 F.3d at 823.

Plaintiff's allegations regarding the student banners and flyers suffer from another flaw, too. As described by plaintiff, the banners and flyers reflect political points of view critical of the Israeli government. *See* [1] ¶ 42 (plaintiff describes the banners' content as "accusing Israel of committing genocide in Gaza" and the flyers as "parroting pro-Hamas propaganda and notifying the student body about anti-Israel protests, lectures, and other activities"). From these allegations, though, the Court cannot also conclude that the banners and flyers represent discriminatory harassment of plaintiff on the ground of her Jewish or Israeli identities.

The Court is not alone in distinguishing between permissible political expression and unlawful discrimination in the aftermath of the October 7 Hamas

---

[5] Although the following information is not included in the complaint (and therefore is not part of the Court's analysis), the Court notes that at the December 2024 hearing on SAIC's motion to dismiss, counsel for SAIC stated that after SAIC learned about Professor Tosca's social media post, "it immediately issued a public statement condemning those hateful views" and that Professor Tosca has since "separated from the university." [103] at 23–24.

19

terrorist attacks, the Israeli government's response to the attacks, and protests that erupted on campuses nationwide as a result of these events. In *Landau v. Corporation of Haverford College*, a district court in the Eastern District of Pennsylvania considered whether a complaint plausibly alleged a hostile environment violation under Title VI where, according to plaintiffs in that action, Haverford College failed to act, or at times chose not to act, "in the face of widespread antisemitism on campus" following Hamas' October 2023 attack. No. CV 24-2044, 2025 WL 35469, at *1–3 (E.D. Pa. Jan. 6, 2025). In granting the college's motion to dismiss, the court in *Landau* explained that "[d]eciphering when criticism of Israel or promotion of the Palestinian cause veers into antisemitism is necessarily a fact specific endeavor." *Id.* at *4. And it rebuffed plaintiffs' efforts to "implicitly sweep any and all criticism of Israel into the basket of antisemitism." *Id.* at *2. It explained: "I reject Plaintiffs' embedded proposition that any anti-Israel speech is intrinsically antisemitic, because reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views." *Id.*

The Court reaches the same conclusion based on the allegations before it. At a hearing on defendant's motion, the Court specifically asked plaintiff whether the complaint sufficiently alleged "in a nonconclusory fashion" that plaintiff experienced discrimination at SAIC "based on her race or national origin as opposed to discrimination based on her political point of view." [103] at 45. Counsel responded in the affirmative, but his answer did not actually point the Court to any factual allegations from which it can reasonably infer that the banners and flyers that

20

preceded plaintiff's October 9 and 17 emails (and the attendant non-response from SAIC) were expressions of antisemitism rather than expressions of political viewpoints. Plaintiff effectively asked the Court to conflate the two. *See, e.g.*, *id.* at 48 (arguing that a school's lack of concern for the safety of "students who support the State of Israel … would be direct discrimination" for purposes of Title VI).

The Court will not draw that equation given the allegations before it. For helpful guidance, the Court turns to other cases where hostile environment claims survived a Rule 12(b)(6) challenge because plaintiffs plausibly alleged that on-campus conduct was intended to target Israeli or Jewish students rather than simply communicate a political message. For instance, a district court in the Southern District of New York recently distinguished between conduct that merely criticizes Israeli government policy or Zionist ideology and conduct that "sends a message that Jews as a class do not belong in Israel while justifying and encouraging violence against those Jews who do live there." *See Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, No. 24 CIV. 2669 (JPC), 2025 WL 401109, at \*13 (S.D.N.Y. Feb. 5, 2025). In *Gartenberg*, the court found that allegations concerning protests, fliers, and other expressions related to the Israeli-Palestinian conflict, which touched on topics like Zionism, colonialism, and racism, could not alone survive a motion to dismiss under Rule 12(b)(6). *Id.* at \*14–15. But conduct that allegedly targeted Jewish students—such as demonstrators chanting the phrase "[f]rom the river to the sea, Palestine will be free" at Jewish students who were wearing visibly Jewish attire; and vandals graffiti-ing the phrase on bathroom walls in a script resembling the font

associated with Hitler's *Mein Kampf* and tearing down posters that Jewish students hung to commemorate hostages taken by Hamas—could constitute a hostile environment claim under Title VI. *Id* at *13–14, 16–17.

