**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SHIRAN CANEL,<br><br>                         Plaintiff,<br><br>       v.<br><br>SCHOOL OF THE ART INSTITUTE OF<br>CHICAGO, and SANDIE YI,<br><br>                    Defendants. | Case No. 1:23-cv-17064<br>Hon. Georgia Alexakis |

## <u>AMENDED COMPLAINT</u>

Plaintiff Shiran Canel ("Plaintiff" or "Shiran"), for her amended complaint[1] against Defendant School of the Art Institute of Chicago ("SAIC") and Sandie Yi[2], alleges as follows:

### INTRODUCTION

1.      Plaintiff, an Israeli Jewish woman, was excluded from participation in, denied the benefits of, and was subject to discrimination under SAIC's Master's program in art therapy (the "Art Therapy Program"). This came as the result of SAIC's direct discrimination against Shiran on the basis of her national origin; of SAIC's de facto policy of treating anti-Israeli and/or anti-Jewish discrimination with skepticism or apathy; and as the result of SAIC's deliberate indifference to the hostile educational environment Shiran experienced inside Professor Yi's classroom, and on campus, which SAIC administrators and department leaders with authority to implement corrective measures knew of but did almost nothing about.

---

[1] In accordance with this Court's Procedures for Amended Complaints, attached as Exhibit A is a redline showing changes from the previous version of the complaint.

[2] The Court granted Professor Yi's Motion to Dismiss on June 18, 2024 (ECF # 66). Plaintiff keeps her name in the case caption and the count against her to preserve its claims and any issues related thereto.

2.      As more fully described below, Plaintiff was initially excluded from the Art

Therapy Program on a discriminatory basis – as confirmed by an independent law firm tasked with

assessing her admissions denial, who found that the committee members recommending her denial

(the "Committee") ████████████████████████████████████████████

████████████████████████████.[3] Specifically, it was found that the Committee had a

"███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████."

3.      That Committee was comprised of ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ (together, the "Committee").

4.      The Committee expressed concern during their deliberations that Shiran had

"████████████████████████" because her application "███████████████████

████████████" In defending this position after the fact, ████████████████████

████████████████████████████████████████████████████████

████████████████████████ Upon information and belief, no other minority applicant

and member of a protected class had their admissions prospects dimmed for not having experience

outside their community, or because their artwork was "████████" with their unique ethnic, racial,

or cultural perspective.

---

[3] Specific, direct quotes from this investigatory report (as well as the later report regarding just Yi) which SAIC has designated as "confidential" and any other confidential information gleaned only from these reports are redacted in the publicly filed version of this Amended Complaint as permitted by the Court's March 20, 2025 order (ECF #109). Plaintiff did not receive copies of the narrative portion of these reports until on or about July 29, 2024 (six months after she filed her initial complaint in this matter), and SAIC declined her request to view the exhibits attached to the reports, which she has not seen.

5.      These Committee deliberations followed Shiran's admissions interview with Deb DelSignore, who interviewed Shiran alone despite the program requiring interviews be conducted by multi-member panels. DelSignore examined Shiran on whether she could get along with Palestinian classmates, and fixated on one piece of Shiran's portfolio that related to Jerusalem, rather than the piece Shiran had selected for discussion.

6.      The outside law firm investigating Shiran's denial to the Art Therapy Program recommended that, in addition to admitting Shiran to the program, SAIC " ██████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ."

7.      Upon information and belief, SAIC ignored the recommendation ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████.

8.      Upon information and belief, SAIC also declined to impose any of the recommended ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████.

9.      Instead, SAIC quietly reversed the denial decision, withheld information from Shiran about the specific issues uncovered during the investigation (including the professors and

faculty involved in the deliberations), and essentially told her, "sorry, it won't happen again."

10.     But this type of discriminatory "█████████" on Shiran's national origin, and unequal and adverse treatment of her because of it continued throughout her first semester that began just a few short months later, both in Professor Yi's classroom – where she treated Shiran differently than other students on the basis of her identity as an Israeli and Jew, and presided over hostility towards Shiran by class members – and on campus more broadly in the wake of Hamas' October 7th terror attack in Israel, which was glorified and justified on campus by SAIC students and faculty.

11.     Despite Shiran's outreach to SAIC administrators, expressing concern for her classroom and campus environment, her belief that she was being discriminated against, and her fear for her safety, and despite being otherwise made aware of the dynamics in Professor Yi's classroom, SAIC's administrators ignored Shiran's messages and took no steps designed to alleviate the situation.

12.     Towards the end of the semester, after Shiran had endured hostility and discrimination from her classmates and Professor Yi, Professor Yi abruptly changed the content of the final exam in a way that exhibited an even more blatant "████████" on, and animus towards, Israelis – which she did to retaliate against Shiran for complaining about the discriminatory climate instead of what Professor Yi demanded that she do, which was to "hold space" for it.

13.     Though SAIC required Professor Yi to withdraw this obviously targeted and retaliatory exam prompt, it did nothing else leading up to the exam or after it to remedy the unequal, adverse treatment that Shiran suffered at the hands of Professor Yi, or the hostile environment she was experiencing in the classroom. Instead, the investigation into Professor Yi's conduct stalled for seven months.

14.     By July 2024 (with another semester passing in the interim), SAIC concluded that

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████."

15.     But by the time this conclusion was ultimately reached, Shiran's first semester was marred by SAIC's deliberate indifference to the hostile environment Shiran was experiencing inside Professor Yi's classroom and on campus, and its overall discriminatory approach of letting anti-Israeli and anti-Jewish discrimination slide until circumstances deteriorate to the point where a formal investigation can no longer be avoided.

16.     SAIC officials with authority to implement corrective measures knew Shiran was continuously experiencing, reporting, and endlessly trying to articulate harassment and discrimination that she was experiencing, and they knew (especially after the October 7th terror attack in Israel) that there was a substantial likelihood this could and would happen under the watch of the Committee members ███████████████████████████████████████

███████████████████████████████████████████████████████████.

Despite this knowledge, SAIC responded with deliberate indifference, ignoring multiple messages from Shiran and leaving her to fend for herself.

17.     While waiting for an update on her formal Title IX complaint, Shiran received no assurances or plan from SAIC, and because of that began the Spring 2024 semester by taking her SAIC courses off-campus, with one-on-one instruction. Leading up to that semester, Shiran was excluded from cohort-wide communications and meetings.

18.     When the Spring 2024 semester began, students on campus "escalated" and more explicitly and regularly called for violence against Israelis and Jews, and also engaged in violent protests on campus. Shiran followed these developments – namely, already-violent students calling for targeted violence against people like her, which were met with promises from SAIC administrators (aware of the conduct) that SAIC would not impose discipline as a matter of policy if the students agreed to conduct their protests in more acceptable campus locations.

19.     After watching SAIC knowingly tolerate harassment and hostility against Shiran specifically, and do nothing about (and even promise to withhold discipline from) students on campus chanting and otherwise promoting violence against Israelis and Jews, Shiran never regained any sense that she could return to SAIC's campus free from threats and discrimination.

20.     Before her admissions interview process began, SAIC's Director of Graduate Admissions, Patrick Quilao, made a cautionary comment to Shiran to the effect of: "███████ ██████████████████████████████████████████████" At the time, Shiran thought little of it, but his ominous remark proved to be true to a devastating degree.

## PARTIES

21.     Plaintiff is an Israeli Jew who was enrolled in SAIC's Master's Art Therapy Program during the 2023-24 school year. She was born in Israel and moved to the United States in 2015. One thing motivating her enrollment in the Art Therapy Program was a desire to bring her expertise back to Israel where many people are in need of therapy as a result of constant and indiscriminate rocket, shooting, car ramming, and knife terror attacks on the civilian population committed and/or inspired by Hamas and similar terror organizations.

22.     Defendant SAIC is a private, not-for-profit educational institution, located in Chicago, Illinois. It is a wholly-owned subsidiary of the Art Institute of Chicago. It is an "institution of elementary, secondary, or higher education" and a "place  of public accommodation" within the

meaning of the Illinois State Human Rights Act.

23. At all times relevant to this Amended Complaint, SAIC was and continues to be a recipient of federal funding, subjecting it to the provisions of Title VI of the Civil Rights Act. Over the past several years, grant and contract revenues that SAIC obtained from U.S. governmental sources have totaled in the millions of dollars.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343 over the claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq.*). This Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as Plaintiff's federal claims.

25. This Court has personal jurisdiction over Defendant SAIC because SAIC is based and operates in Illinois.

26. Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred and is where SAIC is located.

## LEGAL BACKGROUND

**A. Title VI protects Plaintiff against discrimination on the basis of her Israeli and Jewish identity**

27. Title VI of the Civil Rights Act provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

28. Title VI's protections extend to Jewish and Israeli students.

29.     Since at least September 2004, it has been the policy of the Office for Civil Rights ("OCR") of the U.S. Department of Education to investigate Title VI complaints against institutions of higher education related to antisemitism. Since then, the Obama, Trump, and Biden administrations have confirmed the urgent need to combat antisemitism in educational institutions.

30.     In an October 26, 2010, letter to federally funded schools, OCR confirmed that such schools are "responsible for addressing harassment incidents about which [they] know[] or reasonably should have known," and stating that such harassment violates Title VI when it creates a "hostile environment" based on "actual or perceived shared ancestry or ethnic identity as Jews," in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," or when the "harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees."[4]

31.     OCR further clarified that "[w]hile Title VI does not cover discrimination based solely on religion, groups that face discrimination on the basis of actual or perceived shared ancestry or ethnic characteristics may not be denied protection under Title VI on the ground that they also share a common faith. These principles apply not just to Jewish students, but also to students from any discrete religious group that shares, or is perceived to share, ancestry or ethnic characteristics (e.g., Muslims or Sikhs). Thus, harassment against students who are members of any religious group triggers a school's Title VI responsibilities when the harassment is based on the group's actual or perceived shared ancestry or ethnic characteristics, rather than solely on its members' religious practices." OCR added that "[a] school also has responsibilities under Title VI

---

[4] https://www.mass.gov/doc/commission-to-review-statutes-relative-to-implementation-of-the-school-bullying-law-testimony-6/download (last accessed May 4, 2025).

when its students are harassed based on their actual or perceived citizenship or residency in a country whose residents share a dominant religion or a distinct religious identity."

32.     In June 2010, the Obama State Department adopted a working definition of antisemitism developed by the European Monitoring Center on Racism and Xenophobia. That definition is: "Anti-Semitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of anti-Semitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."[5] The Obama State Department also recognized contemporary examples of antisemitism, including ways that antisemitism may manifest itself with regard to Israel, the world's only Jewish state where half of the global Jewish population lives:

- "Calling for, aiding, or justifying the killing or harming of Jews (often in the name of a radical ideology or an extremist view of religion)"

- "Using the symbols and images associated with classic anti-Semitism to characterize Israel or Israelis"

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis"

- "Blaming Israel for all inter-religious or political tensions"

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation"; and

- "Denying the Jewish people their right to self-determination, and denying Israel the right to exist."[6]

33.     On May 26, 2016, the Obama State Department began using the very similar and widely accepted working definition of antisemitism adopted by the thirty-one member nations (including the United States) of the International Holocaust Remembrance Alliance ("IHRA") and

---

[5] https://2009-2017.state.gov/j/drl/rls/fs/2010/122352.htm (last accessed May 4, 2025).

[6] *Id.*

encouraged other governments and international organizations to use it as well.[7] Examples of "contemporary" antisemitism under the IHRA include:

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion";

- "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation";

- "Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis"; and

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis."[8]

34.   The Trump administration affirmed the use of the IHRA definition. Executive Order 13899, titled "Combating Anti-Semitism," stated that, in enforcing Title VI and identifying evidence of discrimination, "all executive departments and agencies [] charged with enforcing Title VI shall consider" the IHRA working definition of antisemitism and list of contemporary examples of antisemitism.[9]

35.   The Biden administration has recognized the IHRA definition as the most prominent definition of antisemitism, with Secretary of State Blinken stating that "The Biden administration enthusiastically embraces the 2016 International Holocaust Remembrance Alliance's Working Definition of Anti-Semitism, including its examples."[10]

---

[7] https://www.state.gov/defining-antisemitism/ (last accessed May 4, 2025).

[8] *Id*.

[9] Executive Order #13899 (Combating Anti-Semitism, Dec. 11, 2019; Fed. Reg. 84 FR 68779) (https://www.govinfo.gov/content/pkg/DCPD-201900859/pdf/DCPD-201900859.pdf (last accessed May 5, 2025)).

[10] https://bidenwhitehouse.archives.gov/wp-content/uploads/2023/05/U.S.-National-Strategy-to-Counter-Antisemitism.pdf; https://image.jewishinsider.com/wp-content/uploads/2021/03/29114459/Secretary-of-State-Blinken-Letter-to-

36.     On January 4, 2023, the Department of Education under President Biden released a fact sheet, "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics." This document reiterated that Title VI protects "students who experience discrimination, including harassment, based on their actual or perceived (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity," (e.g., Israel).[11]

37.     In May 2023 – just a few short months before the Hamas terror attack of October 7th – President Biden released the U.S. National Strategy to Counter Antisemitism, which he described as "the most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history." The National Strategy described  how "Jewish students and educators are targeted for derision and exclusion on college campuses, often because of their real or perceived views about the State of Israel."[12]

38.     In the wake of Hamas' October 7th terrorist attack against Israel, which, according to President Biden, contributed to an "alarming" rise in antisemitism at schools and on college campuses, OCR announced that it was expediting its processing of discrimination complaints involving antisemitism. On October 18, 2023, the U.S. Senate passed a resolution condemning "antisemitic student activities," and on November 2, 2023, the U.S. House passed a resolution

---

AZM.pdf?_gl=1*1js45y1*_ga*NzczMTc5MjAwLjE3NDI3NzY.*_ga_7HK4TGWTHS*MTc0MzE2
NzI2OS4yLjEuMTc0MzE2NzMwNy4yOC4wLjA.*_gcl_au*MjAxNjYyODg1OC4xNzQyNzYyNjc2&_
ga=2.183491822.959459863.1743167275-773179200.1742762676  (last accessed May 4, 2025).

[11] https://www.ed.gov/media/document/ocr-factsheet-shared-ancestry-2023-33851.pdf (last accessed May 4, 2025).

[12] https://bidenwhitehouse.archives.gov/wp-content/uploads/2023/05/U.S.-National-Strategy-to-Counter-Antisemitism.pdf (the "Biden Strategy Memo") (last accessed May 4, 2025).

condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities.

39.     On November 7, 2023, one month after the Hamas massacre, OCR released a letter "remind[ing] colleges, universities, and schools that receive federal financial assistance of their legal responsibility under Title VI . . . to provide all students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics." The letter states: "It is your legal obligation under Title VI to address prohibited discrimination against students and others on your campus—including those who are perceived to be Jewish [or] Israeli . . . in the ways described in this letter."[13]

40.     On May 7, 2024, OCR released a letter promulgating Title VI guidance, making clear, among other things, that the "fact that harassment may involve conduct that includes speech in a public setting or speech that is also motivated by political or religious beliefs . . . does not relieve a school of its obligations to respond under Title VI . . . if the harassment creates a hostile environment in school for a student or students," that "harassing conduct that otherwise appears to be based on views about a country's policy or practices is targeted at or infused with discriminatory comments about persons from or associated with a particular country" may implicate Title VI, and that "[h]arassing conduct need not always be targeted at a particular person in order to create a hostile environment for a student or group of students," but "may be directed at anyone."[14]

**B.      Zionism is an integral part of Jewish identity, ethnicity, and shared ancestry, is core to Plaintiff's identity as a Jew and Israeli, and is protected by Title VI.**

41.     Jews describe their collective as  "*Am*" which means nation. They are an ethno-

---

[13] https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf (last accessed May 4, 2025).

[14] https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-202405-shared-ancestry.pdf.

religious, land-based people. Jews have lived in *Eretz Yisrael*, or the "Land of Israel," continuously since ancient times. Jews are called as such because they descend from *Judea*, a geographic location in the historic Land of Israel. *Zion*, in Hebrew, means Jerusalem.

42.     Jews maintained hundreds of years of national sovereignty in the Land of Israel until Jewish self-governance was ended by the Babylonian empire in the 6th century BCE and again by the Roman empire in the 1st century CE (after Jews were allowed to return and rebuild their Temple, which served as their national epicenter). Though Jews always maintained a continuous and uninterrupted presence in the land, "these historical catastrophes left an indelible mark on Jewish national consciousness."[15]

43.     Zionism is the Jewish national liberation movement dedicated to reconstituting Jewish national life in some part of the Jewish people's ancestral homeland. "It is an expression of millennia of Jewish longing to regain sovereignty and return to the Land of Israel. Zionism is an inherent part of Jewish identity, both ancient and modern."[16] For the vast majority of Jews worldwide, including Plaintiff, Zionism is the deepest expression of Jews' shared ancestry.

44.     This hope to regain sovereignty in their ancestral land "was kept alive for hundreds of generations, and is expressed throughout Jewish prayers, holidays, and culture, and still manifests itself in virtually every Jewish community in every corner of the earth," from Jewish communities in Morocco, to Argentina, to America, and so on.

45.     As a land-based people, many of the religious practices of Jews can only be observed in Israel because they are based on the agricultural cycle and agricultural traditions of the land and its inhabitants. Three of Judaism's core holidays – *Pesach* (Passover), *Shavuot*, and

---

[15] *Russel Shalev*, https://fathomjournal.org/criticism-of-israel-is-not-antisemitic-but-anti-zionism-is-this-is-why/ (last accessed May 4, 2025).