As another example, the district court in *Kestenbaum v. President and Fellows of Harvard College* found that plaintiff there plausibly pled that he was subject to severe, pervasive, and objectively offensive harassment when he described on-campus protests that were, at times, confrontational and physically violent towards Jewish students. No. CV 24-10092-RGS, 2024 WL 3658793, at *5 (D. Mass. Aug. 6, 2024). In *Kestenbaum*, plaintiff described incidents where protesters blockaded Jewish students in a study room and surrounded and intimidated Jewish students. *Id.* at *2.

Plaintiff's pleadings suffer by comparison to the allegations in *Gartenberg* and *Kestenbaum*. In a single paragraph in her complaint, she describes banners and flyers that "parrot[ed] pro-Hamas propaganda" and "notif[ied] the student body about anti-Israel activities." [1] ¶42. From even that barebones description, the Court comfortably concludes that these banners and flyers reflect criticism of Israeli government policy. But even after drawing reasonable inferences in plaintiff's favor, the Court cannot take that assessment one step further and conclude the flyers and banners created a hostile educational environment for plaintiff owing to her status as a Jewish person and as an Israeli. The content of the banners and flyers, as alleged, simply do not convey the degree of animosity and enmity described in *Gartenberg* and *Kestenbaum*. *Compare with Gartenberg*, No. 24 CIV. 2669 (JPC), 2025 WL 401109, at *16 (an episode of "severe or pervasive" harassment had been plead where the

22

complaint alleged that vandals "use[d] … distinctive lettering associated with Hitler's manifesto …. in conjunction with a phrase than can plausibly be understood as calling for the destruction of the State of Israel and the Jewish people") *and Kestenbaum*, 743 F. Supp. 3d at 307–09 (plaintiffs plausibly pled Title VI claim based on Jewish and Israeli identity where "protests were, at times, confrontational and physically violent"; "plaintiffs legitimately fear[ed] their repetition"; and where, as a result of the harassment, plaintiffs "dreaded walking through the campus, missed classes, and stopped participating in extracurricular events").

Moreover, where plaintiff has failed to show, in connection with the events surrounding her October 9 and October 17, 2023 emails, that she was subject to "severe, pervasive, and objectively offensive" harassment that deprived her of access to educational opportunities, plaintiff has failed to allege that any non-response by SAIC to the events or her emails demonstrate deliberate indifference.[6]

---

[6] As described in greater length earlier, plaintiff has also alleged that "[n]ot ten days" after the Hamas terrorist attack some members of SAIC's faculty authored an "open letter" that expressed "uncompromising solidarity with the Palestinian people" and referred to "the Israeli victims of the terror attack as 'settlers.'" *Id.* ¶ 16. Plaintiff references this "open letter" only once in her complaint, in a portion of the pleading recounting SAIC's general "atmosphere of hostility towards Jews and Israelis." *Id.* at 4. Plaintiff does not contend (either in the complaint or in her opposition to SAIC's motion to dismiss) that the open letter itself constituted "severe, pervasive, and objectively offensive" harassment based on race or national origin. Even assuming that it did, plaintiff does not allege whether an SAIC official with authority to institute corrective measures on behalf of SAIC was aware of the letter; and, if so, whether this official's response was deliberately indifferent. And without more precise factual allegations from plaintiff on the timing of the open letter, the Court cannot infer that the letter was circulated before plaintiff sent her October 17 email. Given the paucity of plaintiff's allegations regarding the open letter—and given the placement of the pertinent allegation in a preamble to plaintiff's more detailed allegations—the Court assumes the allegation regarding the letter was intended to serve as a form of table-setting (i.e., an attempt to describe SAIC's environment as generally antagonistic to Jewish and Israeli individuals) rather than an element of plaintiff's Title VI claim.

3. **November 14, 2023 Letters**

With respect to the November 14, 2023 "Free Palestine" letter, for the same reasons the Court has already given, plaintiff fails to sufficiently allege that the letter impermissibly crosses the line from political criticism of the Israeli government to "severe, pervasive, and objectively offensive" harassment of plaintiff on the ground of her Jewish or Israeli identity. Plaintiff describes the letter as "antisemitic," but she does only in a conclusory fashion. [1] ¶¶ 51–52.

Nor does plaintiff allege that the "Free Palestine" letter caused her to be deprived of educational opportunities. Plaintiff reacted to the letter by circulating her own response to students and faculty that same day. [1] ¶ 51. "Examples of a negative impact on access to education may include dropping grades, becoming homebound or hospitalized due to harassment, or physical violence." *Gabrielle M.*, 315 F.3d at 823 (internal citations omitted). Promptly authoring and circulating a letter—and expressing one's own views in response to another's—does not correspond with these examples.