[16] *Id.*

*Sukkot* – are seasonal and were historically (and are currently) observed by making pilgrimage to Jerusalem. Traditionally observant Jews pray three times a day facing Jerusalem; Israel is present throughout Jewish liturgy.

46.     For the overwhelming majority of Jews worldwide, including Plaintiff, Zionism and Judaism are inseparable.

47.     Because of this, Zionism (and anti-Zionism) play a major role in historical and contemporary antisemitism. As one leading scholar has stated, "Antisemitism is the transformation of the Jews into 'The Jew,' a symbol of whatever a given civilization regards as its most loathsome qualities."[17] Throughout the centuries, this has manifested as the Jew as the "Christ-killer," the Jew as the "killer of prophets" (for Muslims), the Jew as the ultimate capitalist (for Marxists), the Jew as the ultimate Marxist (for capitalists), and the Jew as the ultimate race polluter (for Nazis). The re-establishment of Jewish sovereignty in Israel has created a robust channel for this same hate: the collective Jew, *i.e.*, Israel – the only Jewish state where half the world's Jews live – is uniquely evil, "turned into the criminal of nations, a symbol of racism and colonialism, and now even genocide" – again embodying the deadly sins of modern society.

48.     The exclusion of Jews from public life, or differential treatment of them, due to their attachment to the land and country of Israel is a form of antisemitism.

49.     One way this antisemitism manifests is in the labeling of Jewish national identity – and ***only*** Jewish national identity – as a form of racism; "even though the world is full of nation-states and numerous groups who clamor for national recognition and statehood, scorn and

---

[17] Yossi Klein Halevi, *This Dangerous Jewish Moment* (December 9, 2024) https://www.americanbar.org/groups/crsj/resources/human-rights/2024-december/dangerous-jewish-moment/ (last accessed May 4, 2025).

opprobrium is reserved for Jewish national identity alone."[18]

50.     In denouncing Jews as a nation, discriminatory actors often use classically antisemitic symbols and images to characterize Israel or Israelis. This includes, for example, claims that Israel is at the root of (and is secretly orchestrating) all of humanity's problems, and echoes of the ancient blood libel (that Jews use the blood of Christian children to make Passover *matzah*), where Israel is depicted as a "baby-killer" relishing in the murder of women and children.

51.     This discrimination also manifests through a requirement that Jews "shed their national identity in exchange for equal civil rights."[19]

52.     This manifests today on college campuses, where Israeli and Jewish students like Shiran are "effectively marginalize[d] and turn[ed] into pariahs, by forcing them to publicly disavow the State of Israel before being allowed to equally partake as Jews in public life." This excludes Israeli and Jewish students like Shiran from participating fully in campus life, "in the same way that conditioning public participation on denouncing one's family and background would be exclusionary."[20]

53.     Harvard's Presidential Task Force on Combating Antisemitism and Anti-Israeli bias

---

[18] Footnote 15, *supra*.

[19] Footnote 15, *supra* (describing one historical expression of this phenomenon occurring during the French Revolution in the late 1700s when "European countries began adopting liberal and civil notions of citizenship, promising equal citizenship regardless of religion. The Jews, with their peculiar mixture of religious and national identity, posed a problem for the new European model. The solution to this conundrum was to demand that Jews shed their national identity in exchange for equal civil rights. In France, the Count of Clermont-Tonnerre told the members of the National Assembly: 'The Jews should be denied everything as a nation, but granted everything as individuals…if they do not want to do this, they must inform us and we shall then be compelled to expel them…'")

[20] *Id*; Footnote 15, *supra* (Biden Strategy Memo) (noting 2022 survey that found over 50% of Jewish students on college campuses "feel they pay a social cost if they support the existence of Israel as a Jewish state."); https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf (the "Harvard Report") (describing Jewish students feeling "pressure to condemn Israel to prove they were 'one of the good ones' (meaning, an 'anti-Zionist Jew'), and faced social consequences when they refused. This is best understood as an attempt to deny the humanity of Israelis, by treating them as pariahs unworthy of respect as fellow humans…") (last accessed May 4, 2025).

recently described this phenomenon on campus as an "attempt by student activists to drive Israeli students (and Jewish students who feel connected to Israel) out of student life," which "often takes the form of 'shunning.'"[21]

54.     These methods of treating Jews differently often go hand in hand with "erasive antisemitism," which erases Jewish history and replaces it with something else, and denies Jews (but no other minority group) "the right to self-define and to represent their own narrative," and also "imposes external definitions on Jews."[22] This "erasure of Jewish identity frequently 'erases [Jews'] indigeneity…This occurs when Jews are told that they do not originate from the Land of Israel and when Jews face outside pressure to denounce or disassociate from an integral component of their Jewish identity, Zionism."[23]

55.     The argument that Jews who point out these dynamics are simply trying to "silence criticism of Israel" is a straw man that has been labeled the "Livingstone Formulation" by sociologist David Hirsh, who describes this as a "rhetorical device which enables the user [charged with antisemitism] to refuse to engage with the charge made. It is a mirror which bounces back an accusation of antisemitism against anybody who makes it. It contains a counter-charge of dishonest

---

[21] *Id.* (the Harvard Report) (noting that "[a]ccounts of social shunning emerged as one of the most alarming indicators of the breakdown of Harvard's on-campus community," which describe the strategy as "encouraging students and faculty to avoid normalizing relations with Jewish students. This involves social shaming, which is a particularly harmful tactic in academia…") (last accessed May 4, 2025).

[22] The Louis D. Brandeis Center for Human Rights Under Law, Erasive Antisemitism Fact Sheet https://brandeiscenter.com/wp-content/uploads/2023/12/FINAL-factsheet-erasive.pdf (last accessed May 4, 2025).

[23] *Id;* Russell Shalev, Abstract, *America's Perfect Anti-Jewish Storm: Anti-Zionism and Critical Race Theory*, https://mckinneylaw.iu.edu/events/_docs/T-3B_Shalev.pdf ("Anti-Zionism engages in a systematic falsification of Jewish history, thus robbing Jews of their identity and heritage. It consistently denies thousands of years of Jewish history in the land of Israel and the centrality of Israel to Jewish identity. It promotes the disenfranchisement of American Jews as Jews, by imposing upon them a false identification of Zionism as racism (racism considered as one of the cardinal sins of modern society). This has also been referred to as "erasive antisemitism.")

Jewish (or 'Zionist') conspiracy…[resting] on the proposition that when Jews speak up about anti-Zionism, they are not genuinely concerned about their safety and security. Neither are they simply mistaken as to what constitutes antisemitism…Rather, Jews are intentionally lying, abusing public sympathy against antisemitism, in order to shut down critics of Israel. It also assumes that Israel itself is so odious and repugnant that it can only be protected by slurs against its critics, instead of rational debate and discussion."[24]

56.      There are many legitimate criticisms of the Israeli government, society, or policies and people may and should rightfully and vigorously debate those. Calling for the destruction of a country and a people, or celebrating violence against them, though, is not a "criticism" nor is it "political." It is violent, hateful, and discriminatory.

57.      As is the totalizing discourse "that paints Israel in its entirety as racist, evil and fundamentally illegitimate, [and] treats the Jewish national movement and nation-state as qualitatively different, and essentially *demonic*, from the myriad of other national movements and states worldwide."[25]

58.      If Title VI protects Jews' from discrimination based on their shared ancestry, it cannot also be true that Zionism – the very expression of that deeply held shared ancestry – is categorically excluded from, or unrelated to, these protections.

## FACTS

**A.      Shiran is initially excluded from SAIC on the basis of her national origin, and SAIC ██████████████████████████████████████████████
██████████████████████████████████.**

59.      In 2023, Shiran submitted her application to SAIC's Art Therapy Program.  In the

---

[24] https://research.gold.ac.uk/id/eprint/7144/1/hirsh_transversal_2010.pdf (last accessed May 4, 2025).

[25] Footnote 15, *supra*.

months leading up to her application (November-December 2022), Shiran communicated regularly with Patrick Quilao ("Quilao"), the Director of Graduate Admissions, regarding her application to ensure she met all of the program's requirements. ████████████████████████████ ███████████████████████████████████████████████████████████████. Quilao communicated to Shiran that he felt she was a strong candidate.

60.     In preparation for her application, Shiran met with Quilao in person on December 9, 2022 at SAIC. The subject of Israeli-Palestinian relations arose. At one point during the conversation Quilao made a comment to Shiran along the lines of "████████████████████████ ███████████████████████."

61.     Quilao was referring to a known culture of hostility at SAIC. For years, there has been an accepted tenor on campus that Israel is the embodiment of pure evil, and that Jews do not and cannot legitimately live as a collective sovereign in that land. It is what SAIC's Students for Palestine Liberation ("SPL") has publicly described as SAIC's "rich history" of "anti-zionism."[26]

62.     For example, SAIC publishes and maintains on its website a student-run publication called *f Newsmagazine* for which SAIC provides funding and resources. This publication peddles the antisemitic themes discussed above – that Israel is demonic, uniquely evil, and relishes in murdering innocents. On June 8, 2021, this SAIC-funded and supported publication ran a cartoon under the headline "Godzilla Israel" where Israel is depicted as Godzilla, grabbing a sack of money from Uncle Sam who says "This horrible monster has every right to defend itself." It depicts Israel as a monster indiscriminately brutalizing women and children.[27]

---

[26] https://www.instagram.com/p/C2a3MDgLdc9/?utm_source=ig_web_button_share_sheet (last accessed May 4, 2025).

[27] https://fnewsmagazine.com/2021/06/godzilla-israel/ (last accessed May 4, 2025).



63.     Four days later, SAIC's newsletter published another cartoon depicting an Israeli claiming "I have the right to defend myself."



64.     By painting Israelis as foreign interlopers like in the two panels above it, the cartoon engages in erasive antisemitism by stripping Jews of their connection to Israel and depicting them as colonizers with no relationship to the land. It also denies the humanity of Israelis who are regarded as having no "right to defend themselves" against violence.

65.     SAIC—including its Art Therapy program in particular—also publicly platforms student work that glorifies violence against Jews and Israelis by promoting more efficient means for Hamas to engage in "resistance."[28] In this context, "resistance" is a euphemism for violence against Israelis, and also shorthand for Hamas itself, whose name means "Islamic Resistance Movement." The proposal featured on SAIC's website is designed to help the "resistance" "to operate and resist" regardless of "aboveground conditions of Israeli aggressions." In other words, it is a vision for improving violence against Israelis:



66.     Even after the October 7th terror attack in which Hamas used (and continues to use) its tunnel network to imprison living Israeli hostages, SAIC still promotes this work on its website. Upon information and belief, SAIC has never promoted any other student project that proposed

---

[28] https://sites.saic.edu/gradshow2022/artists/arwa-qalalwa/#:~:text=The%20system%20operates%20aboveground%2C%20underground,aboveground%20conditions%20of%20Israeli%20aggressions (last accessed May 4, 2025).

alternative methods and recommendations for making violence against another ethnic group more efficient.

67.     These are a few examples of SAIC tolerating or promoting violence against Jews living in Israel, the erasure of Jewish connection to the land, and of a general culture at the school that Israel is a demon among nations – and why Quilao may have commented to Shiran that it was ████████████████████████

68.      Despite this comment from Quilao, Shiran did not understand that her candidacy was in jeopardy because she was Israeli, and she proceeded with the application process.

69.     Shiran submitted her application to the Art Therapy Program on January 10, 2023. █████████ reviewed her application and determined it was complete and could advance to the interview stage.

70.     SAIC's candidate interviews were scheduled for Saturday February 11, 2023. SAIC's admissions rules require that candidates "meet with a faculty panel to discuss their application materials," as opposed to meeting with a single interviewer. Having a multi-faculty interview panel is important to SAIC because it allows for more perspectives and avoids one person making decisions about a candidate.

71.     Shiran requested an alternative interview time because she observes the Jewish Sabbath. She was offered a 6:30 p.m. slot on that Saturday, after sundown. In confirming this time change, an administrator told her that the "interviews are 20 minutes with your assigned panel that consists of two to three faculty members." Shiran was assigned to a panel led by part-time faculty member Deb DelSignore and two other part-time faculty members. DelSignore e-mailed the other panelists regarding the schedule, stating: "████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████.

72.    DelSignore interviewed Shiran alone. ████████████████████████████

█████████████████████████████████████████████████████.

73.    During the interview, DelSignore asked Shiran "whether she could interact with Palestinians in the classroom," and "what would it feel like for you to sit in the classroom with Palestinians?" Shiran was disturbed by this question, and responded that she was open and "I think we could learn together. I don't know if I agree but at the end of the day we all want the same things." DelSignore noted that Shiran's answer "███████████"

74.    DelSignore continued to focus on Shiran's nationality. Rather than asking her about the still-life picture that Shiran designated for her portfolio discussion, DelSignore instead focused on Shiran's painting of Jerusalem, using it to further prod Shiran about her Israeli nationality. DelSignore discussed the Jerusalem piece for a significant amount of time, which surprised Shiran. DelSignore also repeatedly asked Shiran about her work with the Jewish Federation.

75.    After the interview, SAIC notified Plaintiff that her application was denied, providing no grounds for the denial.

76.    Plaintiff appealed the decision. She provided her account of the interview process and shared her belief that her denial was the result of discrimination against her based on her national origin and religion.

77.    SAIC engaged an outside law firm to investigate whether Shiran was denied admission to the Art Therapy Program as a result of discrimination based on national origin and religion (as well as an allegation that her pregnancy and parental status played a part). These

attorneys interviewed each of the faculty members who comprised the Committee that denied

Plaintiff's admission:

███████████████████████████████████████

████████████

████████████████████████

███████████████████████████████████████████

████████████

███████████████████████████████

78.    As learned during the investigation, when the Committee gathered to discuss

Shiran's application, "████████████████████████████████████████

████████            ███████████████████████████████████████."

79.    During the Committee's deliberations, ███████████████████████

███████████████████████████████████████████████████████

████████████████████████████

80.    The Committee discussed Shiran being Jewish "███████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████" Upon information and belief, no members of an SAIC admissions committee

have recommended denying admissions to a Black, Arab, or Palestinian student because their

experiences came "████████" from their respective racial or ethnic communities.

81.    The attorneys conducting the admissions investigation concluded, using a

preponderance of the evidence standard, that ███████████████████████████████████

████████████████████████████████

82.     They concluded that ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

83.     They also concluded from Delsignore's conduct during the interview ████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████"

84.     The investigators likewise found ██████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████ The investigators noted that the faculty members of the

Committee "██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████

85.     The investigators concluded that: "██████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████."

86.     The investigating attorneys ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████

87.     SAIC admitted Shiran to the program beginning in the Fall of 2023. However, on information and belief, SAIC declined to follow the recommendations regarding ████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ This information and belief is based on Shiran never receiving any notice that such recommendations were being implemented, on the fact that the subsequent investigatory report of Professor Yi's conduct made no reference that any such steps had been previously taken, and on the fact that Professor Yi's conduct going forward evinced no indication that ████████████████████

████████████████████████████████████

88.     Instead, SAIC Provost Martin Berger emailed Plaintiff on June 15, 2023, with a "sincere apology" that SAIC "fell far short of [its] own standards." No further color was provided to Shiran regarding the investigation or its conclusions, nor was Shiran made privy to the identity of the Committee members.

89.     Plaintiff responded the next day that, while she was thankful that SAIC reversed its decision, she continued to have "significant concerns about whether or not [she] can participate in the program without being subjected to discriminatory ideologies—and whether or not [she] can disagree with those ideologies without being subjected to various forms of retribution." She added: "I would like to take some time to reflect on my experience to date, the good news from yesterday, and my ongoing concerns and formulate my thoughts more properly. At that point, I will return to you with an update on both my plans and my concerns."

90.     Provost Berger responded the same day stating:

> You would have the same right to hold and express your views without fear of repercussion as anyone else in the community. While our commitment to academic freedom and freedom of expression necessarily means that we are sometimes exposed to ideas that disturb us, I assure you that the institution will do everything in its power to ensure that all of our students have the latitude to freely express their thoughts, whether popular or not.

91.     Plaintiff replied on July 12, 2023. She reiterated she would have no problem working with, and welcomed having, colleagues who "bring with them a multiplicity of viewpoints on all sorts of issues." She also told the Provost: "What concerns me is that various members of the faculty may sanction a retributive or discriminatory attitude against me, as an Israeli and as a Jew, that would be considered racist, unethical, and possibly illegal were it directed against any other ethnic group." Shiran's worry of faculty retribution aligned with the investigating attorneys' recommendation ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████

92.     Shiran expressed concern that faculty members in the Art Therapy department "valorize[] (or at least tolerate[]) hatred against people like me." Shiran offered one example as the basis for her concern, which was a thesis for which Leah Gipson, a member of the Committee

and the Department Chair, served as advisor for the year prior. That thesis entitled "Art as a Method of Existence and Resistance in Palestine," claimed the "true culprit" of distress among Palestinian children were "the colonizers and oppressors known as Israel" and that "the Zionists of the Jewish state of Israel have been ethnically cleansing the land of Palestine…"[29]

93.     Based on these concerns and others, Plaintiff asked for some assurance that she would not be subject to discrimination. In response, Provost Berger noted they were welcoming a new chair and graduate program director, and stated: "We do demand that everyone at SAIC is treated in a non-discriminatory manner. You and your graduate student peers have every right to freely express your views without fear of discrimination."