Plaintiff also fails to allege that a SAIC official who had authority to institute corrective measures on the school's behalf had actual knowledge of the "Free Palestine" letter. *See St. Francis Sch. Dist.,* 694 F.3d at 871. Plaintiff indicates only that the "Free Palestine" letter made requests of "SAIC" and that "SAIC" responded to the letter. *Id.* ¶¶ 50–52. These vague allegations do not permit the Court to reasonably infer that a SAIC official with authority to institute corrective measures on the school's behalf had actual knowledge of actionable discrimination. *See*

24

*Adusumilli v. Illinois Inst. of Tech.*, No. 97 C 8507, 1998 WL 601822, at *3 (N.D. Ill. Sept. 9, 1998), *aff'd*, 191 F.3d 455 (7th Cir. 1999) (where the complaint alleged that plaintiff complained to her teacher about an incident of student sexual harassment, but the complaint "offers no basis to infer that Professor Weisberg was a school official 'with authority to take corrective action to end' the alleged discrimination," the court could not construe that the defendant school "had actual notice of [that] incident").

At the hearing in this matter, plaintiff argued that because plaintiff "alleged actual notice and knowledge at every level of the administration and faculty," the Court could fairly infer that a qualifying SAIC official witnessed or received a report of all severe, pervasive, and objectively offensive discrimination. [103] at 18. Perhaps the Court can draw that inference for some of the events plaintiff describes, such as the admissions interview or altered final assignment—events that someone at SAIC clearly remedied, even though plaintiff does not always allege with specificity who that someone was. But in her complaint, plaintiff also describes a series of discrete events that include different students, different faculty members and administrators, different settings, and different dates. The Court cannot assume that some omniscient and omnipotent SAIC official had actual knowledge of each of these events. As the Seventh Circuit has explained, school officials have actual knowledge only of the incidents that they witness, or those that have been reported to them. *Galster*, 768 F.3d at 618. The standard is "not satisfied by knowledge that something might be happening and could be uncovered by further investigation." *Id.*

Indeed, *Adusumilli*, which the Court finds persuasive on this point, indicates

that even specifically identifying someone at the school is not enough if a plaintiff does not also specifically allege that this individual had "authority to take corrective action." No. 97 C 8507, 1998 WL 601822, at *3; *see also Crandell v. New York Coll. of Osteopathic Med.,* 87 F. Supp. 2d 304, 320 (S.D.N.Y. 2000) (where plaintiff reported professor misconduct to an adjunct professor and an associate dean, the district court examined those individuals' job responsibilities before determining that they had authority to remedy the alleged misconduct and therefore that the defendant institution had "actual knowledge" of the misconduct).

For these reasons, plaintiff has failed to sufficiently allege that the "Free Palestine Letter" circulated on November 17, 2023, constituted "severe, pervasive, and objectively offensive conduct" that deprived her of access to educational opportunities and that SAIC's response to the "Free Palestine" letter constituted "deliberate indifference" in violation of Title VI.

### 4.    November 17, 2023 Joint Class

Plaintiff faces similar hurdles with her allegation regarding the November 17, 2023 joint class. In the complaint, plaintiff describes in detail how she felt deceived by her professors' abandoned promise to moderate the class discussion. [1] ¶¶ 53–59. But those paragraphs culminate in only one alleged act of harassment: one student's "diatribe describing her hate and anger towards those who reject her narrative of an

ongoing genocide in Gaza," which the professors did not interrupt. *Id.* ¶ 59.[7] As above, plaintiff does not sufficiently allege that this "diatribe" crossed the line from a permissible political opinion to "severe, pervasive, and objectively offensive" harassment on the grounds of race or national origin that deprived her of an educational opportunity.

And again, as above, plaintiff does not allege that any SAIC official with authority to implement corrective measures on behalf of SAIC knew of the incident, as opposed to an SAIC employee with more limited authority. *See* [103] at 10 (SAIC described class professors as lacking authority to take corrective actions on behalf of SAIC and instead only having "some ability to address interactions amongst students").