94.     About two months after the attorney-investigators concluded that ▮▮▮▮▮▮



Shiran began her first semester, and enrolled in a mandatory course taught by Professor Yi, who the investigators ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*B.   Hamas commits the October 7th terror attack one month into the semester*

95.     One month into her first semester, on October 7, 2023, Hamas committed the largest scale murder of Jews since the Holocaust, murdering nearly 1200 Israelis, including infants, children and the elderly (through shootings, asphyxiations, burnings, grenade explosions, and other means). Hamas wounded 4,000 Israelis, committed rape and mutilation, and kidnapped 231 hostages. In authoring a comprehensive 315-page account of the attacks for the British Parliament,

---

[29] https://digitalcollections.saic.edu/node/84612 (last accessed May 4, 2025).

renowned historian Andrew Roberts stated that there were "scenes of sadistic barbarism not seen in world history since the Rape of Nanjing in 1937."[30]

96.     Hamas called its October 7th terror attack "Operation Al-Aqsa Flood."

97.     Hamas intended for Operation Al-Aqsa Flood to be just the first attack in a campaign to eradicate Israel. A leader in Hamas' "political bureau" stated that the Al-Aqsa Flood "is just the first time, and there will be a second, third and fourth ....We must remove that country." When asked whether he meant the annihilation of Israel, he said, "Yes, of course."[31]

98.     Hamas is a designated terror organization[32] that is explicitly dedicated to murdering Jews worldwide. Its founding charter plainly states: "Our struggle against the Jews is very great and very serious. It needs all sincere efforts…The Movement (Hamas) is but one squadron that should be supported by more and more squadrons from this vast Arab and Islamic world, until the enemy is vanquished and Allah's victory is realized."[33]

99.     Hamas' leadership have repeated this objective time and again. Of the abundant examples, a member of Hamas' political bureau, Fathi Hammad, has called for the slaughter of Jews wherever they can be found ("We must attack every Jew on planet Earth"), and recommends

---

[30] *7 October Parliamentary Commission Report*, presented to the British Parliament on March 18, 2025 https://static1.squarespace.com/static/67bf0490d422da027d74c55c/t/67d80d04b3bde77ec3ac2b66/ 1742212374048/The+7+October+Parliamentary+Commission+Report+-+The+Roberts+Report+- +APPG+UK-Israel.pdf (last accessed May 4, 2025).

[31] https://www.memri.org/reports/ hamas-official-ghazi-hamad-we-will-repeat-october-7-attack-time-and-again-until-israel (last accessed May 4, 2025).

[32] On October 8, 1997, the U.S. State Department designated Hamas a Foreign Terrorist Organization https://www.dni.gov/nctc/ftos/hamas_fto.html (last accessed May 4, 2025); https://www.state.gov/foreign- terrorist-organizations/ (last accessed May 4, 2025).

[33] https://avalon.law.yale.edu/20th_century/hamas.asp (Hamas Covenant 1988) (last accessed May 4, 2025). Other parts of Hamas' charter state: "The Day of Judgment will not come about until Moslems fight Jews and kill them;" and "[Hamas] consider[s] itself to be the spearhead of the circle of struggle with World Zionism... Islamic groups all over the Arab world should also do the same, since they are best equipped for their future role in the fight against the warmongering Jews."

decapitating Jews with knives ("People of Jerusalem, we want you to cut off the heads of the Jews with knives. With your hand, cut their artery from here.")[34]

100.    Hamas foot soldiers echo this objective to murder Jews wherever they are, stating "we [Hamas] will chase you everywhere, we know that there is no better blood than the blood of Jews."[35] And their religious preachers share the same message. Just months before Hamas' October 7th terror attack, Hamas' Sheikh Hamad Al-Regeb stated at a sermon: "And today the turn of the Jews has come. Count them, kill them one by one and do not leave a single one of them alive."[36]

101.    "Operation Al-Aqsa Flood" was Hamas acting out its desire to commit genocide by killing all Jews they could find. As one terrorist gloated to his parents by phone on October 7th: "Your son killed Jews! […] Dad, I'm talking to you from a Jewish woman's phone. I killed her and I killed her husband. I killed ten with my own hands! […] Mom your son is a hero! Kill, kill, kill, kill them!"[37]

102.    As President Biden noted, Hamas is "a group whose stated purpose for being is to kill Jews."[38]

103.    Hamas is thus an anti-Jewish hate group in addition to being a terrorist organization. Its October 7th attack was motivated by anti-Jewish hatred and terrorized Jews worldwide.

---

[34]https://www.memri.org/tv/snr-hamas-official-fathi-hammad-urges-people-jerusalem-cut-off-heads-jews-knives-day-reckoning-moment-destruction (last accessed July 29, 2024).

[35] https://palwatch.org/page/569 (last accessed July 29, 2024).

[36]https://www.memri.org/tv/rafah-gaza-friday-sermon-hamas-official-regeb-allah-necks-jews-annihilate-them (last accessed July 29, 2024).

[37]https://www.timesofisrael.com/idf-publishes-audio-of-hamas-terrorist-calling-family-to-brag-of-killing-jews/ (last accessed May 4, 2025).

[38]https://bidenwhitehouse.archives.gov/briefing-room/speeches-remarks/2023/10/10/remarks-by-president-biden-on-the-terrorist-attacks-in-israel-2/ (last accessed May 4, 2025).

**C. Plaintiff's experiences with administrators, faculty, and classmates following October 7th**

104.     Like nearly every Israeli, Plaintiff was deeply and personally shocked and devastated by the massacre. She was the only Israeli in the Art Therapy Program.

105.     On October 9, 2023, with not even two days to grieve and process the magnitude of what occurred in her country and to her people, Shiran wrote to Department Chair, Adelhaid Mers ("Mers"), and her advisor Katherine Kamholz ("Kamholz"), with a copy to SAIC Dean of Student Affairs Felice Dublon ("Dublon") (who later served as acting Provost), that "not all is well." After describing how her friends and family were faring (some dead, no one doing well), she expressed her absolute devastation that people were "publicly celebrat[ing] the atrocities committed against Israel's civilians. Atrocities that include murder, rape, kidnapping, and mutilation." Her e-mail also discussed how the chant "From the River to the Sea" was a "call for the complete destruction of the state of Israel, which sits in the narrow space between the Jordan River and the Mediterranean Sea." She stated, "it pains me beyond measure that this same death-cult ideology enjoys so much support within the school and the department." By then, just two days after October 7th, through conversations with classmates (some of whom claimed Hamas' crimes were "fake") and seeing student posts on social media, she already perceived this to be a prominent ethos on campus.

106.     The next day Plaintiff shared an infamous BLM Chicago social media post with the image of a paraglider in celebration of the Hamas infiltration with the same recipients of her prior e-mail. She did this to give them an example of some of the rhetoric she found shocking, stating, "I don't know how I can feel dignity or safety at SAIC without some form of reckoning on the part of the faculty that for so many of the organizations and ideologies the school supports, Jewish (and particularly Israeli) lives don't matter."

107.    In sending these e-mails, Plaintiff was trying to explain to the recipients the severity of how she was feeling on SAIC's campus in the wake of October 7th, and was trying to shed light on exactly how and why her pain and fear was so acute. None of the recipients responded to Plaintiff's concern, even as she shared how vulnerable she felt, or that she experienced that Jewish and Israeli lives did not matter on SAIC's campus.

108.    Within one week of October 7th, protests erupted on SAIC's campus. These protests featured signs stating "From the River to the Sea, Palestine will be free," with the hashtag "#AlAqsaFlood" written beneath. They also featured signs stating "Resistance is justified when people are occupied" with the same #AlAqsaFlood hashtag. These signs thus openly celebrated Hamas' Operation Al Aqsa Flood by name, glorifying violence against Jews living in Israel perpetrated by the violent, genocidal Hamas whose publicly-stated objective is to kill Jews worldwide.




109.    "From the River to the Sea" is likewise an expression calling for the elimination of Israel, and has been condemned in a bi-partisan resolution of the House of Representatives (H.R. 883) as "an antisemitic call to arms with the goal of the eradication of the State of Israel," and a slogan that "seeks to deny Jewish people the right to self-determination and calls for the removal

of the Jewish people from their ancestral homeland." The resolution also recognized that "Hamas…and other terrorist organizations and their sympathizers have used and continue to use this slogan as a rallying cry for action to destroy Israel and exterminate the Jewish people," also recognizing that it is located in Hamas' 2017 Charter, which states: "Hamas rejects any alternative to the full and complete liberation of Palestine, from the river to the sea."

110. Similarly, the phrase "Resistance is justified when people are occupied" expressly justifies violence against Jews living in Israel and is an expression of blanket approval of Hamas' terror attack against Israelis. That sign, too, contained the #AlAqsaFlood" hashtag, also glorifying Hamas' Operation Al Aqsa Flood by name.

111. At the time, Plaintiff was aware that these posters were being marched in and around SAIC's campus and understood herself to be targeted by them because she is an Israeli and Jew.

112. Plaintiff felt further targeted because she feared if her classmates learned that she served as an Israeli soldier (like all non-exempt Israeli citizens do because the country has a mandatory conscription), she would be subject to heightened attacks.

113. Upon information and belief, SAIC's administrators with authority to institute corrective measures were also aware of the use of these signs in and around SAIC's campus not only because they were waved in plain sight, directly in front of SAIC's main campus buildings, including where SAIC's Title IX office is located at 116 S. Michigan Ave., but also because the SAIC-funded and supported *f newsmagazine* re-published these posters celebrating murder of and violence against Jews living in Israel twice – first in its October 26, 2023 online edition, and again

in its November 2023 print edition, which was circulated in hard copy in SAIC buildings across campus, and is linked on SAIC's official website.[39]

114.    Ten days after October 7th, over 100  members of SAIC's faculty wrote an open letter "To the Students of the School of the Art Institute" referring to Hamas' terror attack as occurring upon "Israeli settlers," and describing Zionism as "a political ideology predicated on colonial theft and destruction." The faculty stated they "understand Palestinian homelands are Indigenous lands" (though not indigenous for Jews). The letter went on to blame Israel as the cause of the terror attack against it, as the faculty expressed "uncompromising solidarity with the Palestinian people in their righteous struggle for self-determination."[40] This was understood by Plaintiff (and would be understand by the vast majority of Jews worldwide) as a justification and support of the October 7th attack against Jews living in Israel.

115.    On information and belief, SAIC's head administrators (with authority to implement corrective measures) and its Board were aware of this faculty letter because it contained demands of them ("We, the faculty of SAIC, are demanding the administration and Board join us in publicly calling for an end to the war on Gaza and an end to the occupation of Palestinian lands") so, upon information and belief, was sent to them, and it was also reported in SAIC's student magazine.[41]

---

[39] https://fnewsmagazine.com/backissues/#flipbook-issue_2023_11_November/ (last accessed May 4, 2025); https://digitalcollections.saic.edu/node/89225 (last accessed May 4, 2025).

[40] https://www.change.org/p/saic-faculty-statement-of-solidarity-with-palestine (last accessed May 4, 2025).

[41] https://fnewsmagazine.com/2023/11/70-saic-faculty-members-sign-letter-in-support-of-palestinian-people/ (last accessed May 4, 2025).

116.    Within the same week, SAIC Professor Mika Tosca publicly posted on social media: "Israelis are pigs. Savages. Very very bad people. Irredeemable excrement. . . . May they all rot in hell."



117.    Plaintiff experienced these overlapping and coalescing events all occurring in a condensed period on SAIC's campus in the immediate aftermath of October 7th and understood them to be acts targeting Israelis and Jews including herself. Plaintiff was aware that each of these events were occurring on campus and considered them to be creating a hostile campus environment in which Israelis and Jews were the targets of calls to violence, or in which violence against Jews living in Israel was justified and celebrated. And even though Mika Tosca was not Shiran's professor, she felt targeted as an Israeli by an on-campus professor calling for all Israelis to "rot in hell," while over one hundred faculty members simultaneously gave October 7th a pass because it was inflicted upon "Israeli settlers," while yet others on campus marched with signs calling for or justifying violence against Jews living in Israel with the hashtag #AlAqsaFlood.

118.    On October 17, 2023, in an email with the Subject, "Antisemitism at SAIC," Plaintiff forwarded Mika Tosca's tweet to Department Chair Mers, Provost Berger; Dean Dublon, Executive Vice President and General Counsel Leslie Darling, and Kamholz, stating: "I have no

words. How can the School of the Art Institute permit a faculty member to spew such horrific hate? Who else holds these views? Am I even safe coming to school?"

119.   Nobody responded to Shiran's concern about her safety coming to school, or what she was to make of a faculty member declaring that all Israelis were "pigs," "savages,' and "very, very bad people" who should "all rot in hell."

120.   Two days later, Plaintiff wrote to her advisor, Kamholz:

Unfortunately, nobody has responded to the substance of my email. I asked in my prior email: "How can the School of the Art Institute permit a faculty member to spew such horrific hate? Who else holds these views? Am I even safe coming to school?" I deserve answers to these questions—and nobody has responded. Why? […] Violent words often lead to actual violence. How can I feel safe?

121.   Once again, Plaintiff received no response to her question. During this time, and because students and faculty were apparently free to target Israelis and Jews with these hateful and discriminatory posters, chants, and statements, Plaintiff felt shocked, confused, targeted, and alienated in coming to campus.

122.   Despite not responding to Shiran's e-mails, SAIC's faculty including, upon information and belief, Department Chair Mers, were e-mailing each other behind the scenes regarding Shiran. This was revealed in a subsequent investigative report pertaining to Professor Yi. Though SAIC has withheld the actual exhibits to the report, including e-mails, the narrative reflects that ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ In other words, rather than responding *to* Shiran, faculty and administrators were passing notes *about* Shiran (or ignoring her altogether).

123.     On November 2, 2023, many SAIC students, led by SPL, conducted a "walkout" of the school. The students called for the destruction of Israel, chanting "From the river to the sea, Palestine will be free," which Plaintiff saw via social media was being shouted on campus, and felt targeted by it. That same phrase also appeared on stickers given to students who participated in the walkout:



124.     Professor Yi, who follows SPL on Instagram, "liked" the social media post sharing details about the walk-out, including their posted images of "From the River to the Sea" stickers.

125.     The administration at SAIC was aware of these chants.  In an email sent to the entire SAIC Community on November 3, 2023, Acting Provost Dublon and President Elisa Tenny obliquely stated that "some of the language used at the event disturbed the equilibrium of some community members," and asked students "to avoid inflammatory rhetoric or the disparagement of the peers with whom we disagree."[42]  They stated that SAIC "condemns the hatred of any person based on religion, country of origin, or any other aspect of their identity, and we denounce both

---

[42] https://www.saic.edu/news/collegiality-and-care-support-inclusive-expression (last accessed May 4, 2025).

anti-Semitism and anti-Muslim sentiment and harassment." In sharing these generic platitudes, the administration never actually identified what it considered problematic. Nor did it indicate that students could be disciplined for engaging in "disparaging" rhetoric. Instead, Dublon and Tenny ended their letter with, "Keep calling upon each other with collegiality. And keep engaging one another with care," as though collegiality and care were already hallmarks of what was occurring on campus. In response to this vague letter that communicated little of substance, students felt free to continue this type of violent rhetoric, and began mockingly called their ongoing campaign, "Disturbing the Equilibrium," to echo the empty words of the administration's letter.

126.    On November 14, 2023, a group of students (including more than half of the students in Shiran's first-year cohort) circulated a letter titled "FREE PALESTINE: Letter Regarding Palestine to the Art Therapy Department from MAATC Students" ("Free Palestine Letter").

127.    The letter called for "naming the difference between anti-semitism versus anti-zionism," in an effort to impose external definitions on Jews including Shiran. It made no mention of Hamas' terror attack, and it referred to Israel as a "settler colonial" state. The letter also complained that SAIC accepted donations from the Crown family, Jewish philanthropists who the letter claimed derived their wealth from an ownership stake in a weapons-contracting company. The letter did not mention any similar but non-Jewish philanthropists for scorn.

128.    Plaintiff felt compelled to respond to this letter, which she felt engaged in anti-Jewish discriminatory rhetoric and dehumanized Israelis, whose mass slaughter immediately preceded the letter, which made no mention of it. The same day Plaintiff prepared and circulated a response to the Art Therapy faculty and the students in her cohort to address the antisemitic claims made in the Free Palestine Letter.