### 5. Plaintiff's Joint Presentation

Plaintiff's allegation regarding her project partner's refusal to "work closely with any individual who denies the genocide so clearly taking place before us," and Professor Yi's ready accommodation of the same, suffer the same faults as her previous allegations. [1] ¶ 62. Nowhere does plaintiff allege that her partner's refusal to work with her was predicated on her Jewish or Israeli identities, rather than the political views plaintiff had expressed on November 17, 2023, in the letter she circulated to classmates and faculty. *Id.* ¶ 51 ("In the Response Letter, [plaintiff]

---

[7] In a later hearing on the matter, plaintiff described this incident as including "discussions of antisemitic accusations." [103] at 36. But this allegation is not in the complaint, and even if it were, it would only have been alleged in a purely conclusory manner. *See Harrell v. U.S.*, 13 F.3d 232, 236 (7th Cir. 1993) ("The plaintiff cannot cure the deficiency by inserting the missing allegation in a document that is not either a complaint or an amendment to a complaint.").

rebutted the claims that Israel was a settler colonial state, that Israel was committing a genocide, and that antisemitism was meaningfully distinguishable from anti-Zionism.").

Likewise, plaintiff does not allege that her poor peer and instructor evaluations were premised on discriminatory considerations. *Id.* ¶ 67 (evaluations contained allegations of plagiarism, "outside factors," and plaintiff's failure to interact with "non-BIPOC-presenting students"). The same is true with respect to plaintiff's complaint that her SAIC classmates ignored her, refused to share art supplies, submitted negative feedback, and avoided her. *Id.* ¶ 68. And again, plaintiff does not allege that a SAIC official with authority to implement corrective action on behalf of the school was aware of her project partner's unwillingness to work with her, Professor Yi's willingness to bifurcate the presentation, her unfavorable peer reviews, or the social ostracism that she faced.

### 6. Changes to Final Assignment by Professor Yi

Plaintiff's allegations regarding Professor Yi's attempt to alter the final paper are also insufficient to survive a Rule 12(b)(6) challenge. Even if this attempted change constituted "severe, pervasive, and objectively offensive" harassment, plaintiff does not explain how the harassment deprived her of access to educational opportunities when the attempted alterations were withdrawn after plaintiff complained to "SAIC."[8] [1] ¶ 82.

---

[8] Plaintiff does not identify who she complained to regarding the changes to the final paper. Because corrective action was taken with respect to this incident, the Court assumes, for purposes of this motion to dismiss, that it was an official with authority to implement corrective action on behalf of SAIC.

28

Plaintiff thus fails to plausibly allege that SAIC's response to her complaint was deliberately indifferent. [51] at 8. Recall that, following plaintiff's complaint regarding the changed assignment, SAIC initially directed her to request an accommodation from Professor Yi. [1] ¶ 82. When plaintiff instead approached SAIC's outside counsel, SAIC directed Professor Yi to withdraw the second part of the exam. *Id*. Plaintiff only maintains that SAIC's *initial* response was deliberately indifferent. [51] at 8. She does not argue that its response following her refusal to engage with Professor Yi also constituted deliberate indifference.

The Court returns to the definition of "deliberate indifference." An institution is not deliberately indifferent under Title VI if it responds quickly and reasonably, in light of the known circumstances, to any incidents of "severe, pervasive, and objectively offensive" conduct. *Jaquet*, 996 F.3d at 809. Plaintiffs cannot demand certain action from a school. *Moore,* 570 F. Supp 3d at 607. According to plaintiff's allegations, she complained about the changes to the final paper; SAIC suggested a course of action; plaintiff rejected that course of action; SAIC then "relented" and took action that plaintiff felt acceptable. [1] ¶ 82; [51] at 8. That plaintiff was dissatisfied with SAIC's initial course of action or that plaintiff surmises SAIC's reversal of course was "not of its own volition" does not negate the fact that SAIC reacted to the alleged harassment in a manner that was not clearly unreasonable. [51] at 8.

### 7. Initiation of the Investigation

The parties dispute whether the investigation SAIC initiated with outside counsel constituted a deliberately indifferent response to plaintiff's alleged

29

harassment. Yet the complaint offers extremely limited information concerning the investigation itself. The Court understands that the investigation began less than two weeks before plaintiff filed her complaint, [1] ¶¶ 71, 86, and based on information provided by the parties at the December 2024 hearing, the Court also understands that the investigation concluded sometime in June 2024, [103] at 23.