129.    In her response, she:

a.    Described the attempt to define antisemitism as categorically distinct from anti-Zionism as "an act of oppression, of the vilest sort, to refuse the Jewish people the right to define the parameters of antisemitism," and challenged "the idea that those who hate Israel should have the right to define antisemitism at the expense of the world's Jewish community. We do not allow the Ku Klux Klan to determine what is or isn't anti-black racism. Every minority group deserves the right to affirm what is or is not prejudicial to them...Jews deserve the same courtesy. This letter peddles blatant antisemitism while simultaneously having the temerity to say that its authors should be permitted to redefine antisemitism so as to exclude their specific antisemitic prejudice";

b.    Explained why her classmates chanting "from the river to the sea, Palestine will be free" was insidious and an expression calling for the elimination of Israel;

c.    Wrote that despite the authors of the Free Palestine Letter "emphasiz[ing] the interconnectedness of all forms of systemic violence as well as all liberation movements," their silence regarding October 7th made clear "that systemic violence against Jews does not matter to its authors [and] their antisemitic attempt to decouple antisemitism and anti-Zionism makes clear that not all liberation movements should be regarded as interconnected [because] Zionism, the national liberation movement of the Jewish people, stands apart in their eyes, a pariah deserving of unique condemnation";

d.    Responded to the claim in the Free Palestine Letter that it was "a disservice to *everyone* in our community, but especially to those students who are directly

impacted, that we have not been provided space to discuss, learn, grieve, heal, and take collective action," by stating: "I would merely ask, what about me? Do I, as an Israeli and a Jew, not count among those 'directly impacted'? Do I not deserve to grieve my murdered countrymen and acquaintances – savagely murdered by Hamas? Do I not deserve to heal from the trauma of witnessing the most horrific anti-Jewish pogrom since the Holocaust?"

e. Explained that "the letter's sole target for blame [], the 'settler colonial state of Israel,' [is] a representation that is itself a gross and antisemitic distortion of reality."

f. Pointed out the double standard in singling out the Jewish Crown family for contempt, while ignoring other large, non-Jewish SAIC philanthropists whose wealth was also derived from the defense industry; and

g. Stated that "for those who would rather traffic in antisemitic deceptions that aid and abet Hamas's attempted genocide against my people – shame on you. You have made the school a hostile environment for me and for many other Jewish students, who presently suffer in silence. I will not abide this state of affairs and will insist that the school do everything required by applicable federal civil rights law to eliminate antisemitism and protect its Jewish community."

130. Shiran's response letter was itself a complaint that her classmates were engaged in antisemitic rhetoric on multiple fronts, and that she was experiencing a hostile environment on campus.

131. The only direct response Plaintiff received to her letter was from Kamholz, her advisor, who on November 14, 2023, asked for permission to share it with Professors Yi,

DelSignore and Savneet Talwar ("Talwar"), "who are the full time faculty in the department and would be consulted in regards to follow up with your concerns."

132.    The next day, Plaintiff gave her permission and sent Kamholz photos of posters that had sprung up in the Department's hallways (which eventually were plastered with signs demonizing Israel), including one focusing on "the Crown family's crimes," and proudly asserting they were "Disturbing the Equilibrium."



133.    The poster's QR code was a link to resources compiled by SPL, including the conspiratorial, antisemitic essay "Zionist Logic" by Malcolm X[43], praise of the Intifada terror campaigns against Israelis, materials "depicting how violence has been used in liberation from colonizers," and instructions to "follow and share updates" from groups including "Within Our Lifetime," a group who supports "resistance by any means necessary," (*i.e.*, murder of Jews living

_____

[43] In this essay, which Art Therapy students could access by following the QR code posted in SAIC's hallway, Malcolm X describes "Zionists" as "ever-scheming imperialists," and argues "Israeli Zionists religiously believe their Jewish God has chosen them to replace the outdated European colonialism with a new form of colonialism, so well disguised that it will enable them to deceive the African masses." He also claims the "ever-scheming European imperialists" (i.e., Jews) "wisely placed Israel where she could geographically divide the Arab world, infiltrate and sow the seed of dissension among African leaders and also divide the Africans against the Asians."

in Israel), whose name refers to eradicating Israel "within our lifetime," and whose logo communicates the same by depicting Israel disappearing in an hour glass:



134.    SPL's animus towards Israelis and Jews was thus on full display in the hallways of SAIC with no consequence. Upon information and belief, at least Department Chair Mers was aware of the postings in the Art Therapy Department.

135.    Upon information and belief, the Art Therapy Department Chair would have authority to institute corrective measures if they believed there was something posted in the hallways of the Art Therapy Department that violated SAIC's anti-harassment and anti-discrimination policies, such as QR codes linking to material that was on its face discriminatory or called for or justified violence against a particular group of people.

136.    Members of SAIC's administration were aware of the Free Palestine Letter and Plaintiff's response (in which she described being subject to a hostile environment and explained the ways in which the rhetoric of the Free Palestine letter exhibit anti-Jewish hate or prejudice) because, on November 14, 2023, the same day they were written, Plaintiff sent them both to Provost Berger, Dean Dublon, SAIC Executive Vice President and General Counsel Leslie Darling, Department Chair Mers and Professor Kamholz, while stating:

> I am returning to this email because, after nearly a month of waiting, I have still received no answer to the substance of my October 17th email -- and no assurance that the school can indeed ensure my safety. In the meantime, a student group has begun circulating an anti-Israel letter/petition that abounds in distortions, lies, and unabashed antisemitism. I have attached a copy of this petition for your review…Unfortunately, the anti-Israel letter…seeks to aid and abet Hamas, a U.S.-designated terrorist organization, by amplifying its propaganda and antisemitic fabrications.

Although your lack of response to the antisemitism on campus to date does not inspire me with much confidence, I nonetheless urge you—once again—to take meaningful action to ensure that the SAIC does not continue to function as a place of hatred against people like me. I insist that SAIC honor my civil rights, as protected by federal law, just as much as it does those of any other group within the school's community.

137.    Shiran did not receive a response to this e-mail either.

138.    Although, unbeknownst to her, and as detailed below, SAIC administrators and faculty were continuing to communicate via e-mail about her behind the scenes – rather than taking any action whatsoever to address or alleviate her concerns (or simply respond to her).

139.    On November 15, 2023, after Shiran protested the discriminatory nature of the Free Palestine Letter, Professor Yi e-mailed students who sent the Free Palestine Letter and thanked them for crafting a 'thoughtful email, which demonstrates what critical thinking skills look like in action.'" Professor Yi thus applauded one group of students for penning a letter which she knew another student had vocally objected to because she believed it was discriminatory in multiple ways. Professor Yi did not similarly communicate with Shiran about her response.

140.    In an email to students that same day, Professors Yi and DelSignore stated they were holding a joint class session to "create a communal space for all of us to hold each other accountable through art, writing and witness reading." Shiran responded to Professors Yi, DelSignore, and Kamholz, along with the students in her class, that she would not attend the joint session, stating:

I welcome the opportunity to speak with any of you individually about the conflict in the Middle East and to discuss with you the constructive efforts we could undertake in order to ensure a peaceful future for Israelis and Palestinians alike—a future free from Hamas's terrorism and genocidal intentions.

For more than a month, I sat silent while I watched various colleagues propound slander against my people, and by extension, me—to my extreme sorrow and dismay. During this time, I behaved with the highest degree of professionalism toward all of my classmates, including those who were engaging in behavior that I regarded as antisemitic. I did not pick this fight. In fact, I tried my best to avoid

conflict. But the situation became so intolerable, that I decided I could no longer suffer in silence—and that I needed to stand up to the bullying and harassment.

As I stated in my response letter, the pro-Hamas letter advances at least three major antisemitic positions. First, it claims that Israel is committing genocide. This statement is false, as a matter of both fact and international law. It draws "comparisons of contemporary Israeli policy to that of the Nazis." Second, insofar as it attempts to recategorize as genocide that which is clearly not genocide—and would not be considered genocide in the case of any other nation—it applies "double standards" to Israel by "requiring of it a behavior not expected or demanded by any other democratic nation."

It should go without saying that the letter itself embraces a galling double standard when it falsely accuses Israel of genocide but makes no mention of October 7th or Hamas's explicit commitment, as recorded in its charter and as repeatedly expressed by its leaders in recent weeks, to carry out an actual genocide against both Israel and the Jewish people.

Second, the letter claims—again, with no factual support and contrary to the historical record—that Israel is a "settler colonialist state." This accusation also falls within the IHRA definition of antisemitism, which states that it is antisemitic to "[deny] the Jewish people their right to self determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor."

Lastly, and relatedly, the letter claims that anti-Zionism is not antisemitism. This contention attempts to disregard the perspective of the overwhelming majority of world Jewry, which indeed sees anti-Zionism as a form of antisemitism, and to effectively rewrite the above-quoted example of antisemitism from the IHRA definition that states that it is antisemitic to "[deny] the Jewish people their right to self-determination.

The IHRA definition of antisemitism has been endorsed by the United States government and the Department of Education….

There is a categorical difference between good-faith criticism of Israel, grounded in fact, and defamatory lies that aim to discredit Israel and pave the way for its elimination. I welcome well intentioned criticism of Israeli policy that aims to secure a better and more peaceful future for Israelis and Palestinians alike. I engage in this sort of criticism all the time. But as I made clear in my response, the pro-Hamas letter does not engage in such a good-faith critique. It is antisemitic in all regards—and it reflects an attitude of tolerance or even support for antisemitism and antisemitic harassment that has become all too pronounced in our department.

While I would like to believe that the faculty announced Friday's event with only the best of intentions, because the faculty has taken no action to address the antisemitic hate speech included in the pro-Hamas letter, they have provided implicit sanction to repeat that speech at Friday's event. I understand the general

importance of respecting diverse narratives, but a narrative loses its legitimacy when it is nothing more than the antisemitic talking points of a genocidal terrorist organization.

The school would not subject a student of color to the degrading experience of "listening" to the "opinions" or "narratives" of a white supremacist, and I likewise should not be subjected to programing that will almost certainly result in antisemitic hate speech being directed at me. The school would not give a platform to—let alone sponsor—any other form of hate speech. It should not initiate an event that in effect—even if not in intention—will likely constitute school-sponsored antisemitism.

Throughout the Middle Ages, Jews in Europe were subjected to public humiliation in the form of religious "debates" known as disputations. Most disputations followed a standard script. The Christian officiants of the event would make all sorts of inflammatory charges against Jews and Judaism, the Jews were allowed to respond—but not in a way that might offend the officiants or change any minds – and the Jews would "lose" the debate. Usually, some sort of state-sponsored persecution would follow.

The event contemplated by the faculty reminds me of just such a disputation. I will need to hear outrageous and inflammatory narratives that have no basis in fact—narratives that closely track the propaganda of a recognized terrorist organization sworn to the destruction of my people—and I will be allowed to respond, but only in a way that does not seek to change any minds. I will invariably "lose the debate" and become even more of a social outcast than I already am. This activity will do nothing to lessen the antisemitic harassment occurring on campus—it will only constitute another instance of such harassment.

I will close by reminding everyone that we are attending an art therapy school and that we pay to attend specific classes with recognized academic purposes. The school is under an obligation to provide us with that education—and not to divert regularly scheduled programming for political purposes or to appease an antisemitic group. If I wanted to study the conflict in the Middle East, I could have pursued a degree in geopolitics. The same applies to anyone else in the department.

As a therapist in training, I have learned that it is important to not force our clients into an action stage if they are not ready to do so. I will continue to maintain a professional relationship with my colleagues and treat them with full respect. Unfortunately, not all of my fellow students have taken the same position. In further acts of antisemitic harassment, I am already being boycotted by some of my colleagues.

141.    The reference to "being boycotted by some of my colleagues" was to the fact that

by then some of her classmates refused to speak with or engage with her during class because she

refused to adopt their discriminatory views, or to disavow her national identity or her country of origin in order to be accepted as an equal in the classroom. In other words, she was treated as a pariah because she would not play ball in the anti-Jewish game of having to publicly disavow the State of Israel before being allowed to equally partake in the classroom environment. Professor Yi was well aware that Shiran's classmates were engaging in this shunning tactic, and she permitted it.

142.    Professor Yi responded that same morning to Plaintiff's e-mail, with copies to Department Chair Mers, DelSignore, and Kamholz, "to provide some clarifications." She described the "open studio process" the teachers intended for the joint session and said, "We have no plans for diverting classes to talk about the conflicts in the Middle East. These two classes are designed to focus on art therapy assessment and art materials. We are teaching students to utilize the knowledge and skills offered in our classes to hold human emotions and difficult feelings that are hard to grasp through words." Yi proposed that Plaintiff have a call with the two professors to answer her questions about the session, to which Plaintiff agreed.

143.    Prior to meeting with Plaintiff, Yi and DelSignore (along with Department Chair Mers and Professor Talwar) met with ███████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████ By virtue of their high positions as SAIC administrators, and as alleged in Count I below, each of these officials had authority to implement corrective measures addressing harassment and/or discrimination on campus.

144.    Professor Yi reported (during the later investigation) that these administrators "███████████████████████████████████████████" This meant SAIC's administrators had decided they would not respond to Shiran regarding the substance of her letter

even though it included reports that she was experiencing a hostile environment, and that her classmates were repeating antisemitic and violent slogans that targeted her as an Israeli and Jew.

145. Professor Yi also reported that "████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████." Upon information and belief, if Professor Yi shared "████████████████████████████ ████████ this would include sharing with the administrators that Shiran was being shunned by her classmates and excluded from normal classroom activity, and that Professor Yi had already agreed that one of Shiran's classmates could cancel presenting jointly with Shiran (as described below) on the basis of Shiran's failure to disavow Israel as "genocidal."

146. Professor Yi also reported that ████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ████████████████████████████ And because Professor Yi had reported "███████████████ in this meeting, upon information and belief she also shared that Shiran had objected to the proposed joint session as akin to forcing other minorities into having to sit and listen (during class time) to the discriminatory narratives of classmates who harbored animus against them.

147. At least Dublon had already been notified of these issues by Shiran directly on multiple occasions and, upon information and belief, Dean Martin-Thomsen was also aware of these concerns prior to meeting with Yi and the other faculty because she had, just prior to the meeting, e-mailed the Art Therapy faculty telling them to "████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. Upon information

and belief, Shiran's objection to the planned "joint session" prompted Dean Martin-Thomsen's e-mail, because she was the only Israeli in the cohort who had raised concerns about it. In any event, Dean Martin-Thomsen appears to have backpedaled from this directive when she met with Yi, the other art therapy faculty, and other administrators, instead instructing the faculty to tell students (i.e., Shiran) that "████████████████████████████████████████████."

148.    Because SAIC has withheld the exhibits to the investigatory report describing this meeting, Shiran is not able to assess the full scope of what else may have been discussed in this faculty-administration meeting, which at the very least had a particular focus on Shiran, as described above.

149.    Upon information and belief, at least some of these administrators were also aware of the earlier investigation into Shiran's rejection from the school, and that the investigation concluded that ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ This information and belief is based on the fact that the investigatory report on Shiran's admissions process was sent to ████████████████████████████████████████████████ ████████████████████████████████████████████████

150.    15 minutes after Yi, DelSignore, Talwar, and Department Chair Mers met with SAIC's administrators, Plaintiff met with Yi and DelSignore who assured her the joint class session was not going to be about "Middle East events." Yi and DelSignore stated they would clarify at the beginning that the joint class was not an opportunity to air one's views on "politics," but rather to use art and learn therapy skills, and their representation that if things began to veer in that

direction, they would redirect the classroom focus and clarify that it was "not what this space is for." Hearing this, Shiran changed her mind and agreed to attend the session with her classmates.

151.    Also on November 16th, and before the joint session which occurred the following day, Shiran received an e-mail from one of her classmates, Jannah Sellers ("Sellers"), a non-Jewish, non-Israeli, who was also an SAIC-paid graduate assistant that was supposed to provide support for Shiran and other students.

152.    Sellers informed Shiran that Professor Yi had "graciously" offered Sellers to cancel a presentation she was scheduled to give jointly with Shiran. According to the investigatory report, ███████████████████████████████████████████████████████████████ ████ .

153.    Sellers informed Shiran that she would not present jointly with her as planned, stating she was "simply unable to work closely with any individual who denies the genocide so clearly taking place before us…" Sellers informed Shiran that she would present on calligraphy and Shiran could present on watercolor. In other words, because Shiran was not willing to disavow her own country as "genocidal," Professor Yi allowed Sellers to ditch her joint presentation with Shiran (which also resulted in the Hebrew calligraphy portion of the presentation being deleted altogether).

154.    Unlike how Professor Yi demanded that Shiran "hold space" for other students in the classroom, Professor Yi did not once encourage or expect Sellers to extend the same for Shiran's benefit. Professor Yi thus facilitated Sellers rejection of Shiran as a co-presenter on the basis of the student's discriminatory view that Shiran needed to disavow Israel before she could be treated equally as a participant in this collaborative presentation, and out of retaliation against Shiran for speaking up against the discriminatory rhetoric contained in the Free Palestine Letter,

which Sellers signed.

155.    Plaintiff objected to splitting the project and felt discriminated against by both Professor Yi and Sellers in being excluded from her own joint presentation. Plaintiff e-mailed Professor Yi the same day, stating that Sellers' "disagreement with the content of my letter and her feelings should not allow her to silence me and prevent me from defending myself against antisemitic harassment. She and those supporting the pro-Hamas letter have slandered my home country and effectively called for its elimination. That gives me a tangible reason to feel threatened and targeted…by splitting our presentation, [Sellers] has effectively eliminated the segment of the presentation that was to be devoted to Hebrew calligraphy. So her decision to cease working together also means that students will lose an opportunity to learn about Israel and Israeli/Jewish culture—which I take to be a form of silencing and oppression."

156.    Professor Yi did not respond to this e-mail.

157.    Yi and DelSignore's joint session occurred the following day, November 17, 2023, and spiraled precisely as Plaintiff had feared. Substantial time was dedicated to her classmates airing all of their grievances about the only topic on which everyone was constantly fixated upon – Israel. One classmate screamed her hate and anger towards those who rejected her narrative of an ongoing genocide which, of course, in that classroom, referred only to Shiran. As Yi and DelSignore sat silently while Shiran absorbed attacks from her classmates, Shiran not only felt deliberately misled by her professors, but also that she had just been coerced to sit through a school-sanctioned event for her classmates to vent their rage towards her because she would not get on board with their hateful and discriminatory views, because she would not disavow her country of origin, and because she had the temerity to publicly call out her classmates for trading in antisemitic rhetoric.