But in terms of assessing the sufficiency of plaintiff's complaint, the Court is limited to the following facts: SAIC's Title IX director informed plaintiff of the investigation on November 17, 2023, "after [plaintiff] submitted several complaints to SAIC's faculty and administration regarding the increasing harassment and hostility." [1] ¶ 69. Plaintiff does not say what incidents these complaints concerned, when she lodged them, or with whom. At the hearing, plaintiff urged the Court to read the complaint as alleging that the investigation covered all the incidents that plaintiff brought to SAIC's attention. [103] at 22. But that argument does not help the Court, as the complaint does not allege *which* incidents plaintiff brought to the attention of a SAIC official with authority to launch an investigation. For example, as stated above, nowhere does plaintiff allege that she relayed any of the in-class conduct—such as the November 17 joint class, or her project partner's unwillingness to work with her—to a qualifying SAIC official.

The law requires the Court to consider the alleged harassment and the totality of the circumstances to determine whether a plaintiff has alleged that SAIC's response was deliberately indifferent. Here, plaintiff has failed to plead crucial information to that analysis, like the complaints that form the basis of the

investigation. Given these limited allegations, it is impossible for the Court to say that the investigation could constitute a deliberately indifferent response. For this reason as well, plaintiff's hostile environment claim under Title VI does not survive SAIC's Rule 12(b)(6) challenge.

\* \* \*

Two final notes on plaintiff's hostile educational environment claim. The Court conducted the above analysis in the same way that plaintiff presented her complaint: incident by incident. Some courts favor an aggregated, "totality of the circumstances" approach. *See Williams v. Gen. Motors Corp.,* 187 F.3d 553, 562 (6th Cir. 1999) (criticizing the district court for "divid[ing] and categoriz[ing] the reported incidents, divorcing them from their context and depriving them of their full force"); *Crandell*, 87 F. Supp. 2d at 319 (requiring "only that the alleged incidents cumulatively have resulted in the creation of a hostile environment").

Even if the Court were to assume that, taken as a whole, plaintiff's allegation demonstrate that she suffered "severe, pervasive, and objectively offensive" harassment on the grounds of her race or national origin, her Title VI claim would still fail. She would still need to allege that an SAIC official or officials, with authority to take corrective measures on behalf of SAIC, had actual notice of at least the bulk of—if not all—this alleged harassment, and that SAIC responded with deliberate indifference. *Plainfield Cmty. Consol. Sch. Dist. 202,* No. 21 C 4460, 2022 WL 1641684, at \*5. But as already explained, plaintiff only plausibly alleges (at best) that a qualifying SAIC official was aware of three incidents: her admissions interview; the

31

October 9 and 17, 2023 emails she sent to various SAIC administrators and faculty and the events prompting those emails; and Professor Yi's alteration of the final assignment. And as already explained, plaintiff does not plausibly allege that SAIC acted with deliberate indifference to these incidents. Thus, comprehensively analyzing plaintiff's allegations of harassment does not move her Title VI claim any closer to clearing the 12(b)(6) bar.

Plaintiff suggests that the Court may analyze SAIC's deliberate indifference as a whole, rather than on a per-incident basis. *See, e.g.,* [51] at 6 ("[T]he school's *overall* reaction to [plaintiff's] reports of discriminatory harassment was one of deliberate indifference.") (emphasis added). But an incident-by-incident review is typical in Title VI and IX analyses. *See, e.g., Doe v. Columbia Coll. Chicago,* 933 F.3d 849, 857 (7th Cir. 2019) (reviewing the college defendant's response to each alleged instance of harassment). The Court is not aware of, and plaintiff does not cite, a version of this analysis that examines a defendant's "overall" deliberate indifference, rather than its deliberate indifference to specified conduct. Having found that SAIC did not act deliberately indifferent to any alleged incident of harassment, the Court cannot now find that SAIC's "overall reaction" was one of deliberate indifference.

## B. Direct Discrimination

In response to SAIC's motion to dismiss, plaintiff argues that her complaint also advances a claim of direct discrimination under Title VI. [51] at 2. According to plaintiff, to state a direct discrimination claim, she must allege that "(1) the educational institution received federal funding, (2) plaintiff was excluded from

32

participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on [nationality or race]." *Columbia College*, 933 F.3d at 854 (citing *Doe v. Purdue Univ.*, 928 F.3d 652, 657 (7th Cir. 2019)).[9] Because the parties do not dispute that SAIC receives federal funding, plaintiff must only allege that she was excluded from, or denied the benefits of, an educational program, and that SAIC discriminated against her based on her race or nationality.