158.    When Shiran expressed her anger at this, Yi and DelSignore effectively scolded Plaintiff, telling her that she needed to learn to "hold space" for others' feelings. Shiran left the classroom during a break sobbing.

159.    For the rest of the semester, Professor Yi continued to "hold space" for Shiran's classmates to express vitriol towards Israelis, and it was continually demanded of Plaintiff to "tolerate upsetting or triggering subject matter in a professional manner" while there was never any expectation that Plaintiffs' classmates similarly "hold space" for Shiran's feelings or views (including when a classmate described Shiran's views as "bullshit" which evoked no response from Professor Yi). They could ostracize her, instead, with Yi's blessing.

160.    Up to and through the final exam, Professor Yi presided over a classroom environment wherein Shiran was repeatedly either verbally targeted or intentionally excluded, ignored, and isolated by her peers. By and large, Shiran was completely ostracized in retaliation for objecting to what she expressed was discriminatory rhetoric against Jews and Israelis, her objection to being dehumanized as an Israeli and a Jew in the wake of such a massive and widespread murder spree of Israeli Jews, and because she refused to disavow her national identity in favor of her classmates' narratives which were themselves packed with anti-Jewish tropes. Because she would not shed her Jewish national identity in the manner they required of her, she was cast away and excluded from the ordinary graduate curriculum which required collaboration and discussion among the graduate students in order to serve an educational benefit.

161.    In addition to being discriminatory, this shunning denied Shiran the ability to fully participate in the graduate course because the course itself, rather than a lecture format, required classroom and peer-to-peer collaboration, communication, and the sharing of classroom resources and supplies.  Shiran therefore could not fully engage in the curriculum, when her peers had carte

blanche from Professor Yi to exclude her from classroom activities.

162.    Professor Yi was aware of this dynamic in the classroom. She did not require that classroom norms among graduate students, and the corresponding educational benefits of those norms – classroom communication, collaboration, sharing work materials – be extended to Shiran and for her benefit.

163.    She did, however, penalize Shiran for not extending her classmates the same respect. Professor Yi gave Shiran a failing mark for "Professionalism: Collegial + Interpersonal skills" regarding to the joint presentation, stating that, "I noticed that you mostly interacted with non-BIPOC-presenting students during skillshare." In other words, it was incumbent upon Shiran to interact with BIPOC-presenting students during class activities, but her classmates were free to shun and ostracize her under Professor Yi's watch without penalty.

164.    Professor Yi also adopted scoring from Shiran's classmates on this "joint" skillshare project which she knew contained falsehoods motivated by animus against Shiran. Several of Shiran's classmates accompanied their low marks of Shiran with baseless accusations that she plagiarized her work from Sellers (who refused to present with Shiran), stating that it was "really frustrating to know that Jannah [Sellers] made the presentation," and that "there were errors in the slides that showed that they were co-opted or plagiarized from a different presentation." Some classmates expressly acknowledged that "most of [their] feedback has to do with outside factors."

165.    Professor Yi knew that these allegations of plagiarism were false because she was copied on the e-mail that Sellers sent to Shiran notifying her that she refused to work with Shiran because she did not acknowledge "the genocide." In that e-mail Sellers also stated, "I have created new slides for myself so feel free to use the ones we already have and edit them as needed." Professor Yi also did not believe the allegations of plagiarism because she never raised the issue

with Shiran nor did she escalate it as a concern under SAIC's academic misconduct policies, which require a faculty member to follow certain steps if a student "is suspected of committing a single act of academic misconduct," which includes plagiarism. Nonetheless, Professor Yi adopted and applied the scores from the tainted peer evaluations knowing they contained baseless accusations against Shiran.

166.    Though Shiran never received any responses from SAIC administrators or faculty regarding her prior e-mails asking about her safety on campus and her reports of a hostile environment ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

167.    That report – which concluded ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ and in addition to the direct messages they received from Shiran on multiple occasions that she had concerns about the classroom and campus environment).

168.    Though SAIC has withheld the e-mails themselves and the report refers only to

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████

　　　████████████████████████████████████████████████████

　　　　██████████████████████████████████████████████

　　　████████████████████████████████████████████████████

　　　████████████████████

　　　████████████████████████████████████████████████████

　　　█████████

　　　██████████████████████████████████████████████████

　　　██████████████████████████

　　　██████████████████████████████████████████████████

　　　██████████████████

　　　██████████████████████████████████████████████████

　　　███████████████████████████████████████████████████

　　　██████████████████████████████████████████████████

　　　██████████████████████████████████████████████████

　　　██████████████████████████████

169.    SAIC administrators with authority to institute corrective action were thus aware –

both from Shiran's communications to them, which they ignored, and also ██████████████

████████████████████████████████████████████████████████████████

█████ – that Shiran believed she was being targeted because of her Israeli and/or Jewish identity

inside Professor Yi's classroom, and by her classmates.

170. Consistent with SAIC's failure to implement the attorney-investigators' recommendations following Shiran's discriminatory admissions denial that ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ SAIC failed to take any steps to address what its administrators knew Shiran perceived to be a hostile environment, despite receiving multiple e-mails that indicated as much.

171. By November 17, 2023, after weeks of receiving no response from the SAIC administrators who she personally contacted about, or who were otherwise made aware of, Plaintiff's concerns regarding the hostile environment she was enduring in Professor Yi's class and on campus generally, Plaintiff received an e-mail from SAIC's Title IX office notifying her that SAIC engaged an outside law firm to investigate Plaintiff's complaints of discrimination and harassment specifically as they related to Professor Yi's treatment of her.

172. She met with a Title IX investigator on November 30, 2023 but nothing substantively changed for her in Professor Yi's classroom, nor did SAIC take any steps to directly or immediately address what was actually going on in the classroom.

173. Things got worse. Not only did Shiran's classmates persist in their deliberate shunning and mistreatment of Shrian, but on December 7, 2023, while an investigation against her was now pending, Professor Yi announced to her class an abrupt change to the final assignment, just ten days before it was due – and even though the students had already submitted their drafts

of the original final assignment.

174.    Professor Yi drastically changed the final assignment to revolve almost entirely around Israelis. Similar to the Committee deliberations, Professor Yi's new final exam was "█████ ██████" on Israelis, and portrayed the same type of discriminatory animus that Professor Yi knew Shiran had endured for nearly the entire semester.

175.    Part 2 of the new final assignment instructed the class to review two groups of images provided by Professor Yi, nearly all of which were explicitly negative depictions of Israelis.

176.    The images in Group A purported to contain "depictions of genital, physical, verbal or sexual abuse, violence and trauma inflicted on children and youth." Of all the possible depictions of this universal problem, Professor Yi selected an Israeli father and son speaking in Hebrew, where the dad states: "You are a bad boy!" and the son replies, "Stop, dad, that is insulting." Professor Yi selected this low-value image in order to maintain a hyper-focus on Israelis, and as way of targeting and retaliating against Shiran whose national origin was a thorn in Professor Yi's side all semester, and was now the subject of a pending Title IX claim against her.



177.    According to the second part of Professor Yi's newly designed exam, Group B images contained "depictions of gun, violence, truma [sic; trauma], displacement and colonization

from children's view." Professor Yi chose a collection of drawings *all of which* pertained exclusively to Israelis engaged in seemingly senseless violence against children, even smiling while shooting. The images also contained descriptions that put "anti-Semitic" in scare quotes and suggested the "Israel Lobby" was engaged in a "bid to shut down" an exhibition.



A Bay Area children's museum shut down a planned exhibition of Gaza children's drawings. (Middle East Children's Alliance)



Israel lobby groups claimed the children's drawings were "anti-Semitic" in a bid to shut down the exhibition. (Middle East Children's Alliance)



A piece in the Palestinian children's art exhibit, A Child's View from Gaza. **A Child's View from Gaza**

178.     Professor Yi's sudden creation of this new assignment and selection of an overwhelming amount of images depicting Israelis as engaged in senseless acts of violence and brutalization of children was a transparent effort to further harass and isolate Plaintiff.

179.     Her preface to the assignment also reveals that it was designed specifically to "trigger" Shiran. Professor Yi's pretext for including these images was to explore how sometimes "clients' experiences/backgrounds are 'too close to home' and we need to deal with our own complicated feelings, internalized racism / ableism / homophobia / supremacy and countertransference…We must decenter ourselves…How do you reduce harm in therapy? Can you keep it professional and still empathize with clients even when the content of their art upsets or triggers you? How do you compartmentalize your own feelings and stay helpful to your clients? […] In this Part 2…you are going to demonstrate your ability to examine your own readiness for doing the hard work as an art therapist."

180.     Despite projecting the dynamic onto the hypothetical client-therapist relationship, Professor Yi knew that this prompt would only constitute "hard work" for Shiran. Professor Yi knew the images were "too close to home" only for Shiran; she knew that she believed only Shiran needed to "deal with [her] own complicated feelings;" she knew that only Shiran needed to

"decenter" herself in order to address the images; she knew that the "content" of the art would "upset[] and trigger[]" only Shiran; she knew that only Shiran needed to "compartmentalize [her] own feelings," and that only Shiran needed to "demonstrate [her] ability to examine [her] own readiness for doing the 'hard' work as an art therapist." She knew that no other student in the class would have these reactions to her selected images. She disregarded that Shiran had been targeted the entire semester on this basis, and she deliberately honed in on Israeli nationality to punish Shiran for objecting all semester to her classmates' and Professor Yi's discriminatory behavior, and for stubbornly refusing to shed her Jewish and Israeli identity and capitulate to the warped classroom narrative regarding her people, which Professor Yi shared in and fostered.

181.    When Plaintiff complained about Professor Yi's retaliatory harassment in modifying the final assignment, SAIC first directed Plaintiff to request an accommodation from Professor Yi. Only after Plaintiff informed SAIC's attorneys that she would seek emergency legal relief if the offensive material was not retracted did SAIC direct Professor Yi to withdraw Part 2 of the final assignment; but it had by then taken no steps to curb Professor Yi's discriminatory behavior that persisted all semester, nor did it take any steps to curb Professor Yi's discriminatory behavior on a going-forward basis.

182.    Although Shiran was spared from having to complete the discriminatory final assignment, her feelings of being deliberately targeted as an Israeli by Professor Yi did not abate.

183.    On December 18, 2023, Professor Yi wrote to the class thanking students who "shared disappointments" that the Israeli-focused final assignment targeting Shiran was cancelled, and apologized to the students who felt their learning "was compromised" by not being able to complete the Israeli-focused assignment. In other words, she implicitly blamed Shiran as the cause for their learning being "compromised." She then stated she would "very much appreciate" if the

students would tell the department chair, Professor Mers, their perspectives – *i.e.*, if they would reach out to Professor Yi's supervisor in support of Professor Yi's discriminatory change to the final exam. Professor Yi knew she could count on her students to do this because she knew they participated in and supported targeting Shiran on the basis of being an Israeli Jew who refused to check her identity at the door to curry favor with her hostile peers.

184.   Professor Yi gave Shiran a 50 out of 100 ███████████████████████ ██ on her "Final Peer Evaluation" which she knew was an outlier score motivated at least in part by discriminatory animus against Shiran, which Yi fomented and participated in all semester.

185.   Professor Yi's tolerance of this classroom environment stemmed in large part from the fact that she shared the discriminatory views of the students excluding Shiran from normal participation in the class. This animus was evident in her ████████████████████ ████████████████████████████████████████ █████████████, and in her actions during the semester that immediately followed. For example, ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████. Professor Yi "liked" SLP's social media posts displaying stickers "From the River to the Sea Palestine Will be Free." ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████." Despite knowing Plaintiff was suffering from harmful interactions with her classmates, Professor Yi withheld similar

compassion from Shiran because of her animus against Shiran for standing up against what she believed was discrimination and for refusing to shed her Israeli and Jewish identity in favor of the prevailing narrative that Israel was a "settler colonial racist" state and that violence and murder of Jews in Israel was something to be justified or even glorified.

186. This classroom environment had a terrible effect on Plaintiff, leading her to feel isolated and targeted and that her very identity was not only not tolerated, but was also rejected out of hand by both faculty and students.

187. This condoned boycott of Shiran by her fellow students made her work suffer. Much of the education in the Art Therapy Department was based on collaboration among the students. Plaintiff lost that benefit, and neither faculty nor administrators took any steps to attempt to remedy the deliberate shunning and ostracization of Shiran while it was happening. SAIC administrators, instead, did nothing until the dramatic turn of the final exam, despite knowing ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████

188. The Title IX investigation that SAIC commissioned, which stalled for seven months, came only after weeks of Shiran pleading for support from SAIC administrators with literally no response; only after she endured the majority of her first semester in Professor Yi's hostile classroom; and only after SAIC initially failed to ███████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████

189. During this time, the treatment Shiran endured affected her mental health. She suffered from intense anxiety, nervousness, sleeplessness and inability to function because of this

harassment. She could not focus on her schoolwork. She felt discouraged from becoming more actively involved in campus activities, and simply wanted to leave the moment her required classes ended. She avoided certain areas of campus where she knew hateful protests were occurring or had occurred. She felt targeted and/or feared for her safety when on campus.

190.    The reasonableness of Shiran's fear for her safety on campus is evident from the fact that SAIC's President Tenny required the head of security to accompany her to 15-minute meeting with the Art Therapy Department's SPL members on December 5, 2023. President Tenny did so because, on information and belief, she believed the students may become hostile, aggressive, or violent towards her.

191.    The Title IX investigation confirmed what Shiran had stated all along, that it was

"█████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████.

192.    The investigators of Yi's conduct stated:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

193.    In her interview with the investigators, Professor Yi ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████ ████ ████████████████████████████████

████████████████████████ Yet this did not prompt her to introduce content that might be "triggering" for her Palestinian students, or force them to do the "hard work" of "decentering" themselves.

**D.** **Plaintiff takes classes remotely for the Spring 2024 semester while the Title IX investigation is pending and SAIC has not otherwise put forth any plan for her to participate on campus free from discrimination and harassment.**

194. Following the end of the Fall 2023 semester, Plaintiff asked SAIC if there was a plan for her to return the following semester to an environment free of harassment and discrimination. When it became clear that SAIC had no such framework, or planned action steps, she requested permission to work with individual tutors on her coursework. Plaintiff's reason for this request was that the school could not assure her safety or that she would be free from the harassment she faced on campus and in the classroom. The endlessly "pending" Title IX investigation, which was not completed until after the semester *following* the semester in which she suffered in Professor Yi's classroom, offered her no protection whatsoever – it was just downloading in the background with no impact on Shiran's day-to-day experiences, and SAIC doing nothing to otherwise alleviate her concerns.

195. Though Shiran was to begin the Spring 2024 semester by completing her SAIC coursework with one-on-one tutors, just prior to and at the beginning of the Spring 2024 semester, Shiran began to again be excluded within the Art Therapy program. On January 19, 2024, Professor Mers sent an email to all cohort members except Plaintiff, apparently regarding changes for the

---

[44] According to the 2020 Metropolitan Chicago Jewish Population Study by Brandeis University researchers, the Chicago area is home to 319,600 Jews. https://www.brandeis.edu/cmjs/community-studies/chicago-report.html#:~:text=Among%20the%20key%20findings:,420,300%20people%20in%20Jewish%20households. The Center for Arab Narratives reports that 13,596 Palestinians live in the Chicago Metropolitan Area. https://www.arabnarratives.org/narrative/palestinian-american-community-in-numbers.

Spring semester. Another e-mail to all cohort members except Plaintiff invited students to join a meeting via Zoom or in person on January 19, 2024 at 1:00 p.m. Shiran only learned about the emails and the meeting when a fellow student asked why she didn't attend.

196. Upon information and belief, based upon the far fewer messages Plaintiff received as compared to the prior semester, Plaintiff was also excluded from additional faculty communications to the entire cohort as related to the Spring 2024 semester. Upon information and belief, SAIC officials with authority to implement corrective action – such as the Art Therapy Program Director, and Department Chair, are cc'ed on these messages and were aware that Shiran was not.

197. Upon information and belief, given the past, extensive behind-the-scenes coordinating between Art Therapy faculty and "admin" regarding Shiran, SAIC administrators with authority to implement corrective action were aware that Shiran was excluded from cohort-wide messages leading up to the Spring 2024 semester. Upon information and belief, Plaintiff's exclusion from relevant messages and meetings pertaining to the academic semester is because the Title IX investigation (██████████████████████████████████████) was pending, *i.e.*, it is in retaliation for her protected activity.

198. Plaintiff was also excluded from her cohort's group chat, facilitated by Sellers, the SAIC-paid graduate assistant who refused to present jointly with Shiran in the semester prior. Plaintiff received a message on January 21, 2024 from Sellers in one group chat referring to details about a fellowship application that were supposedly sent in prior messages. Plaintiff never received any such messages and, upon information and belief, a separate cohort-wide chat exists that includes everyone in Plaintiff's program except her, where Sellers actually communicated details about the fellowship application.

199.    Plaintiff's exclusion from cohort-wide communications sent by both faculty and an SAIC-paid graduate assistant constituted exclusion from the activities of her program, and represented a further push at isolating her.

200.    Plaintiff took four remote classes in Spring 2024: Group Art Therapy, Painting, Psychopathology, and Cultural Dimensions. Rather than being remotely connected to the full class, each of these classes was one-on-one with the instructor. This disadvantaged her, especially because she had to learn group therapy not via group activities and participation but rather in one-on-one instruction. She also had to paint at home instead of having the benefit of a studio space, which was also to her disadvantage.