The only paragraphs plaintiff cites to support her direct discrimination claim are conclusory allegations that merely restate the law. [51] at 3 (citing [1] ¶¶ 102, 207–110); [103] at 39 (counsel describes these paragraphs as "catch-all elements").[10] These conclusory allegations are insufficient to support plaintiff's claim. *Twombly*, 550 U.S. at 555. The Court is left to dig through plaintiff's complaint to find factual support for her legal conclusions—a task that is not the Court's responsibility. *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Even then, the complaint lacks factual support for

---

[9] Defendant suggests a different pleading standard for direct discrimination claims. *See* [57] at 4 (citing *Khan v. Midwestern Univ.,* 147 F. Supp. 3d 718, 720 (N.D. Ill. 2015) ("To state a claim under Title VI, plaintiffs must allege facts satisfying two elements: (1) that they have been intentionally discriminated against on the grounds of race; and (2) that defendants are recipients of federal financial assistance."). For purposes of this motion to dismiss, the Court will adopt plaintiff's proposed standard, which appears to be used in the Title IX context in this Circuit. *See, e.g., Jaquet,* 996 F.3d at 810; *O'Shea v. Augustana Coll.,* 593 F. Supp. 3d 838, 847 (C.D. Ill. 2022); *Doe v. Bd. of Regents*, 615 F. Supp. 3d 877, 887 (W.D. Wis. 2022); *see also Galster*, 768 F.3d at 617 (interchanging Title VI and Title XI interpretive caselaw, because "a decision interpreting one generally applies to the other").

[10] During the December 2024 hearing on this matter, when plaintiff's counsel was asked to point to factual support for plaintiff's direct discrimination claim, counsel surveyed the complaint, recounting all allegations. [103] at 43, 51–52.

plaintiff's claim. The Seventh Circuit requires plaintiff to allege some sort of concrete proof of denial of an educational benefit, such as a change in academic status or absenteeism. *See Jauquet*, 996 F.3d at 810. Yet nowhere does plaintiff specify what educational benefit SAIC denied her.

In the hearing on the matter, plaintiff argued that her classmates' unwillingness to work with her and Professor Yi's change to a class grading scheme both represented denials of educational benefits. [103] at 40–41. But these examples—peer-to-peer social exclusion and a professor's gradebook-management decision—do not represent the type of institutional denial of an educational benefit that courts have recognized as sufficient to state a direct discrimination claim. *See Jauquet*, 996 F.3d at 810 (dismissing a complaint that did "not specify what program or benefit Student A was not able to access because of the … differences in the school's expectations for students."); *Doe v. Bd. of Regents*, 615 F. Supp. 3d 877, 887 (W.D. Wis. 2022) ("Generally, this second element is established by an alleged [student] later bringing a direct discrimination claim after being unfairly suspended or expelled.").

Separately, and for reasons the Court has already detailed, the complaint contains no facts to support a reasonable inference that SAIC's response to plaintiff's complaints (at least those she brought to SAIC's attention) was affected by plaintiff's race or nationality, or—more specifically—that if SAIC did deny her an educational benefit, it was *because of* her race or nationality. *Jauquet*, 996 F.3d at 811; *O'Shea*, 593 F. Supp. 3d at 848 (dismissing a direct discrimination claim where plaintiff failed

to identify instances in which she or other women were treated differently than men by the defendant college).

Thus, to the extent that plaintiff attempts to state a direct discrimination claim, the Court agrees with SAIC that she has not sufficiently pled one.

## C. State-Law Claims

Because the Court has now dismissed all claims over which it has original jurisdiction, it declines to exercise supplemental jurisdiction over plaintiff's state-law claims. 28 U.S.C. § 1367(c)(3). Plaintiff's state-law claims are dismissed without prejudice. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[T]he usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

## IV. Conclusion

Plaintiff has failed to allege that SAIC violated Title VI. Plaintiff's complaint [1] is dismissed without prejudice. Because the Court dismisses plaintiff's sole claim under federal law, it declines to exercise jurisdiction over plaintiff's state-law claims.

Plaintiff is free to file an amended complaint that addresses the deficiencies described in this opinion. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss."). If plaintiff elects to file an amended complaint, she must do so on or before March 24, 2025. If plaintiff does not file an amended complaint on or before

35

that date, the dismissal will convert to one with prejudice, and the case will be closed.

_____
Georgia N. Alexakis
United States District Judge

Date: February 20, 2025