201.    There were other ways in which her remote instruction was of a lesser quality than regular in-person instruction. She received only one hour a week with the instructor, compared to three hours a week for students attending the regular classes. Moreover, regular classes are not lectures, but interactive discussions among instructors and students. Plaintiff did not receive the benefit of those in class discussions and experiences.

202.    SAIC was aware of the pitfalls of this type of arrangement. As set forth by SAIC students in a prior petition to President Tenney and Provost Berger regarding the importance of in-person instruction during the COVID pandemic, "an essential part of being a student at SAIC is [] access to resources, networks of artists, in-person critiques and studio-based learning."[45]

203.    Because SAIC did not take steps designed to remedy the harassment and discrimination Shiran endured in the prior semester, only stepping in at the eleventh hour to address the final exam, Plaintiff had no reasonable belief that she could return to campus for the Spring

---

[45] https://www.change.org/p/school-of-the-art-institute-of-chicago-saic-refund-spring-2020-tuition (last accessed May 4, 2025).

2024 semester free of harassment and discrimination – especially as her Title IX claim was still inconclusive and the mere fact that it was pending had no impact on the ground – Plaintiff felt compelled to begin the Spring 2024 remotely. This deprived her of an in-person academic experience, where she not only had to study "group" courses as an individual, and could not access the paint studio space, but she also was deprived of the general benefits of being on campus, such as artist talks, gallery openings, in-person interaction, and club meetings.

204. Plaintiff's fear that the school could not provide her with a safe and harassment-free environment persisted for the entirety of the Spring 2024 semester, where she witnessed hateful student mobs on SAIC's campus calling for violence against Jews and Israelis.

205. In May 2024, a mob of anti-Israel student protestors violently forced museum officers out of the Art Institute Museum's garden, assaulted them, stole their master keys, and blocked and barricaded fire exits.

206. This violent student mob chanted "we will free Palestine, within our lifetime," a rallying call that is coded to refer to "Within Our Lifetime," an organization described in Paragraph 133 above, whose stated goal is to eradicate the state of Israel within the near future.[46]

207. They also held up posters stating "By Any Means Necessary," a phrase that champions violence and murder of Jews living in Israel as a form of so-called resistance.[47]

---

[46] In reporting on this, the NY Times includes a video with audio and subtitles showing these chants. https://www.nytimes.com/2024/05/05/us/art-institute-chicago-protests-arrests.html#:~:text=Sixty%2Deight%20people%20were%20arrested,and%20their%20encampment%20be%20removed (last accessed May 4, 2025).

[47] https://www.adl.org/resources/article/stop-and-think-anti-israel-chants-and-what-they-mean



208.    SAIC administrators, including President Tenny and Provost Berger, with authority to implement corrective measures  – such as disciplining students involved in this violent and hateful display – were aware of the genocidal chanting calling for the destruction of Israel "within our lifetime" and were aware of the posters justifying or glorifying violence against Jews in Israel as resistance by "any means necessary." Upon information and belief, and based on President Tenny and Provost Berger's official letter commenting on the mob gathering[48], they personally witnessed these events, and/or became aware of them through reports and extensive media coverage which depicted the hateful chanting. The NY Times ran a lengthy article on it the following day that included video of these hateful chants.[49]

209.    But rather than condemn and threaten discipline or other action in response to these threats against Israelis and Jews, and justification for violence against Jews living in Israel,

---

[48] https://www.saic.edu/news/demonstration-museums-north-garden#:~:text=Student%20protesters%20were%20promised%20amnesty%20from%20academic,a%20student%20group%20to%20discuss%20their%20demands.&text=The%20School%20will%20not%20pursue%20any%20academic,to%20pursue%20trespassing%20charges%20against%20our%20students (last accessed May 4, 2025).

[49] https://www.nytimes.com/2024/05/05/us/art-institute-chicago-protests-arrests.html#:~:text=Sixty%2Deight%20people%20were%20arrested,and%20their%20encampment%20be%20removed

President Tenny and Provost Berger noted in their letter that "Student protesters were promised amnesty from academic sanction and trespassing charges if they relocated, and we agreed to meet with a student group to discuss their demands." Even though students did not "accept" this offer, President Tenny and Provost Berger anyway reaffirmed that "The School will not pursue any academic sanctions against the SAIC students who participated in Saturday's protest and we are grateful to the museum for notifying us that they do not intend to pursue trespassing charges against our students." President Tenny and Provost Berger ended their public remarks by stating "we wish to notify the School community that those who engage in future activities that jeopardize the safety of our community or the public, or disrupt academic operations, will be subject to disciplinary action."

210.    But this promise of future discipline (especially when coupled with their offer to withhold discipline from students who had already engaged in violent conduct), was lip service rather than a genuine promise to take action. On May 17, 2024, President Tenny sent an internal e-mail to the SAIC community following up on these events, with a much rosier disposition towards the student protestors. She stated that SAIC "see[s] the protest at the museum as an expression of the drive for social justice that animates the research and teaching of many of our faculty and that draws like-minded students to SAIC. We understand that student participants were motivated by an admirable desire to see a world with less suffering and more justice. We applaud their resolve and commitment to a better world [and] we share the community's pain that the protest ended with arrests." The only thing that "troubled" SAIC according to President Tenny was that the protesters violently "forced museum officers out of the garden" not that they were calling for violence against Jews living in Israel, or the eradication of Israel. President Tenny reiterated that the school offered students immunity from discipline: "SAIC protestors were offered an

alternative location to which they could relocate their tents and continue to protest indefinitely. We also promised that if they relocated, there would be no criminal charges or disciplinary sanctions at School."

211.  Plaintiff closely followed these events with horror, and saw these statements and slogans as directed at her as an Israeli Jew. SAIC's inaction and its promises to refrain from discipline conveyed to Shiran and other students that this type of genocidal rhetoric and justification of violence against Jews in Israel would be tolerated on campus. She was appalled that SAIC had promised the student mob that it would not discipline anyone if only they relocated elsewhere on campus (where they were promised they could continue their conduct "indefinitely"), despite the violent and harassing nature of their conduct and messaging. Shiran continued to reasonably believe that she could not safely learn on SAIC's campus and needed to continue pursuing her degree through remote instruction.

212.  Throughout the Spring 2024, both before and after the violent May protest featuring chants to destroy Israel "within our lifetime" and "by any means necessary," SPL posted antisemitic and threatening messages on social media that further affirmed Plaintiff's belief that campus was not a safe place for her.

213.  On March 20, 2024, SPL posted about hosting a "Glory to Our Martyrs" vigil, with a promise in Arabic that "We continue the struggle." "Glory to our Martyrs" is regarded as "another antisemitic rallying cry…used to praise terrorists that beheaded, murdered, burned, raped, and kidnapped Israelis on October 7. Those who use it are signaling their support for the actions of the antisemitic terrorist group Hamas."[50]

---

[50] AJC, *7 Ways Hamas Has Conned Americans and Spread Hatred of Jews*, https://www.ajc.org/news/7-ways-hamas-has-conned-americans-and-spread-hatred-of-jews (last accessed May 4, 2025)



214.    On April 20, SPL posted "We will not stop! We will not rest! We chant alongside the courageous students at Columbia University…" This referred to the "Gaza Solidarity Encampment" at Columbia that became so severe a local rabbi at the school urged Jewish students to stay away from campus, and the Biden White House issued a condemnation: "While every American has the right to peaceful protest, calls for violence and physical intimidation targeting Jewish students and the Jewish community are blatantly antisemitic, unconscionable, and dangerous."[51] This post made Plaintiff even more fearful of returning to SAIC's campus because her fellow students were promising to bring the same threats that harassed Columbia's Jewish students to SAIC.

215.    At an April 2024 demonstration in front of the school entrance, protestors held signs stating "Long Live the Intifada" – a term referring to Palestinian violent terrorism against Jews in Israel by which thousands of Jews living in Israel have been murdered. The "Second Intifada" is perhaps the most famous period of sustained terrorism against Israelis – a four-year wave of suicide

---

[51] Celina Tenor *et al*, *Columbia University faces full-blown crisis as rabbi calls for Jewish students to 'return home'* (4/22/2024) https://www.cnn.com/2024/04/21/us/columbia-university-jewish-students-protests/index.html (last accessed May 4, 2025).

bombings (many perpetrated by Hamas) from the years 2000-2004.



216.    This call for violence against Jews living in Israel expanded on SAIC's campus to a call to target Jews around the globe via Intifada, with SAIC protestors urging everyone to "Fight for Worldwide Intifada."



217.    By May 29, 2024, SPL began calling for a global *student* intifada.



218.    That same day, SPL shared an image of a swastika inside of a Jewish star, surrounded by drops of blood, with the phrase, "it is right to rebel, Hillel go to hell." This statement was accompanied by an inverted red triangle which is a symbol used by Hamas, and adopted by its supporters, to signify placing a target on someone to be killed. This message thus was an explicit threat of violence against Hillel – the on-campus student organization where Jewish students gather and receive support.



219.    Two days later, another violent SAIC campus group called "The People's Art Institute" called on SAIC students to "escalate" and stated "***We are not being symbolic when we chant: There is only one solution, intifada revolution***."



220.    As discussed above, chanting for Intifada revolution is an explicit call for violence against Jews and Israelis on SAIC's campus, and the formulation that there is only "one solution" is meant to echo Hitler's "final solution" rhetoric. And if there were any question as to whether this post was intended to incite violence, The People's Art Institute expressly stated that they were "not being symbolic" when they uttered those chants.

221. SAIC officials with authority to implement corrective action had knowledge of these menacing and violent posts which explicitly threatened Israelis and Jews like Shiran on SAIC's campus, and kept her from returning to in-person learning. That is because – not only were these physical "Intifada" posters waved in public view on SAIC's main campus, but SAIC's Vice President of Diversity, Equity & Inclusion, Sekile M. Nzinga, at all relevant times followed both SLP and The People's Art Institute's social media accounts and, upon information and belief, saw their violent and hateful posts. SAIC's Director of Diversity, Equity, & Inclusion for Student Engagement, Karl Constant also followed The People's Art Institute on social media and, upon information and belief, saw these violent posts.

222. In addition to SAIC's two top DEI officials following these accounts explicitly calling for violence against Israelis and Jews, so did numerous official SAIC departments, including SAIC's Center for Teaching and Learning (which follows The People's Art Institute's social media posts); and SAIC's Career and Professional Experience department, the MFA Sculpture department, SAIC's Textile Resource Center, SAIC's Painting and Drawing Department, and SAIC's International Student Affairs study abroad, which all follow SLP's social media posts.

223. Professors Yi and Gipson also followed SLP's social media posts calling for violence against Jews and Israelis. And even though SAIC's faculty handbook requires "All AIC and SAIC staff" to "report incidents or allegations of discrimination, harassment, and retaliation to SAIC's Director of Title IX, EEO, and Employee Relations," and acknowledges that while "individual faculty members are not expected to be experts on issues such as discrimination and harassment, [] that is not a reason to fail to report behavior that appears to be (or is perceived by others to be) discriminatory or harassing," upon information and belief neither Yi nor Gipson (nor the school's two top DEI officials) ever reported the violent and hateful posts against Jews and

Israelis that they saw on SLP's social media despite being required to do so.

224. During the violent and hostile events of the Spring 2024 semester, in May 2024, Plaintiff and Provost Berger began discussing Plaintiff's education for the Fall 2024 semester.

225. On May 7, Provost Berger emailed Plaintiff with the subject "next steps." He told Plaintiff that she was "welcome to return to campus" and said he had "no reason to believe that you would be unsafe on our campus . . . ." This was three days after the violent campus demonstration where students chanted to Free Palestine "within our lifetime" and held up signs justifying violence against Jews living in Israel "by any means necessary," and were at the same time promised by SAIC's President that they could escape arrest and any school-imposed discipline if they shifted their activities to a different campus location. This also came after additional protests on campus where students held posters saying "Long Live the Intifada."

226. Nevertheless, he said the school had "taken concrete steps to address the concerns you have raised." One was to offer "trainings on antisemitism for both senior leadership, faculty, and the student body." He also mentioned the outside investigation into her claims of mistreatment, though neither the mere *offering* of trainings, nor the mere fact that an investigation was pending, alleviated Shiran's apprehension about returning to campus nor were they reasonably calculated to address her concerns of a hostile environment.

227. He offered two alternatives to a return to campus given that "[w]e understand that online learning has its limitations . . . ." The first was taking a leave of absence for a year and returning with a different cohort "as a means of getting some space from classmates with whom you have had challenges in the past." The second was transferring to a different school.

228. The next day, Plaintiff responded that Provost Berger had simply described "two nonconcrete, inconclusive efforts neither of which are likely to address [her] concerns." She asked

for information about whether any of the faculty or students actually participated in the non-mandatory antisemitism trainings (to which Provost Berger never responded), and also noted that she was still long-waiting to hear anything regarding the outcome of the investigation into Professor Yi.

229.    She also rejected the alternatives he offered for the Fall, including a return to campus under current circumstances:

> [Y]ou assure me that I am welcome to return to campus and to resume classes. I don't understand what you mean by that. In what way am I "welcome"? I am watching these violent protests unfold at SAIC and on college campuses around the country. The danger for Jewish students is real and only increasing. Jewish students have been physically attacked and severely injured. At SAIC, students have already identified me as their Israeli target and an outlet for their despicable rage. I am a mother to two young daughters. In what way is it even remotely safe for me to be around this unhinged, criminal mob? Has the school done anything to stem their violent and criminal behavior? The messages I'm getting from President Tenny and yourself assure these students that, despite the escalations you've seen, you are taking no disciplinary action against them and that you are grateful that the museum is not pressing charges for their criminal conduct. Does someone need to be hurt at SAIC before something will be done? Do I need to be the bait to test the waters, before you will acknowledge the dangerous reality created by these demonstrations?

> I appreciate the flexibility you are extending me while I try to navigate through this treacherous environment. Respectfully, I do not need to get some space nor is the problem classmates with whom I've had challenges in the past. The school, its administration, and its faculty all bear responsibility for the hostile environment it now is for Israeli and Jewish students.

> Also, it is not that I have come to believe that online learning has its limitations. I think that is an obvious and commonsense observation shared widely (we all got to see what that is like during the pandemic). Nevertheless, it is the only option the school has left me while it lets violent antisemitism run rampant throughout its campus.

> I choose not to run away, take a leave of absence, or transfer to another school. SAIC is my school of choice and I would like to complete my studies and graduate here. I prefer to stand up against hate and persecution, than to run and hide. I hope you can understand my sentiment.

> I am glad to hear that SAIC hopes for my return to campus. I too hope to return to campus. Unfortunately, an offering of antisemitism training and a still pending

investigation does not protect me from the violent mob of antisemitic students who have been given free rein [sic] on campus. I look forward to a return to normalcy and an end to this craziness, so that I can return to campus safely. Until then, I appreciate the school's efforts to accommodate my continued studies from afar.

230.     That same day, she wrote her academic advisor, Professor Kamholz, confirming what she had told Provost Berger:

> I just sent my response to Provost Berger, explaining that while I appreciated his efforts I cannot accept any of the options he proposes. Returning to campus while a violent mob roams free would be irresponsible. I have young children at home and cannot afford the risk to my physical safety. Also, I cannot accept taking a leave of absence or transferring to a different school as viable options. I've never surrendered to terrorism before and prefer not to now. It is against my values.
>
> As I shared with Provost Berger, I am very eager to return to classes on campus as soon as the school is able to ensure my safety. Until then, I am left with no choice but to continue my studies remotely

231.     Provost Berger responded to Plaintiff on May 15, 2024. He did not directly respond to her questions about whether anyone actually participated in the antisemitism training. He stated he was "confident that threats and physical harm to Jews have not been an issue on our campus." His words ignored the actual violence that had already occurred on campus, the explicit calls for future violence by at least two student-run SAIC groups on social media accounts followed by SAIC's highest DEI officers and a handful of SAIC departments, and the posters and chants that further justified or glorified violence against Jews in Israel and worldwide. And he appeared unconcerned that no students had been disciplined in any way for engaging in this violent conduct targeted at Israelis and Jews.

232.     Provost Berger went on to mention that he would "shortly meet with a group of student activists to make clear the School's position and what we take as the counterproductive nature of their demands." However, he never resumed his correspondence with Plaintiff to tell her whether that meeting in fact took place and, if so, whether the students said anything that would

ease Plaintiff's concerns. From that silence, Plaintiff alleges, on information and belief, that either that meeting did not take place or, if it did, nothing occurred that would give Plaintiff confidence about her safety if she returned to campus.

233.    There were no further written communications between Plaintiff and Provost Berger or any other school official regarding "next steps" for Fall 2024. All further communication occurred between Plaintiff's representatives and those of the school. Through her representatives, Plaintiff requested that she be allowed to take her classes remotely again. However, the school refused to permit that and allowed her course of study to occur only on campus.

234.    SAIC has offered no plan or framework for Plaintiff's return to campus. It has essentially told her she can either come back or transfer to another school. Because Plaintiff has no sense of safety or security on campus, or any indication from the school that she will be meaningfully supported and not subjected to further discrimination and harassment on campus, she has not returned.

## E.    SAIC Policies

235.    SAIC has instituted several policies prohibiting discrimination based on national origin and religion.

236.    The Student Handbook states:

**Notice of Nondiscrimination**

The Art Institute of Chicago, including both the school and the museum, is committed to providing an inclusive and welcoming environment for its students, visitors, faculty, and staff, and to ensuring that educational and employment decisions are based on an individual's abilities and qualifications. The Art Institute of Chicago does not tolerate unlawful discrimination based on race, color, sex, marital status, religion, national origin, disability, age, sexual orientation, gender identity, military or former military status, or any other status protected by federal,

state or local law, in its programs and activities, public accommodations or employment practices.[52]

237.    The Student Handbook also has a Discrimination, Harassment, and Retaliation policy, which prohibits all three:

> The Art Institute of Chicago (AIC), including the School (SAIC), the Museum, and Central Administration, is committed to maintaining an educational and working environment that is free from any form of prohibited discrimination. SAIC prohibits discrimination or harassment based on race, color, gender, religion, national origin, disability, age, actual or perceived sexual orientation, gender-related identity, marital status, parental status, military or former military status, or any other basis protected by federal, state, or local law. SAIC also prohibits retaliation against anyone reporting or participating, or thought to have reported or participated in, an allegation, an investigation, or proceeding regarding discrimination or harassment, regardless of whether any discrimination or harassment is substantiated. For purposes of this Policy, the term "AIC" includes all trustees, officers, governors, faculty, staff, and volunteers.

238.    The Discrimination, Harassment, and Retaliation Policy defines Discrimination, Harassment and Retaliation as follows:

> **Discrimination** is defined as unequal, adverse treatment of an individual because of their protected legal status. This means that unequal, adverse treatment is prohibited if it is because of a person's race, color, gender, religion, national origin, disability, age, actual or perceived sexual orientation, gender-related identity, marital status, parental status, military or former military status, or any other basis protected by federal, state, or local law.

> **Harassment** is one form of discrimination and is defined as unwelcome, hostile, or inappropriate conduct directed toward an individual because of their protected legal status. The determination of what constitutes illegal harassment varies with the particular circumstances, but it must be so severe, persistent, or pervasive that it affects an employee's ability to work or a student's ability to participate in or benefit from an educational program or activity, or it creates an intimidating, threatening, hostile or abusive educational or working environment. It must include something beyond the mere expression of opinions, views, words, symbols, or thoughts that someone finds offensive.

---

[52] Office of Student Affairs, School of the Art Institute of Chicago, *Student Handbook* (2024-25) at 2, available at https://www.saic.edu/sites/default/files/2025-03/osa-02262025_orientation_handbook_student_v3.pdf. The Student Handbook applicable in 2023 is no longer available on SAIC's website, but there is no indication that these provisions have changed, so Plaintiff alleges they are the same upon information and belief.

**Retaliation** is defined as an adverse or negative action (or threats of adverse or negative action) against an individual because that individual: In good faith, reported discrimination, harassment, or retaliation; or Participated as a party to or witness in an investigation or a proceeding relating to such allegations; or Is thought to have participated in a good-faith report of discrimination, harassment, or retaliation, or is thought to have participated as a party or witness in an investigation or proceeding relating to such allegations.

239. The Art Institute of Chicago Faculty Handbook Legal Supplement, updated April 6, 2017, also prohibits discrimination based on religion and national origin:

The School is committed to maintaining an educational and working environment that is free from any form of unlawful discrimination. The School has a policy of nondiscrimination towards its students, employees and visitors, and will not tolerate unlawful acts or harassment based on race, color, gender, religion, national origin, disability, age, actual or perceived sexual orientation, gender-related identity, marital status, parental status, military or former military status, or any other basis protected by federal, state or local law.

240. In addition, SAIC's Faculty Policy Prohibiting Discrimination, Harassment, and Retaliation ("SAIC Faculty Policy"), in effect at the time of the events alleged herein, prohibited "discrimination or harassment based on race, color, gender, religion, national origin, disability, age, actual or perceived sexual orientation, gender-related identity, marital status, parental status, military or former military status, or any other basis protected by federal, state, or local law."

## COUNT I
### (Violation of Title VI of the Civil Rights Act against SAIC)

241. Plaintiff incorporates the allegations of Paragraphs 1-240 as if fully set forth herein.

242. SAIC directly discriminated against Plaintiff on the basis of her Israeli and or Jewish identity, and was deliberately indifferent to the reported hostile environment and discrimination she was experiencing in Professor Yi's classroom and around campus.

243. SAIC's Title IX Policy officially designates the Vice President and Dean of Student Affairs, the Provost and Senior Vice President of Academic Affairs, the Dean of Faculty, the Chief

Human Resources Officer, and the President as having authority to institute corrective action in the context of reports of Sexual Misconduct. Plaintiff has not located a similar designation by SAIC identifying which officials have authority to institute corrective action in the context of reports of discrimination and harassment on the basis of national origin.

244. Upon information and belief, these same officials also have authority to institute corrective action to remedy harassment or discrimination on the basis of national origin. This information and belief is based in part on common sense that high-ranking college officials have the authority to take steps to remedy discrimination and harassment in the course of their job, and based on descriptions of their job duties:

a. The President is the chief administrative officer of the school and "is responsible for the concerns and needs of the students, faculty and staff."[53]

b. The Provost "oversees a broad range of academic and administrative departments, including academic affairs, student affairs, enrollment management, information technology, community engagement, and the libraries and special collections."[54] The Provost is also the senior vice president of academic affairs and serves as the school's chief academic officer.[55]

c. The Dean of Faculty/Vice President of Academic Affairs is responsible for the leadership of the academic program, including "authority for the day-to-day

---

[53] The School of the Art Institute of Chicago Faculty Handbook Supplement, https://www.saic.edu/sites/default/files/2024-04/Faculty_Handbook_Supplement_2024.pdf (last accessed May 4, 2025).

[54] https://www.saic.edu/leadership-governance/office-provost#:~:text=He%20oversees%20a%20broad%20range,the%20libraries%20and%20special%20collections (last accessed May 4, 2025).

[55] https://www.saic.edu/news/saic-names-martin-berger-provost-and-senior-vice-president-academic-affairs (last accessed May 4, 2025).

administration of the academic programs [and] the supervision of academic staff and faculty ."[56]

d. The Vice President and Dean of Student Affairs is the senior student affairs administrator for SAIC, responsible for leading areas including Student Support and Student Success,[57] and is "responsible for the Student Conduct Procedures."[58]

245. Upon information and belief, SAIC's Executive Vice President and General Counsel also has authority to implement corrective measures because they oversee the legal operations for the school.

246. Upon information and belief, the Dean of Graduate Studies has similar duties as the Dean of Student Affairs, with a specific focus on graduate programs, such as the Master's Art Therapy Program in which Shiran was enrolled.

247. The Chair of Faculty "establishes and oversees programs for faculty development as teachers, practitioners, and researchers and works with the deans to develop systems and processes for mentoring all faculty." Upon information and belief, this would also include programs for faculty development that are aimed at educating faculty on issues relating to protected classes, discrimination, and harassment.

248. Upon information and belief, Department Chairs also have authority to address harassment occurring within their departments. According to the SAIC Faculty Handbook, Department Chairs report to the Dean of Faculty and, among other responsibilities, recommend

---

[56] https://www.saic.edu/sites/default/files/2024-04/Faculty_Handbook_2024.pdf (last accessed May 4, 2025).

[57] https://www.saic.edu/leadership-governance/office-president/presidents-cabinet (last accessed May 4, 2025) (this description pertains to Dean Dublon's successor, but there is no indication that the responsibilities changed).

[58] SAIC Student Handbook, osa-02262025_orientation_handbook_student_v3.pdf (last accessed May 4, 2025).

faculty appointments and changes to the Dean of Faculty.[59] They also work with the provost and are seen as "play[ing] an important role in the work of a department or program in that they are the contact person for many other parts of the School" and are considered a "conduit of information."

249.    Upon information and belief, SAIC's high ranking Title IX officers, and high ranking officials of its Diversity, Equity, and Inclusion department (who are also tasked with enforcing SAIC's non-discrimination and non-harassment policies) also have the authority to implement corrective measures to address discrimination and/or harassment on campus.

250.    SAIC directly discriminated against Shiran by subjecting her to unequal, adverse treatment on the basis of her Israeli and/or Jewish identity.

251.    This first occurred when Shiran was excluded from the program on the basis of her national origin.  Though this decision was reversed, SAIC officials who received the admissions investigation report, and who had the authority to implement corrective measures to address or prevent future discrimination against Shiran (███████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

252.    SAIC's decision to, upon information and belief, ████████████████████████

████████████████████████████████████████████████████████████████████████████

---

[59] https://www.saic.edu/sites/default/files/2024-04/Faculty_Handbook_2024.pdf (last accessed May 4, 2025).

████████████████████████████████████████████████████████████████

███████. SAIC has a de facto policy of tolerating anti-Israeli bias and sweeps aside prejudice and discrimination against Israeli and/or Jewish students because SAIC officials know that its student and faculty members overwhelmingly harbor animus towards Israelis and/or Jews. Rather than attempt to confront this particular kind of discrimination head-on, as a matter of unwritten policy, SAIC prefers to ignore that it occurs on campus, and its approach when it receives reports of discrimination and/or harassment is to do the bare minimum for as long as possible, and to then band-aid the present issue, without doing anything to prevent the ongoing discrimination and harassment on a going-forward basis.

253.    That this is SAIC's unofficial policy was reflected in a comment made by the Director of Graduate Admissions (who also has authority to implement corrective measures) to Plaintiff that ██████████████████████████████████████████. What he meant by this was that there is widespread animus towards Israelis at SAIC, and this fact was known to him even before Shiran was interviewed for admission.

254.    Upon information and belief, when SAIC receives recommendations to conduct other types of training aimed at protecting other minority groups on campus, or aimed at fostering an understanding of unconscious bias, microaggressions, or similar topics, it embraces and follows those recommendations, rather than ignore them.

255.    As Shiran began her first semester just two short months after she was initially excluded from the Art Therapy Program on the basis of her national origin, SAIC officials with authority to implement corrective measures, and others, including but not limited to the Art Therapy Program Director (Semekoski) and the Chair of the Art Therapy Department (Gipson) knew that Shiran would be placed in Professor Yi's class, and that ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████.

256.     The Fall 2023 semester began on or around September 5, 2023, and ███████████

███████████████████████████████████████████████████████████████

███████████████████████      ███████████████████████████████████████

████████████████████████████████████

257.     Over the course of five weeks of Plaintiff's first semester (from October 9, 2023 to

November 17, 2023), SAIC administrators with authority to implement corrective measures were

contacted directly by Plaintiff on at least four occasions wherein she expressed fears for her safety

on campus or reported anti-Israeli and/or anti-Jewish discrimination on campus, and █████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████.

During this same time span, SAIC administrators with authority to implement corrective measures

were also aware of chants and posters on campus calling for the destruction of Israel and/or

justifying or glorifying violence against Jews living in Israel.

258.     SAIC administrators ██████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████.

259.     This knowledge, coupled with SAIC's knowledge that █████████████████

███████████████████████████████████████████████████████████████



, amounted to knowledge that Shiran was suffering acts of discrimination including differential treatment by Professor Yi, and/or harassment by her peers within Professor Yi's classroom and around the campus. Indeed, "████████████████" were reported to ████████████████████████ ████████████████████████████, but SAIC was committed to its strategy of evading Shiran.

260. SAIC, as part of its unwritten policy of taking no action, or as little action as possible, regarding anti-Israeli and anti-Jewish harassment and discrimination, decided to do nothing – ignoring Shiran's direct communications and taking no steps to address the issues she raised of discrimination and harassment. Instead, SAIC let her ride it out under Professor Yi's watch for the bulk of her first semester on campus.

261. SAIC's decision to ████████████████████████ ████████████████████████████████████████ ████████████████ its decision to ignore Shiran's pleas for support or clarification regarding her safety, status, and well-being on campus, its decision to leave Professor Yi with free reign to abuse Shiran in her classroom (knowing that Shiran was simultaneously reporting mistreatment), and its decision to do or say nothing of consequence regarding the glorification or justification or violence against Jews in Israel that students were promoting on campus, and of which Shiran was aware and complained, is an act of direct discrimination against Shiran on the basis of her identity as an Israeli and/or Jew.

262.     SAIC only stepped in once Professor Yi's modified final exam was rolled out. At that point, it had no choice but to clean up the blatant act of harassment by requiring her to retract the prompts that revolved around the vilification of Israelis.

263.     But for the vast middle part of Shiran's first semester, SAIC did nothing at all to take steps designed to address the concerns she repeatedly raised to, or that were otherwise shared with, SAIC administrators, making a decision to stay mum on her concerns.

264.     This harmed Shiran because it deprived her of the benefits of her first semester in the Art Therapy Program. Specifically, because SAIC knowingly tolerated the hostile climate in Yi's classroom, Shiran did not receive the educational benefits attendant with working in a small-group, collaborative graduate studies environment. On the basis of her protected identity, she was iced out of peer communication and collaboration under Professor Yi's watch. She could not focus on her schoolwork. She felt discouraged from becoming more actively involved in campus activities and avoided certain areas of campus where she knew anti-Israeli and anti-Jewish student conduct was prevalent. She was unable to utilize the benefits of the graduate-assistant assigned to her class, because Professor Yi allowed that graduate-assistant to withdraw from working with Shiran on a discriminatory basis. She was graded unfavorably by her peers on the basis of their discriminatory animus against her, and Professor Yi adopted those grades even knowing they contained false accusations of plagiarism against Shiran and were otherwise based on "outside factors."

265.     SAIC also directly, or intentionally, discriminated against Shiran through its deliberate indifference to the substantial likelihood that Professor Yi was violating Plaintiff's federally protected rights. SAIC knew that Professor Yi ████████████████████████
████████████████████████████████████████████████████

█████████████████████ SAIC also knew that there was conflict in Professor Yi's class between Shiran and other students arising out of what Shiran reported to be anti-Israeli and anti-Jewish harassment and discrimination not only because Shiran e-mailed SAIC administrators as much, █████████████████████████████████████████

266.    Yet SAIC did nothing to stop the train until it reached the last stop – *i.e.*, the final exam. But by then, Professor Yi had also herself directly discriminated against Shiran by treating her differently than her similarly-situated non-Israeli / non-Jewish peers. For example, Shiran was required to "interact" with all students, including "BIPOC-presenting students," during class time and received a lower mark for her perceived failure to do so, while Shiran's classmates were not penalized in any way for intentionally ignoring, isolating, and excluding Shiran (nor were they ever told that peer interaction, or "collegiality" towards Shiran was a classroom expectation – as it was for Shiran vis-à-vis BIPOC-presenting students). Professor Yi required that Shiran "hold space" and accommodate her classmates' views which she regarded as discriminatory and hateful, while supporting and facilitating non-Israeli and non-Jewish students' demand to separate entirely from Shiran including for class presentations, rather than urging them (like she urged Shiran) to "hold space" for the opposing "viewpoint." Professor Yi constantly prodded Shiran and only Shiran to tolerate triggering or upsetting content, while doing her best to cozy up to and show sympathy for other students when they were similarly confronted by upsetting content – namely, Shiran's refusal to adopt their discriminatory, hostile, and violent worldview about Jews and Israelis.

267.    SAIC also acted with deliberate indifference to known acts of harassment that Shiran was experiencing in Professor Yi's classroom and on campus more broadly.

268.     Because Shiran was highly communicative with SAIC administrators who had authority to implement corrective measures, and ████████████████████████████ ████████████████████████████████████, SAIC administrators knew that Shiran was being "boycotted" by her classmates in the form of shunning and ostracization on a discriminatory basis in Professor Yi's classroom.

269.     These acts which occurred in Professor Yi's classroom amounted to severe and/or pervasive harassment. Shiran's classmates excluded her from participating in the normal affairs of the classroom – such as peer collaboration on projects, day-to-day communication, and sharing classroom art resources – even ignoring her altogether when she spoke directly to them about coursework or related academic matters. This occurred frequently, as Shiran was treated like a ghost in the day-to-day routine of the classroom (except for when her classmates referred to her beliefs as "bullshit" or expressed vitriol at her for refusing to disavow her country and adopt their discriminatory narrative regarding Israelis and Jews).

270.     Her complete ostracization by her peers was not only tolerated by Professor Yi, it was supplemented by her differential treatment of Shiran on the basis of her national origin.  This included Professor Yi's requirement that Shiran (and only Shiran) accommodate and "hold space" for her classmates' conduct and words which she found discriminatory, while permitting Shiran's non-Israeli, non-Jewish classmate to reject Shiran as a presentation partner; it included Professor Yi's penalizing of Shiran for failing to sufficiently "interact" with BIPOC-presenting students while permitting other students to completely and intentionally ignore Shiran in a curriculum requiring peer discussion and collaboration; and it included Professor Yi's adopting peer evaluations when grading Shiran which she knew were based on false accusations of plagiarism, discriminatory animus towards Shiran, and "outside factors."

271.     The hostility in the classroom was simultaneously compounded by the climate outside the classroom, where students chanted for the elimination of Israel, and glorified or justified violence against Jews in Israel, which words and actions singled out Israelis and Jews for hatred. And it was further exacerbated by the fact that none of the SAIC administrators and faculty to whom Shiran reached out could do her the courtesy of responding to her messages, ███████

███████████████████████████████████████████████████████

272.     This harassment and discrimination humiliated and devastated Shiran who was functionally excluded from the day-to-day routine of the classroom and found the campus to be an intolerable educational setting.

273.     SAIC acted with deliberate indifference to Shiran's distress under Professor Yi's watch. Administrators ignored Shiran's messages and took no affirmative steps to help alleviate the situation until the end of the semester when SAIC instructed Professor Yi to withdraw her final exam prompts which were transparently another attempt to target Shiran.

274.     SAIC's lackadaisical attitude towards Shiran's complaints of discrimination and harassment persisted beyond the Fall 2023 semester into the Spring 2024 semester, where Shiran was compelled to learn remotely, away from the faculty and staff that had shown discriminatory animus towards her (and continued to exclude her from cohort-wide messages leading up to that semester).

275.     And as Shiran was evaluating her ability to return to campus on an ongoing basis, closely monitoring campus events, SAIC also exhibited deliberate indifference to known acts of calling for and glorifying violence against Jews living in Israel, and against Jewish and Israeli students on campus (as part of the "worldwide" Intifada, and the "student Intifada") which they knew constituted threats against Shiran and other Israeli and/or Jewish students.

276. SAIC officials with authority to implement corrective measures – namely, President Tenny, Provost Dublon, the Vice President of Diversity, Equity & Inclusion, Sekile M. Nzinga, and the Director of Diversity, Equity & Inclusion, Karl Constant, knew of threatening and hostile activities occurring on campus, both through firsthand knowledge in at least the case of President Tenny and Provost Berger – who issued promises to violent student protestors calling for the eradication of Israel by "any means necessary," that they could avoid discipline if they just moved their gathering elsewhere on campus – and through social media, in the case of SAIC's two highest ranking DEI officials – where two student groups on campus – SLP and The People's Art Institute – were explicitly calling for violence against Jews and Israelis on campus and/or were glorifying and celebrating the same.

277. SAIC did nothing whatsoever to acknowledge this conduct, let alone attempt to address it. Upon information and belief (stemming in part from the fact that President Tenny promised not to), SAIC has not disciplined any students calling for, celebrating, or justifying violence against Jews or Israelis, or taken any meaningful action to ensure that its campus is free from such threatening student behavior.

278. Shiran, seeing the violent events on campus, the chanting for the elimination of Israel "within our lifetime," the posters promoting Intifada and action "by any means necessary," the social media posts from student groups calling for the destruction of her country and her people, and SAIC's promises to withhold discipline, praise of the protestors, and lack of any meaningful action, concluded that she had to continue learning remotely for the entirety of the Spring 2024 semester, and ultimately could not safely return to campus.

279. She expressed these concerns to Provost Berger, who could muster nothing other than empty assurances that everything would be fine and that the school had offered (though did

not require) some training on antisemitism. When Shiran asked what percentage of the campus population availed itself of the opportunity, he did not respond.

280.    As a result of SAIC's deliberate indifference to the known acts of violence, threats, and intimidation against Israelis and Jews on campus, Shiran was deprived of on-campus, in-person instruction for the Spring 2024 semester, and has now been entirely excluded from the program.

281.    SAIC's direct discrimination against Shiran, and its acts of deliberate indifference to known instances of harassment, and/or violence and threats against Israelis and Jews, violates Title VI.

**COUNT II**
**(Violation of Illinois Human Rights Act, 775 ILCS 5/1-101 et seq.)**
**(Against SAIC)**

282.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 281, as though fully stated herein.

283.    Shiran is Jewish and Israeli and identifies as such.

284.    Shiran has been excluded from participation in and has been denied the full benefits of SAIC's educational and other programs and facilities based on her race, religion, national origin, and ancestry.

285.    As a result of SAIC, its administrators, and its faculty's actions, inactions, and conduct described herein, Shiran was treated differently from similarly-situated non-Jewish, non-Israeli student peers on the basis of her protected identity.

286.    SAIC, its administrators, and its faculty have permitted severe and pervasive harassment, abuse, and intimidation of, and discrimination against Shiran, on the basis of her race, religion, national origin, and ancestry, by other SAIC students and faculty members. As a result of

SAIC, its administrators, and its faculty's deliberate indifference, Shiran has been denied the full benefits and use of SAIC's educational programs and facilities.

287. SAIC, its administrators, and its faculty have failed to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Shiran, and the hostile environment that Shiran has endured at SAIC on account of being Jewish or Israeli.

288. The hostile environment at SAIC is sufficiently severe, persistent, and pervasive that it can be said to deprive Shiran, of equal access to the educational opportunities and benefits offered by SAIC.

289. SAIC, its administrators, and its faculty also directly discriminated against Shiran, based on Shiran's actual or perceived race, religion, national origin, or ancestry.

290. SAIC's actions or conduct had, and continue to have, a differential or disparate impact on Shiran, as a Jewish and Israeli student.

291. In applying its policies, SAIC, its administrators, and its faculty failed to act or acted with leniency or delay when receiving Shiran's reports. Discrimination—based on Plaintiff's race, religion, national origin, or ancestry—was a substantial or motivating factor in SAIC's actions, which were intentional.

292. SAIC, its administrators, and its faculty's actions were the actual, direct, and proximate causes of Plaintiff's injuries.

293. As a result of the foregoing, Plaintiff has suffered, and continues to suffer, substantial damages in an amount to be determined at trial.

294. Plaintiff is also entitled to appropriate injunctive relief under 775 ILCS 5/7A-104(a)(1), as SAIC, its administrators, and its faculty had knowledge of, and have been and

continue to be deliberately indifferent to a hostile environment that is severe, persistent, and pervasive.

295.    Plaintiff is entitled to attorneys' fees and costs pursuant to 775 ILCS 5/8A-104(G)

## COUNT III
### (Breach of Contract against SAIC)

296.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 295, as though fully stated herein.

297.    When Plaintiff applied to SAIC, she reviewed the school's brochures, catalogues, and other online materials to evaluate whether she wanted to pay for and participate in the program. Through these documents and other published materials made available to Plaintiff, SAIC made express and implied contractual commitments concerning the campus environment, the equal opportunity for all students to learn and thrive, and protections against abuse, harassment, intimidation, and discrimination.

298.    For example, SAIC's Non-Discrimination Statement touts how "The Art Institute of Chicago, including both the school and the museum, is committed to providing an inclusive and welcoming environment for its students, visitors, faculty, and staff, and to ensuring that educational and employment decisions are based on an individual's abilities and qualifications. The Art Institute of Chicago does not tolerate unlawful discrimination based on race, color, sex, marital status, religion, national origin, disability, age, sexual orientation, gender identity, military or former military status, or any other status protected by federal, state or local law, in its programs and activities, public accommodations or employment practices." (https://www.saic.edu/non-discrimination-statement).

299.     This is aligned with the other promises boasted throughout SAIC's website regarding how inclusive, welcoming, and tolerant the school is. One of the school's strategic initiatives is to "enhance belonging" and "continue to cultivate diversity and inclusion." (saic.edu/strategic-initiatives). The school's DEI program for academic affairs claims "SAIC is committed to assembling a diverse community of faculty, students, and staff and to nurturing and creating an environment in which different perspectives and backgrounds can be heard, valued, and utilized." (saic.edu/diversity-equity-inclusion/academic-affairs).

300.     SAIC not only promised a nurturing and inclusive environment to Plaintiff, but further reassured her – in the Program Guide particular to her program -  that her peers would be held to the school's rules of conduct outlined in the SAIC Student Handbook. (https://www.saic.edu/sites/default/files/2023-08/23_24_MAATC_Program_Guide_0.pdf) ("MAATC students must adhere to the SAIC Rules of Conduct, which are outlined in the SAIC Student Handbook.")

301.     The Student Handbook re-affirms  all students' and faculty's obligation to uphold the standards of non-discrimination," reflects their "shared responsibility" to uphold a community based on "respect for the rights of others…" and "affirms that the responsibility to create an environment conducive to the freedom to learn is shared by all members of the academic community."

302.     Plaintiff was also able to see SAIC's robust on-paper definitions of "Discrimination" and "Harassment" in its Student Handbook. SAIC defines "Discrimination" as the "unequal, adverse treatment of an individual because of their protected legal status. This means that unequal, adverse treatment is prohibited if it is because of a person's race, color, gender, religion, national origin, disability, age, actual or perceived sexual orientation, gender-related

identity, marital status, parental status, military or former military status, or any other basis protected by federal, state, or local law." SAIC defines "Harassment" as "one form of discrimination and is defined as unwelcome, hostile, or inappropriate conduct directed toward an individual because of their protected legal status. The determination of what constitutes illegal harassment varies with the particular circumstances, but it must be so severe, persistent, or pervasive that it affects an employee's ability to work or a student's ability to participate in or benefit from an educational program or activity, or it creates an intimidating, threatening, hostile or abusive educational or working environment. It must include something beyond the mere expression of opinions, views, words, symbols, or thoughts that someone finds offensive.

303. Based on these representations, robust definitions, and policies, Plaintiff believed she was enrolling in (and paying for) an educational environment in which she would be free from discrimination and harassment on the basis of being Israeli or Jewish.

304. SAIC also provided course descriptions for the classes Plaintiff was to enroll in (and pay for). These course descriptions provided Plaintiff with an opportunity to evaluate what topics and areas of study interested her, and to gauge whether SAIC was a good choice for her to pursue her career and spend tuition dollars.

305. The Course Description for Professor Yi's Materials and Media in Art Therapy, states:

> This course is an examination of the qualities and properties of art materials, media, and processes, and their applications in the context of art therapy. Socially constructed understandings of the significance of materials and media, as well as the relevance of contemporary art practices to art therapy, are investigated through lecture, discussion, and experiential formats.

306. Plaintiff, therefore, had an expectation that she was enrolling in (and paying for) this course, providing this subject matter.

307.    These representations, separately and in the aggregate, constitute contractual promises by the school to provide a welcoming and inclusive learning environment free of discrimination and harassment, and constitute contractual promises to actually provide the courses as described.

308.    These written promises were buttressed and re-affirmed by SAIC's Provost. Following the discriminatory admissions incident, Provost Berger made representations to Plaintiff to persuade her to enroll, including that Plaintiff "would have the same right to hold and express [her] views without fear of repercussion as anyone else in the community." He also "assure[d] [her] that the institution will do everything in its power to ensure that all of our students have the latitude to freely express their thoughts, whether popular or not."

309.    In exchange for these and other promises, Plaintiff paid tens of thousands of dollars in tuition to SAIC. She complied with all of her obligations under her contract with SAIC.

310.    But SAIC did not live up to its contractual promises. It has breached its promise of a discrimination- and harassment-free environment; it has utterly failed at creating an inclusive academic environment for Plaintiff, and its professors – chiefly Professor Yi – have acted as cheerleaders for the abuse, rather than as safeguards against it.

311.    SAIC also breached its promise to give Plaintiff the class she signed up for. Substantial classroom time was devoted to discussion of events in the Middle East, despite the course being Materials and Media in Art.

312.    SAIC also has breached the implied covenant of good faith and fair dealing in every contract, by unfairly applying its policies and procedures in a discriminatory way for Plaintiff, improperly motivated by discriminatory animus against Plaintiff as a Jew and Israeli.

313. Among other things, SAIC breached the implied covenant by responding to and treating incidents of abuse, harassment, intimidation, or discrimination against Plaintiff in a more lenient, tolerant, indifferent, forgiving, and nonchalant manner than it treats similar incidents raised by other minority students, and by failing to apply and enforce its student handbooks, university bulletins, regulations, codes, policies, and procedures when responding to and treating incidents of abuse, harassment, and intimidation of, or discrimination against Plaintiff.

314. As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff has been damaged in amounts to be determined at trial.

## COUNT IV

### (Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq.)
### (Against SAIC)

315. Plaintiff repeats and realleges the allegations of paragraphs 1 through 314.

316. SAIC made public statements and representations regarding the opportunities and benefits of enrollment at SAIC. These statements and representations were consumer-oriented and were aimed at, and had a broad impact on, a large consumer group, namely, prospective and current students of SAIC. These statements include those reflected, embodied, and set forth in SAIC's policies, procedures, student and faculty handbooks, and publicly available other materials.

317. SAIC has not acted in accordance with, and has not followed through on, its statements against discrimination, abuse, and harassment, or its representations regarding the content, structure, and form of its educational offerings, and has instead engaged in false acts or practices that are deceptive or misleading in a material way, that were aimed at the consumer public (namely, prospective and current students), and that were likely to mislead a reasonable prospective or current student acting reasonably under the circumstances.

318.    SAIC falsely led Plaintiff to believe that SAIC would apply, enforce, and follow the rules and policies, and the commitments contained, reflected, embodied and set forth in SAIC's policies, rules, student and faculty handbooks, course descriptions, and other materials.

319.    SAIC falsely led Plaintiff to believe that if she paid tuition and fees to SAIC, and upheld any academic and conduct commitments placed upon her, then SAIC would uphold, adhere to, abide by, and comply with its stated rules and policies, and the commitments contained in its handbooks and publicity materials, to foster, ensure, maintain, and create an environment free of discrimination, abuse, harassment, and intimidation, and provide an adequate and appropriate setting and environment in which all students, of whatever race, ethnicity, and ancestry, could freely express their identity and ancestry, could learn and grow, and could participate fully and meaningfully in SAIC's educational and other programs.

320.    Shiran saw, heard, and was aware of SAIC's false and misleading statements and representations before and after she enrolled at SAIC.

321.    SAIC's false and misleading statements and practices caused Shiran injury by causing her to enroll at SAIC, to pay tuition and fees to SAIC, and to continue to maintain enrollment at SAIC and continue to pay tuition and fees to SAIC in order to complete her degree, based on the reasonable understanding that SAIC would apply, enforce, and follow through on its codes and policies, and the commitments contained therein, concerning protecting students from harassment, abuse, intimidation, and discrimination based on their race, ethnicity, and ancestry, would otherwise seek to protect students from such hateful and bigoted conduct, and would take actions and implement measures to adequately, appropriately, and sufficiently address such misconduct to foster, ensure, and maintain a safe educational and campus environment. SAIC did not take such actions.

322.     SAIC's failure, refusal, lack of ability and intention, and lack of commitment to combating, addressing, and ameliorating these deplorable actions, and to making good on and complying with its aforementioned statements, constitute deceptive practices or false advertising, and have caused Plaintiff to sustain actual damages, including the loss of the value of the tuition and fees she has paid SAIC, emotional distress, loss of educational and extracurricular opportunities, economic injuries, and other direct and consequential damages.

323.     Accordingly, Plaintiff is entitled to statutory and actual damages in amounts to be determined at trial and to punitive damages pursuant to 815 ILCS 505/10a.

324.     Plaintiff is entitled to attorneys' fees and costs pursuant to 815 ILCS 505/10a(c).

## COUNT V
### (Intentional Infliction of Emotional Distress against All Defendants)

325.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 324, as though fully stated herein.

326.     SAIC and Professor Yi's intentional conduct in discriminating against Plaintiff was extreme and outrageous.

327.     Their extreme and outrageous conduct, as outlined above, includes intentionally subjecting Plaintiff to a knowingly hostile environment; facilitating discrimination and harassment against Plaintiff by her peers, intentionally targeting Plaintiff by modifying course assignments for the purpose of harassing Plaintiff, repeatedly requiring Plaintiff to tolerate "triggering" subject matter which was just a euphemism for making her listen to her classmates vent their rage towards her and their anti-Israeli and anti-Jewish narratives.

328.     Their extreme and outrageous conduct is exacerbated by the fact that they know that Plaintiff has been in a state of grief, shock, and mourning since atrocities of October 7th, one of the worst attacks against Jews and Israelis in history.

329.     SAIC and Professor Yi intended their extreme and outrageous conduct inflict severe emotional distress, or they knew that that there was at least a high probability that their conduct would cause severe emotional distress.

330.     SAIC and Professor Yi's extreme and outrageous conduct caused Plaintiff severe emotional distress.

## PRAYER FOR RELIEF ON ALL COUNTS

WHEREFORE, Plaintiff requests that the Court enter judgement in her favor and against Defendants as follows:

a.     Injunctive relief preventing the School of the Art Institute of Chicago and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Jewish or Israeli students, including Plaintiff, in any way, and ordering SAIC to take all necessary and appropriate remedial and preventative measures to secure the rights covered by Title VI, including by, among other things, (i) terminating deans, administrators, professors, and other employees responsible for the antisemitic and discriminatory abuse permeating the school, whether because they engaged in it or permitted it, (ii) suspending or expelling students who engage in discriminatory or antisemitic conduct, and (iii) providing appropriate Title VI and anti-discrimination training, including specifically about Jewish and Israeli identity and attacks against those identities, to all faculty and staff;

b.     An award of money damages in an amount to be determined at trial;

c.     An award of punitive damages in an amount sufficient to deter such future conduct;

d.     An award of attorneys' fees, costs and expenses, including under 42 U.S.C. § 1988;

e.     Pre-judgment interest and post-judgment interest at the maximum rate allowable by law; and

f.     Such other and further relief as this Court may deem just and proper.

Respectfully submitted,
**SHIRAN CANEL**

By:    */s/ Steven P. Blonder*
       One of her attorneys

Steven P. Blonder (6215773)
Joanne A. Sarasin (6191817)
Laura A. Elkayam (6303237)
**MUCH SHELIST, P.C.**
191 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
(312) 521-2402
sblonder@muchlaw.com
jsarasin@muchlaw.com
lelkayam@muchlaw.com

Avraham E. Aizenman
**STEELMAN ADVOCATE, PC**
3840 Via De La Valle
Del Mar, CA 92014
(424) 242-4603
eli@steelmanadvocate.com
(admitted pro hac vice)

Date: May 5, 2025