**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SHIRAN CANEL,

      Plaintiff,

      v.

ART INSTITUTE OF CHICAGO,

      Defendant.

No. 23 CV 17064

Judge Georgia N. Alexakis

**MEMORANDUM OPINION AND ORDER**

In her second amended complaint, plaintiff Shiran Canel again alleges that, as a student at the School of the Art Institute of Chicago ("SAIC"), she endured a campaign of antisemitic and anti-Israeli abuse by SAIC's faculty, administration, and students, in violation of Title VI of the Civil Rights Act of 1964. [146]; 42 U.S.C. § 2000d *et seq*. (Count I). She also raises several state-law claims (Counts II–V). SAIC again moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). [139].[1]

The Court detailed Canel's allegations against SAIC in its earlier memorandum opinion dismissing her first complaint. [106]. Canel's second amended complaint is substantially lengthier than her previous pleading; it numbers more than 330 paragraphs and totals more than 100 pages.[2] [146]. Rather than summarize

---

[1] Although Canel was a student at SAIC, the proper defendant is the Art Institute of Chicago. [66]. The Court will refer to SAIC throughout its opinion, though, given that Canel's allegations focus on the educational environment.

[2] The Court declines SAIC's invitation to dismiss the complaint as violative of Federal Rules of Civil Procedure 8(a) and 10(b). Though the complaint is certainly lengthy, it is not confusing. Dismissal is therefore not warranted.

these allegations at the outset of this memorandum opinion, the Court will assume familiarity with its previous decision and recount allegations—both old and new— where relevant in the course of its legal analysis.

For the reasons it sets forth next, the Court grants SAIC's motion as to Canel's Title VI claim and declines to exercise supplemental jurisdiction over Canel's state-law claims.

## I.    Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor, but the Court need not accept legal conclusions, or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal,* 556 U.S. 662, 667 (2009). The Court adheres to these principles throughout this opinion.

When considering a motion to dismiss, a court may consider documents attached to the complaint or documents central to the complaint and referred to in it. *Williamson v. Curran,* 714 F.3d 432, 436 (7th Cir. 2013). Throughout her complaint, Canel provides links to, or screenshots of, source material underlying her allegations, e.g., social media posts, newspaper articles, an "open letter" from SAIC faculty, and communications from SAIC administrators. *See, e.g.,* [146] ¶¶ 114, 125, 206, 208. In several instances, Canel highlighted specific language in the source material, presumably for the Court's benefit. Because Canel's allegations rely on and refer to

2

this source material—and because it is evident that Canel intended for the Court to review it—the Court considers this material when resolving SAIC's argument against the sufficiency of the complaint. *Williamson,* 714 F.3d at 435–36.

## II.  Canel's Hostile Environment Claim Under Title VI

In moving to dismiss Canel's hostile educational environment claim, SAIC concentrates on the following three prongs of the Title VI analysis: whether Canel has alleged "severe, pervasive, and objectively offensive" harassment actionable under Title VI; whether SAIC was deliberately indifferent to conduct of which it had actual knowledge; and whether the hostile environment deprived Canel of access to educational benefits. *See* [106] at 12 (setting forth the elements of a Title VI claim and citing *Doe v. Galster,* 768 F.3d 611, 617 (7th Cir. 2016)). The Court limits its analysis to the first two prongs.

According to Canel, she experienced two hostile educational environments: one "on campus," as protests and related expressive activity took place following the October 7, 2023 Hamas terrorist attacks in Israel, and a second one inside the classroom of Professor Sandie Yi. [146] ¶ 1; [152] at 6 ("Plaintiff plausibly alleges a hostile environment on campus generally and in Yi's classroom specifically."); *see also* [106] at 31–32 (the Court earlier explained why it declined to conduct a single Title VI analysis based on the full spectrum of allegations made). In assessing the legal sufficiency of Canel's Title VI claim, the Court will address the allegations concerning both environments. Based on its reading of Canel's complaint, it will analyze a third environment as well: the hostile environment that Canel allegedly experienced

during her application to, and initial rejection from, SAIC.[3]

### A. On-Campus Protests and Activity

#### 1. Relevant Factual Allegations

A large part of Canel's second amended complaint alleges that on-campus protests and other forms of student expression created a hostile educational environment—both during the second half of the Fall 2023 semester when Canel studied on campus and during the Spring 2024 semester when Canel studied remotely.

The complaint points to the following conduct in the Fall 2023 semester:

- Within one week of the October 7, 2023 attack, protests began on SAIC's campus, featuring signs stating "from the river to the sea, Palestine will be free," and "resistance is justified when people are occupied," with the phrase "#AlAqsaFlood" written beneath. [146] ¶ 108.

- On October 17, 2023, more than 100 SAIC faculty members wrote an open letter to SAIC students that referred to "Israeli settlers," described Zionism as "a political ideology predicated on colonial theft and destruction," expressed an understanding that "Palestinian homelands are Indigenous lands," and expressed "uncompromising solidarity with the Palestinian people in their righteous struggle for self-determination." *Id.* ¶ 114.[4]

- Around the same time, then-SAIC Professor Mika Tosca posted on her personal Instagram page that "Israelis are pigs. Savages. Very very bad people.

---

[3] Canel again alleges events that predate her 2023 application to, and enrollment in, SAIC. *E.g.*, [146] ¶¶ 62–65. For reasons it already has explained, the Court does not consider these allegations in its analysis. [106] at 2, n.1.

[4] The petition also expressed, among other sentiments, "a profound sense of grief over the Palestinian and Israeli lives that have been lost, and the staggering number of women, children, and elderly who've been critically wounded both in the past week and over the past 75 years," and that its authors were "horrified to bear witness to the violence of the Hamas attacks on Israeli settlers." [146] ¶ 114 n.40 (link to quoted letter).

4

Irredeemable excrement … May they all rot in hell." *Id.* ¶ 116.[5] Tosca was not Canel's professor. *Id.* ¶ 117.

- On November 2, 2023, many SAIC students, led by Students for Palestinian Liberation ("SPL"),[6] conducted a "walkout." *Id.* ¶ 123. Canel observed the walkout via social media as participants chanted "from the river to the sea, Palestine will be free." *Id.* The same slogan appeared on stickers distributed to walkout participants. *Id.*

- The next day, SAIC's President and Acting Provost emailed the entire SAIC community concerning the "unsanctioned gathering." *Id.* ¶ 125 & n.43 (providing link to full November 3, 2023 email). As quoted in the complaint, the email noted that "some of the language used at the event disturbed the equilibrium of some community members"; stated that "SAIC condemns the hatred of any person based on religion, country of origin, or any other aspect of their identity"; and "denounce[d] both anti-Semitism and anti-Muslim sentiment and harassment." *Id.* The full version of the email continued: "That means we ought to avoid inflammatory rhetoric or the disparagement of the peers with whom we disagree. I urge everyone to work toward an inclusive campus in their words and actions."

- On November 14, 2023, a group of SAIC students circulated a letter titled "FREE PALESTINE: Letter Regarding Palestine to the Art Therapy Department from MAATC Students." *Id.* ¶ 126.[7] As Canel describes the letter,

---

[5] Canel does not allege whether or how SAIC responded to this social media post other than to note that Tosca no longer works at SAIC. [146] ¶ 118 n.42. Canel only alleges that she emailed certain SAIC staff and faculty, asking: "How can [SAIC] permit a faculty member to spew such horrific hate? Who else holds these views? Am I even safe coming to school?" *Id.* According to Canel, no one at SAIC responded to her regarding the "substance" of this email, although Canel alleges that certain SAIC faculty communicated amongst themselves regarding her "expressed concerns." *Id.* ¶¶ 119, 121–22. As the Court explained in its earlier opinion, without additional facts concerning Tosca's "undoubtedly offensive" social media post (for example, how SAIC responded to it or how the post concretely and negatively affected Canel's education when she was not enrolled in Tosca's classes), the Court does not discern a connection between it and Canel's Title VI claim. *See* [106] at 18–19.

[6] Canel alleges that SPL is a "student group." [146] ¶ 277. It is not clear from this allegation (or from the other materials in the record) whether SPL is solely made up of SAIC students and what degree of control SAIC exercises over it. But construing this allegation in the light most favorable to Canel, the Court assumes that SPL is an official SAIC student group, that its membership consists of SAIC students, and that SAIC has some degree of control over its activities.

[7] "MAATC" refers to SAIC's Masters of Arts in Art Therapy and Counseling program, which is the program in which Canel was enrolled. [146] ¶ 1.

it called for "naming the difference between anti-semitism versus anti-zionism," did not mention the October 7, 2023 terrorist attack, referred to Israel as a "settler colonial" state, complained that SAIC accepted donations from the Crown family and claimed the Crown family derived their wealth from an ownership stake in a weapons-contracting company. *Id.* ¶ 127. Members of the Crown family are Jewish. *Id.*

- Around that same time, flyers were hung in the Art Therapy Department hallway that called upon faculty and community members to boycott SAIC's "Programs to Address Violence in Israel and Palestine," as mentioned in the President and Acting Provost's November 3, 2023 letter. *Id.* ¶ 132. The flyer urged SAIC to "[c]ut ties with the Crowns." *Id.* The poster also included a QR code. *Id.* When scanned and followed, the QR code led to "resources compiled by the SPL." *Id.* ¶ 133. Those "resources" included an essay by Malcolm X titled "Zionist Logic"; materials "depicting how violence has been used in liberation from colonizers"; and instructions to "follow and share updates" from groups including a group called "Within Our Lifetime," which supports "resistance by any means necessary." *Id.*

Owing to these events and SAIC's failure to "assure her safety or that she would be free from the harassment she faced on campus and in the classroom," Canel asked to conduct her Spring 2024 semester remotely, with one-on-one tutors. *Id.* ¶¶ 194–95, 200, 203. SAIC accommodated this request. *Id.* ¶ 194. Canel alleges the following hostile conduct occurred on or around SAIC's campus during her remote semester:

- On January 19, 2024, one of Canel's professors sent a school-related email to every member of Canel's cohort except Canel. *Id.* ¶ 195. Canel did not receive a second email otherwise sent to her entire cohort concerning a school-related meeting, *id.*, and, based on her noticeably lower email volume, presumes she did not receive other faculty communications as well, *id.* ¶ 196.

- A SAIC graduate assistant, who had earlier refused to present a class project jointly with Canel (*see infra* at 32), created a cohort-wide group chat that excluded Canel and used that group chat to communicate details about a fellowship application. *Id.* ¶ 198; *see also* [106] at 7.

- On March 20, 2024, SPL advertised on social media a "Glory to Our Martyrs" vigil "honoring those murdered in Palestine," to be held jointly with Chicago's

6

Columbia College. *Id.* ¶ 213. The post included Arabic text that translates to "we continue the struggle." *Id.*

- On April 20, 2024, SPL posted on social media: "We will not stop! We will not rest! We chant alongside the courageous students at [New York City's] Columbia University." *Id.* ¶ 214.

- At an April 26, 2024 walkout, a protester held a sign that read "Long Live the Intifada" in front of SAIC's entrance. *Id.* ¶ 215. The protest included students from SAIC as well as nearby Columbia College and Roosevelt University. *Id.*

- On May 4, 2024, protesters gathered in the garden of the Art Institute of Chicago (the museum, not the school). Canel describes this protest in Paragraphs 205 through 207 of the complaint and also provides a link to a *New York Times* article about the event.[8] Based on the allegations that appear in the body of the complaint as well the underlying source material, the Court understands that some of the protesters were SAIC students and that, during the protest, some of the protesters surrounded and shoved a security officer and stole the officer's keys to the museum, blocked emergency exits, and barricaded gates. Chicago police immediately responded and, after two hours of negotiations, removed the protesters at SAIC's request. The police then dismantled the encampment and arrested and charged 68 people with trespassing. During the protest, the protesters chanted: "We will free Palestine, within our lifetime" and displayed signs stating: "By Any Means Necessary." The museum later released a statement asserting that it had offered protesters an alternative venue and that SAIC had promised students they would not face academic sanctions or charges if they relocated.

- The next day, SAIC's President and Provost sent a letter to the SAIC community regarding the protest. [146] ¶¶ 208–09 & n.50.[9] Based on Canel's allegations in the body of the complaint and the linked-to letter, the Court understands that the letter described the protest as including "some SAIC students"; described the steps taken "to de-escalate the conflict and mitigate the safety risk"; described failed attempts to negotiate with the protesters; and stated that, after the protesters rejected these offers, the Chicago Police Department arrested those 68 protesters (including some SAIC students) who

---

[8] *See* [146] ¶ 206 n.48 (citing Yan Zhuang, *Dozens Are Arrested in Pro-Palestinian Protest at Art Institute of Chicago,* N.Y. Times (May 5, 2024), https://www.nytimes.com/2024/05/05/us/art-institute-chicago-protests-arrests.html) (last visited March 13, 2026).

[9] The complaint includes a link to the letter (available at https://www.saic.edu/news/demonstration-museums-north-garden) (last visited March 10, 2026).

7

still refused to leave despite repeated warnings. The letter stated that SAIC would "not pursue any academic sanction against the SAIC students who participated in Saturday's protests," but warned that "those who engage in future activities that jeopardize the safety of our community or the public, or disrupt academic operations, will be subject to disciplinary action." On May 17, 2024, SAIC's president sent an email to the SAIC community that communicated similar information as the May 5, 2024 letter. *Id.* ¶ 210.

- A May 13, 2024 post from an unidentified social media account showed an unidentified individual holding what appears to be a newspaper with the phrase "fight for worldwide intifada." *Id.* ¶ 216. The post's caption listed four Chicago-area universities and colleges: SAIC, the University of Chicago, DePaul University, and Northwestern University. *Id.* SPL was "tagged" to the post. *Id.*

- On May 29, 2024, SPL reposted on its social media account an image reading: "It is time for a revolutionary escalation of the global student intifada for Palestine: A call from the Palestinian student movement in the Gaza strip." *Id.* ¶ 217.

- That same day, SPL reposted on Instagram a one-minute video originally posted by two other accounts (including an account identified as "cuny4palestine"). *Id.* ¶ 218. The complaint does not link to the full video but includes one screenshot from it. That screenshot includes the text: "NYPD Brutalizes Anti-Genocide Students, Targets Femmes & Hijabis. It is right to rebel, Hillel go to hell! Baruch." *Id.* Behind the text, the screenshot shows a person holding a portion of a banner that depicts the Israeli flag with a swastika at the center of its Star of David, surrounded by illustrations of red drops of blood. *Id.*

- On June 1, 2024, "thepeoplesartinstitute"—which Canel describes as a "violent SAIC campus group"—posted on Instagram "calling for a city-wide, campus-wide month of student escalation for Rafa!" *Id.* ¶ 219. The post asked "students across Chicago" to "ESCALATE NOW, ESCALATE ALL MONTH," "OFF CAMPUS INTO THE HEART OF THE CITY," and stated: "We are not being symbolic when we chant: There is only one solution, intifada revolution ... The student intifada will settle for nothing less than a free Palestine." *Id.*

### 2. Title VI and the First Amendment

In granting SAIC's motion to dismiss Canel's original complaint, the Court emphasized the need to "distinguish[] between permissible political expression and unlawful discrimination in the aftermath of the October 7 Hamas terrorist attacks, the Israeli government's response to the attacks, and protests that erupted on campuses nationwide as a result of these events." [106] at 19–20. The Court declined to conflate criticisms of Israel's government or promotion of the Palestinian cause with antisemitism. *Id.* at 19–21 (relying on *Landau v. Corp. of Haverford Coll.,* 789 F. Supp. 3d 401 (E.D. Pa. 2025)). And it drew unfavorable comparisons between the allegations in Canel's original complaint—which described "banners and flyers reflect[ing] political points of view critical of the Israeli government"—with allegations made in other, more successful Title VI complaints—in which plaintiffs "plausibly alleged that on-campus conduct was intended to target Israeli or Jewish students rather than simply communicate a political message." *Id.* at 19–23 (relying on *Gartenberg v. Cooper Union*, 765 F. Supp. 3d 245 (S.D.N.Y. 2025), and *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297 (D. Mass. 2024)).

Now, relying primarily on *Gartenberg*, Canel argues that her second amended complaint sufficiently alleges that "she endured severe, pervasive, and/or objectively offensive conditions on SAIC's campus generally." [152] at 7–9. The Court continues to disagree. Canel's amended allegations continue to collide with the First Amendment and its protection of free expression. *Gartenberg* does not lead to a different conclusion. Nor do other district court and appeals court decisions that

involve similar factual allegations about similar types of speech and activity in university settings.

The First Amendment often protects offensive, hateful speech. As the Supreme Court has explained: ""[P]reventing speech expressing ideas that offend … strikes at the heart of the First Amendment." *See Matal v. Tam*, 582 U.S. 218, 246 (2017) (internal quotations omitted). It continued: "Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express the thought that we hate." *Id.* In the university setting, the Supreme Court has stressed that First Amendment protections are especially "[v]ital." *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835–36 (1995) ("For the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses."); *Healy v. James,* 408 U.S. 169, 180–81 (1972) (First Amendment protection "is nowhere more vital than in the community of American schools … The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom.") (cleaned up).

In balancing Title VI's prohibition of harassment against the First Amendment's protection of speech, courts distinguish between speech on matters of public concern "directed to the community at large through generally accepted

10

methods of communication" and speech that constitutes "targeted, personal harassment" aimed at a particular individual or group of individuals. *See Gartenberg*, 765 F. Supp. 3d at 265; *Landau,* 789 F. Supp. 3d at 401 (same); *see also Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.,* 605 F.3d 703, 710 (9th Cir. 2010) (analyzing the intersection of the First Amendment and a Title VII hostile environment claim and expressing "doubt that a college professor's expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment").

In *Gartenberg*, 765 F. Supp. 3d at 245, the district court resolved a motion to dismiss a Title VI claim premised on allegations surrounding on-campus speech and expressive conduct following the October 7, 2023 terrorist attacks. In so doing, *Gartenberg* explained that "speech on matters of public concern—expression that can be fairly considered as relating to any matter of political, social, or other concern to the community—is entitled to special protection under the first amendment and generally cannot be restricted simply because it is upsetting or arouses contempt." *Id.* at 262 (quotations omitted). Applying that principle, *Gartenberg* concluded that the following activity constituted "pure speech on matters of public concern":

- Less than three weeks after the October 7, 2023 attack, students demonstrated on a sidewalk outside of a university building and chanted slogans such as "resistance is justified when people are occupied," "it is right to rebel, Israel go to Hell," "there is only one solution: intifada revolution," and "from the river to the sea, Palestine will be free." *Id.* at 255, 270.

- Flyers distributed around campus invited students to "[c]elebrate the 36th anniversary of the First Intifada" and to attend a vigil hosted by a university group, Students for Justice in Palestine, to "[h]onor Palestinian Martyrs" and "grieve and honor all those killed by decades of Israeli occupation and imperial violence." *Id.* at 257, 270–71.

11

- Articles in the student-run newspaper criticized "the conflation of Zionism and Judaism." *Id.* at 271.

- An alumni letter, signed by a number of professor and administrators, claimed that it constituted "complicity in the atrocities committed against the Palestinian people" for the university to condemn violence against Israelis without also condemning "75 years of ongoing apartheid, siege, and illegal military occupation of Gaza and the West Bank, mass imprisonment of Palestinian civilians without trial or charge, and the war crimes committed during the genocide of Palestinians in the past 58 days." *Id.* at 257, 271.

- An art display that included the words "RESIST COLONIALISM FROM THE BRONX TO PALESTINE 'BY ANY MEANS NECESSARY.'" *Id.* at 271.

- The university mandated that all students in a certain humanities and social sciences class attend an anti-Israel advocate's speech, titled "The Never Again Syndrome: Uses and Misuses of Holocaust Memory and the Weaponization of Language." *Id.*

*Gartenberg* explained that these expressions were "related to the ongoing Israeli-Palestinian conflict," "touched upon topics like Zionism, colonialism, and racism," and were not "intended to target particular Jewish students, as opposed to efforts to communicate a political message to the Cooper Union community at large." *Id.* at 271. They therefore qualified as "pure speech on matters of public concern" that could not themselves "support a claim for an objectively hostile educational environment." *Id.; see also id.* at 275 ("It would be difficult to imagine an outcome more antithetical to the First Amendment than imposing liability for a hostile environment on a private college for its judgment about what its students should be taught or allowed to say on matters of political significance."). *Gartenberg* allowed that, "regardless of whether this expression is better characterized as righteous protest in support of a noble cause, as the vulgar celebration of terrorism and

12

antisemitism, or as something in-between, it is not a proper basis on which to impose civil liability." *Id.* at 271.

*Gartenberg* distinguished the above activity—"directed to the community at large through generally accepted methods of communication"—from "targeted, personal harassment aimed at a particular person." *Id.* at 265. Compare the above protected speech to the following activity, which *Gartenberg* held constituted *un*protected harassment, actionable under Title VI:

- A "mob" of student protesters forced their way past campus security guards into a university building, disrupted classes, and descended upon the hallway surrounding the school library, where students wearing "visibly Jewish" attire huddled inside. *Id.* at 255, 271–72. The protesters then attempted to enter the library, banging on and rattling the locked library doors and shouting, waving a Palestinian flag and signs critical of Israel. *Id.* at 272. Library employees suggested that the Jewish students (and those students alone) hide in the windowless portion of the library, or attempt escape through a back exit. *Id.* Some students called the police for help. *Id.* The ordeal lasted 20 minutes, until the Jewish students were allowed to leave (some escorted by campus security). *Id.* None of the students who engaged in the harassing conduct towards Jewish students faced discipline. *Id.* at 277.

- Jewish students hung posters with the names and photographs of victims of the October 7 attacks, but later found those posters vandalized and torn down to shreds. *Id.* at 273.

- Jewish students found a bathroom stall vandalized with the phrase "from the river to the sea" written in a font commonly associated with *Mein Kampf. Id.*

- The windows of a "main campus building," which housed the school's only library, were "defaced" with signs that called "Jews in Israel" settlers, justified the October 7 attack as a "reaction" to the "settler colonization," and suggested that there should be no "blame" for "the counterattack." *Id.* at 252, 254–55, 273–74, 277. University officials and security staff "were aware of the signs as they were being hung up," and the signs violated a university policy against unauthorized postings. *Id.* at 255. Yet, the signs remained in place for several hours. *Id.*

13

*Gartenberg* held that these events—the personally threatening and harassing library incident, in conjunction with the acts of vandalism and defacement—constituted episodes of severe and pervasive harassment rather than protected expression. *Id.* at 272–74. *Gartenberg* reasoned: "[U]nlike the first category of alleged harassment … these acts of vandalism—tearing down hostage posters, scrawling plausibly antisemitic graffiti where Jewish students could not reasonably avoid it, and defacing the windows of a main campus building that Jewish students must enter and walk past—were not reasonably calculated to contribute to public discourse and violated Cooper Union's time, place, and manner regulations." *Id.* at 273–74. *See also Gartenberg v. Cooper Union for Advancement of Sci. & Art*, No. 24 CIV. 2669 (JPC), 2025 WL 602945, at *3 (S.D.N.Y. Feb. 25, 2025) (denying motion for reconsideration and describing these allegations as "physically threatening or humiliating conduct and repeated acts of antisemitic vandalism" that "crossed that line" and "satisf[ied] Title VI's hostility element); *Kestenbaum*, 743 F. Supp. 3d at 304–05 (finding that the plaintiff plausibly pled being subject to severe, pervasive, and objectively offensive harassment when he described on-campus protests that were, at times, confrontational and physically violent towards Jewish students; incidents where protesters blockaded Jewish students in a study room and surrounded and intimidated Jewish students; and circumstances in which "[s]ome students felt compelled to doff clothing that might identify them as Jewish and ceased attending Jewish-sponsored events on campus").

14

The events Canel describes in her second amended complaint—even after being read in the light most favorable to her and with all reasonable inferences drawn in her favor—are akin to the protected expression described in *Gartenberg*. They represent instances of speech on matters of public concern "directed to the community at large through generally accepted methods of communication." 765 F.3d at 265. Canel points to flyers criticizing SAIC's response to the Israeli-Palestinian conflict and resulting discourse that were thumbtacked in a school hallway. [146] ¶ 132. She alleges that students and faculty—herself included—exchanged open letters and petitions sharing their views on the conflict. *Id.* ¶¶ 114, 126, 129. She describes various social media posts, inviting SAIC students to protests, utilizing slogans associated with the Israeli-Palestinian conflict, and depicting posters and signs containing the same. *Id.* ¶¶ 108, 123, 132, 213–19. She alleges that students conducted a "walkout," protesting on public streets and chanting slogans using similar language. *Id.* ¶ 123.

Unlike the *Gartenberg* plaintiffs, Canel does not allege any vandalism, defacement, or targeted harassment of Jewish or Israeli students. Her allegations concerning the protest in the museum garden are the closest she comes to making allegations about activity that "lack[] the degree of legitimate expressive purpose that might merit the kind of First Amendment protection that has long been recognized in the academic arena." *Gartenberg,* 765 F.3d at 269, 274. And yet, for the reasons that immediately follow, even those allegations do not permit her to prevail on SAIC's motion.

15

In the body of her complaint, Canel describes a "violent student mob," *see* [146] ¶¶ 205–06, but she then directs the Court to a news article reporting that only some of the demonstrators were SAIC students, *id.* ¶ 206 n.48. Then, in the body of her complaint, she alleges that the "student protesters violently forced museum officers out of the Art Institute Museum's garden, assaulted them, stole their master keys, and blocked and barricaded fire exits." *Id.* ¶ 205. The full extent of her allegations, though, paint a less volatile scene. The underlying source material provides: "[S]ome protesters 'surrounded and shoved a security officer and stole their keys to the museum, blocked emergency exits and barricaded gates.'" *Id.* ¶ 206 n.48. Canel never alleges that SAIC students in the museum garden targeted Jewish students, unlike the student mob in *Gartenberg* that descended upon the school library's, where students wearing "visibly Jewish" attire had congregated. 765 F. Supp. 3d at 255, 271–72. And unlike the *Gartenberg* plaintiffs, Canel does not allege that SAIC failed to respond to the protesters, or that the protesters escaped discipline. [146] ¶ 206 n.48 (protesters who resisted requests to vacate the garden were arrested and charged with trespassing within two hours).

Significantly, Canel has not alleged that she was physically present in the museum's garden when the protest took place. She has not even alleged that she was on SAIC's nearby campus at the time.[10] This absent allegation matters, first, because

---

[10] The same is true for other vigils and protests that occurred during Spring 2024, when Canel was studying remotely. Instead, based on Canel's complaint, the Court understands that Canel learned that these events took place, and what may have transpired at them, from social media and news outlets. *See, e.g.*, [146] ¶ 206 n.48 (linking to a *New York Times* article, including video posted by that newspaper, about the May 2024 protest in the museum

16

it informs the Court's decision not to credit Canel's allegations that a "violent student mob" "assaulted" "museum officers," *id.* ¶¶ 205–06, when those allegations are contradicted by the very source material that Canel voluntarily incorporated into her complaint. *See Zablocki v. Merchants Credit Guide Co.*, 968 F.3d 620, 623 (7th Cir. 2020) ("[W]hen the plaintiff relies on a document attached to the complaint and does not deny its accuracy, the facts communicated by that document control over allegations to the contrary."); *Zak v. Bose Corp.*, No. 17-CV-02928, 2019 WL 1437909, at \*3 (N.D. Ill. Mar. 31, 2019) ("[T]he Court need not give legal effect to conclusory

---

garden); *see also id.* ¶¶ 213, 215 (describing social media posts concerning a March 2024 vigil and an April 2024 protest).

Other allegations reference activity that did not occur in Chicago, but for which SPL expressed support. *See, e.g.*, [146] ¶ 218 (pointing to a screenshot with New York City references, such as "cuny4palestine," "NYPD," and "Baruch"). Canel tries to link this activity to her Title VI claim against SAIC by contending that she feared that SAIC students, by re-posting speech used elsewhere, "were promising to bring the same threats that harassed … Jewish students [elsewhere] to SAIC." *Id.* ¶ 214. *See also id.* ¶ 218 (alleging that by sharing an Instagram "reel" of a violent anti-Hillel protest in New York, SPL was "explicit[ly]" threatening violence against all Hillels). But this allegation is too speculative to form the basis of a Title VI claim. The inquiry is whether the hostility *was* sufficiently severe, pervasive, and objectively offensive, not whether a plaintiff anticipated that would be the case in the future. *See Galster*, 768 F.3d at 617. "[T]he mere risk of future harm, without more, is not a concrete harm in a suit for damages." *Campbell v. Edward-Elmhurst Health,* No. 25-1115, 2026 WL 511137, at \*1 (7th Cir. Feb. 24, 2026). "Hypothetical harms," like those Canel alleges, "are insufficient to confer standing." *Id.*

Nor has Canel sufficiently alleged that an SAIC official with authority to institute corrective action had actual knowledge of the post described in ¶ 218. School officials have actual knowledge only of incidents they witness, or those that have been reported to them. *Galster,* 768 F.3d at 618. Canel alleges generally that an SAIC official *must* have known of all SPL's posts, because "President of Diversity, Equity & Inclusion, Sekile M. Nzinga, at all relevant times followed both SLP [sic] and The People's Art Institute's social media accounts and, upon information and belief, saw their violent and hateful posts." [146] ¶ 221; *see also id.* ¶ 222 (alleging that various SAIC department pages "follow SLP's [sic] social media posts."). But the Court cannot infer that, because an official follows SPL's social media page, that official *must* have witnessed all of SPL's posts, let alone this post specifically. Nor has Canel alleged that she reported this SPL post to any SAIC official.

17

allegations that are contradicted by the pleader's actual description of what happened.") (citing *McCauley v. City of Chicago*, 671 F.3d 611, 617-18 (7th Cir. 2011)).

It also matters because Title VI does not ask whether a plaintiff perceived an environment as hostile from afar. It asks whether the plaintiff actively suffered that environment. In *Felber v. Yudof,* 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011), in granting a motion to dismiss a Title VI claim, the district court observed that "a broad swath of the conduct alleged occurred at times and in places where plaintiffs were not present." It continued: "While such conduct may, to the extent plaintiffs were actually aware of it, have some extremely marginal relevance to plaintiffs' contention that they perceived a hostile environment, acts occurring … on different campuses entirely, does little to demonstrate that plaintiffs suffered severe and pervasive harassment." *Id.* Where Canel has alleged, in effect, only that she *perceived* SAIC as a hostile environment based on social media posts and news articles she reviewed while away from campus, and feared "harassment and discrimination" were she to "*return*" to campus, those contentions do not support a Title VI claim that Canel *experienced* severe, pervasive, and objectively offensive conduct at SAIC while away from campus during her remote semester. [146] ¶¶ 194, 203, 229 (emphasis added).

Reasonable people may certainly disagree as to whether the activity that Canel describes in her complaint constitutes "righteous protest in support of a noble cause," "the vulgar celebration of terrorism and antisemitism," or "something in-between." *Gartenberg,* 765 F. Supp. 3d at 271. But the activity was not violent, physically or personally threatening, or targeted to Jewish or Israeli students—for the reasons the

18

Court has already provided and for additional reasons that it offers below (as part of its discussion of *Stand With Us Center for Legal Justice v. Massachusetts Institute of Technology*, 158 F.4th 1 (1st Cir. 2025)). It did not involve defacement or vandalism. It was speech on a matter that has generated significant public concern, directed at the SAIC community through flyers, posters, posts, petitions, and protests.[11] Just as Congress cannot punish protesters for such expression without running afoul of the First Amendment, nor can Congress, through Title VI, punish SAIC for its failure to do the same.[12]

*Gartenberg* is not alone in its analysis. In *Landau*, the district court similarly observed that "[h]owever noble the objective of nondiscrimination, institutions cannot be threatened with civil liability for declining to censor First Amendment protected speech." 789 F. Supp. 3d at 412. Like *Gartenberg, Landau* held that student expression aimed at the Israeli-Palestinian conflict, directed to the campus as a whole, constituted protected conduct and could not form the foundation of a Title VI claim. *Id.* at 413–14 (references to Israel's "settler colonialism in Palestine," distribution of Palestinian flags, support for "the liberation of Palestine through the

---

[11] At least some of the speech also occurred off campus, on major Chicago streets and public grounds and in the museum's garden. [146] ¶¶ 205, 213, 215,  Neither SAIC nor Canel have addressed whether SAIC can regulate speech that occurs on public property or private property that SAIC may not control, or that involved non-SAIC students.

[12] Nor, for that matter, could SAIC be held liable under Title VI for its failure to adopt and convey certain viewpoints. "Title VI is not a portal for students to litigate their general dissatisfaction with the conduct of administrators or to advance their view of how contentious issues should be handled on campus." *See Landau,* 789 F. Supp. 3d at 418. Instead, "[i]t sets an exacting standard for what constitutes a sufficiently hostile environment to justify imposition of civil liability"  and does not permit "a court to hold a college administrator liable for failing to convey a specific message that students would have liked to see." *Id.*

complete dismantling of the apartheid settler colonial state of Israel, by all means necessary," and social media posts (some of which promoted Palestinian resistance and depicted the silhouette of a paraglider, and some of which disparaged those who continued to support Israel) all constitute protected expression).

And in *Garrett v. City University of New York*, a Title VII case, the district court also adopted "the dividing line … between actionable physically threatening or humiliating conduct and repeated acts of antisemitic vandalism on the one hand, and, on the other, non-actionable pure speech on matters of public concern expressed through generally accepted methods of communication and reasonably designed or intended to contribute to public debate." No. 24-CV-9710, 2025 WL 3096550, at *6–8 (S.D.N.Y. Oct. 10, 2025) (quotations omitted). The district court there held on the protected side of that line "exposure to peaceful protests … regardless of their offensive content, disruptive nature, or technical violation of campus rules"— including a protester's display of a sign depicting "blood dripping from the Star of David and other Jewish symbols"— and on the unprotected, actionable side, protests "targeting individuals with threatening or humiliating conduct," like an anti-Hillel protest that aggressively and "personally target[ed] Jewish students." *Id.* at *9–11 (cleaned up).

In concluding that Canel has failed to state a Title VI hostile-environment claim based on on-campus protests and related activity, the Court also relies on the First Circuit's more recent decision in *Stand With Us*, 158 F.4th at 13. There, the federal appeals court considered whether an institution could be held liable under

20

Title VI for its failure to curtail student speech in circumstances similar to those Canel alleges. Like *Gartenberg* and *Landau, Stand With Us* recognized that "Congress cannot skirt First Amendment concerns by passing a law requiring someone else to punish protected speech." *Id.* at 14 (citing *Nat'l Rifle Ass'n of Am. v. Vullo,* 602 U.S. 175, 187 (2024)). So, *Stand With Us* reasoned that for a Title VI plaintiff to proceed past the pleading stage, the complaint would have to contend (1) the protesters' expression, as alleged, was racist (i.e., antisemitic), and (2) that racist speech of this type can be punished under Title VI, without running afoul of the First Amendment. *Id.* at 15. Unlike *Gartenberg* and *Landau,* however, *Stand With Us* reached only the first question: whether the plaintiffs had adequately alleged that the protesters' expression was antisemitic. *Id.*

In so doing, it declined to conclude that anti-Zionism was inherently antisemitic. *Id.* at 17. It wrote that the "absence of consensus reflects ongoing debate as to the relationship between anti-Zionism and antisemitism" and that under "our constitutional scheme," this debate is " resolve[d] through discourse, not judicial fiat." *Id.* As already noted, this Court took the same position in its earlier opinion granting SAIC's motion to dismiss Canel's original complaint. [106] at 19–21.

*Stand With Us* further explained that the plaintiffs there had alleged "no facts plausibly establishing that the protesters, as a group, opposed Israeli actions in Gaza or supported the Palestinian cause because of antisemitic animus," or "facts plausibly showing that the protesters as a group shared plaintiffs' view that anti-Zionism was inherently antisemitic." *Stand With Us*, 158 F.4th at 18. Because the plaintiffs failed

to "allege facts that, if true, would … permit the inference that in these specific circumstances the protesters' strident criticisms of Israel were driven by antisemitism," *Stand With Us* held that the "protesters' speech c[ould not] constitute racial harassment for Title VI purposes" *Id.*

The same is true of Canel's claims. In her complaint, Canel earnestly conveys the pain she felt following the October 7, 2023 massacre, as she watched peers and SAIC faculty members criticize Israel and, in her view, celebrate Hamas's terrorist attacks. But Canel has not plausibly alleged that the flyers, chants, slogans, social media posts, vigils, and protests that she describes were driven by antisemitism or anti-Israeli sentiment, rather than political points of view criticizing the Israeli government and/or advocating for Palestinians.

She contends that the slogans—like "from the river to the sea, Palestine will be free" and those referencing "intifada"—are necessarily calls to eliminate the Jewish people and, thus, are inherently antisemitic and anti-Israeli. *See, e.g.,* [146] ¶¶ 109–10. However, "neither slogan says as much on its face." *Stand With Us,* 158

F.4th at 19.[13] Nor does Canel "allege facts suggesting that either chant," slogan, or term "was commonly so construed by the protesters." *See id*. From Canel's complaint, the Court can only reasonably infer that someone who read, for instance, Canel's letter explaining to her classmates "why … chanting 'from the river to the sea, Palestine will be free' was … an expression calling for the elimination of Israel" may have understood that this is how Canel understood some of the protesters' words. [146] ¶ 129(b). But Canel does not plausibly allege that the student protesters agreed with, or shared, her construction of this phrase or many other phrases that feature in her complaint. The Court therefore cannot ascribe a particular antisemitic or anti-Israeli meaning to the speech at issue.

---

[13] Indeed, Canel made significant efforts to explain to SAIC students and faculty—as well as to the Court—why, in her view, these (and other) slogans are inherently antisemitic and anti-Israeli. *See, e.g.,* [146] ¶¶ 105, 109, 129(b) (Canel explains her understanding of "from the river to the sea" to SAIC faculty, the Court, and her classmates); *id*. ¶ 110 (Canel explains to the Court that she understands "resistance is justified when people are occupied" to be an "expression of blanket approval of Hamas' terror attack against Israelis" that "expressly justifies violence against Jews living in Israel"); *id*. ¶ 140 (Canel explained to her classmates and professors why she believes accusations that Israel has committed genocide, accusations that Israel is a "settler colonialist state," and claims that "anti-Zionism is not antisemitism" to be antisemitic); *id*. ¶¶ 206–207 (Canel explained to the Court that the phrases "within our lifetime" and "by any means necessary" to necessarily "champion" the "murder of Jews"); *id*. ¶¶ 215–16 (Canel explained to the Court her understanding of the term "intifada" as an explicit call for violence against Jewish individuals); *see also* [152] at 9 (explaining to the Court that chants to free Palestine "within our lifetime" are "code for the prompt eradication of Israel"). Interestingly, to support one of these allegations, Canel cites to materials from the Anti-Defamation League, which acknowledges that "we cannot ascribe specific intent to all those attending these demonstrations." [146] ¶ 207, n.49 (citing *Stop and Think: Anti-Israel Chants and What They Mean*, Anti-Defamation League (Nov. 2, 2023), https://www.adl.org/resources/article/stop-and-think-anti-israel-chants-and-what-they-mean) (last visited March 13, 2026).

In short, because Canel's Title VI allegations related to protests and on-campus activity are premised upon SAIC's failure to regulate protected speech, they cannot proceed.

### 3. Deliberate Indifference to "Violence" at SAIC

Canel makes numerous allegations referencing on-campus "violence," "violent" protests and conduct, and "violent" students. *See, e.g.,* [146] ¶¶ 18, 219, 224, 229, 231, 279; *see also* [152] at 9 (alleging that Canel witnessed "violent student mobs calling for violence against Israelis, calling for violent action on campus"). But the only event that could plausibly fit this description is the May 2024 protest in the museum's garden. As discussed earlier, during that event, protesters surrounded and shoved a security officer and stole their keys to the museum, blocked emergency exits and barricaded gates. *See supra* at 7. Although Canel does not so allege, and instead acknowledges that only some of the protesters were SAIC students, for purposes of this analysis, the Court will assume that the protesters who engaged in this particular activity were SAIC students, over whom SAIC could exercise authority. [146] ¶ 206, n.48. From Canel's description of the event, which relies on a *New York Times* account, the protest was handled quite readily by the museum, SAIC, and the Chicago Police Department. *Id.* ¶¶ 205–06 & n.48. Police responded immediately, the protest dissipated within two hours, 68 protesters were arrested, and within a day of the protest, SAIC sent a community-wide message warning students against engaging in similar conduct. *Id.*; *see also id.* ¶ 209.

As the Court previously articulated, to state a hostile educational environment

24

under Title VI, Canel must allege that SAIC was deliberately indifferent to any known acts of harassment:

> An institution is not deliberately indifferent under Title VI if it responds quickly and reasonably, in light of the circumstances it actually knows about, to any incidents of "severe, pervasive, and objectively offensive" conduct. *See Jauquet v. Green Bay Area Cath. Educ., Inc.,* 996 F.3d 802, 809 (7th Cir. 2021). This standard "requires that the school's response not be *clearly* unreasonable, which is a higher standard than reasonableness." *Moore v. Freeport Cmty. Unit Sch. Dist. No. 145*, 570 F. Supp. 3d 601, 607 (N.D. Ill. 2021) (emphasis added). A school's response will "suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *C.S. v. Madison Metro. Sch. Dist.,* 34 F.4th 536, 543 (7th Cir. 2022).
>
> A response need not be perfect or even successful to clear this bar. *Id.* A "negligent response," for example, "is not unreasonable, and therefore will not subject a school to [Title VI] liability." *Moore,* 570 F. Supp 3d at 607. Nor do victims have license to demand specific remedial actions from the school. *Id.* Depending on the circumstances, even a decision not to impose any remedial measures at all is not necessarily clearly unreasonable or deliberately indifferent. *Id.*; *see also Jaquet*, 996 F.3d at 809. In short, the question is not whether the school's response satisfied the plaintiff; rather, the question is whether the school responded in a way that was clearly unreasonable. The Court may make this determination as a matter of law at the motion to dismiss stage. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649 (1999) ("[T]here is no reason why courts, on a motion to dismiss … could not identify a response as not 'clearly unreasonable' as a matter of law."); *see also Moore*, 570 F. Supp. 3d at 609.

[106] at 13–14.

Given its earlier discussion of the First Amendment, the Court adds the following: When it comes to the deliberate indifference standards, Title VI again lies in tension with the Constitution. Courts must grant "substantial deference to a college's decision not to take action against students who engage in expressive activity on matters of public concern" and must "defer to colleges' decisions to err on

25

the side of academic freedom." *Gartenberg*, 765 F. Supp. 3d at 267 (citing *Rodriguez*, 605 F.3d at 708-09). "The choice of message in the face of public controversy remains the province of college administrators, and unless clearly lacking in reason or overtly hostile cannot be deemed deliberate indifference." *Landau,* 789 F. Supp. 3d at 418. "College administrators need not be perfect. They need not even be good. They just need to behave in a way that is not clearly unreasonable in light of the circumstances known at the time." *Id.* at 421.

Canel has not alleged that SAIC reacted with deliberate indifference to the protest in the museum garden. Rather, she alleges that once it learned of the museum garden protest, SAIC acted "quickly and reasonably" by contacting the police; attempted a peaceful negotiation; and, when those efforts failed after two hours, allowed the police to arrest the remaining protesters. *Jauquet,* 996 F.3d at 809. That SAIC attempted, as an unsuccessful negotiation tool, to encourage student-protesters to comply by offering immunity from academic sanctions is not clearly unreasonable, *id.,* "clearly lacking in reason" or "overtly hostile." *Landau,* 789 F. Supp. 3d at 418. Rather, the rejected offer of academic sanctions was well within SAIC's province as a college to "err on the side of academic freedom." *Gartenberg,* 765 F. Supp. 3d at 418; *see also Doe et al. v. Northwestern Univ.,* No. 24-cv-4831, 2026 WL 607423, at *5–6 (N.D. Ill. Mar. 3, 2026) (university not deliberately indifferent where the complaint "describe[d] efforts by [university] officials to bring the encampment to an end," officials "publicly denounced the encampment," and "decid[ed] that a negotiation would bring a quicker and more peaceful resolution").

26

Canel has therefore not plausibly alleged that SAIC responded with deliberate indifference to any acts of violence.

## B. Canel's Initial Application to, and Rejection from, SAIC

### 1. Relevant Factual Allegations

In December 2022, Canel met with SAIC's Director of Graduate Admissions, Patrick Quilao. [145] ¶¶ 20, 60. "The subject of Israeli-Palestinian relations arose." *Id.* ¶ 60. Quilao "made a cautionary comment … to the effect of": "sometimes it can be challenging to be an Israeli at the Art Institute." *Id.* ¶ 20. Canel "thought little of" the comment. *Id.*[14]

Then, around the time of Canel's 2023 application to SAIC, Professor Sandie Yi was one of four members of the Admissions Committee. *Id.* ¶ 77. In deliberating over Canel's application, one of the committee members, who was also Art Therapy Program Director, commented that Canel's application "indicated a limitation in her cultural exposure because it was saturated with Jewish experience." *Id.* ¶¶ 77(d), 79. The committee as a whole "expressed concern over Ms. Canel having a lack of broader exposure," as her "experiences were primarily from the Jewish community, and her application was saturated with one particular population." *Id.* ¶¶ 78, 80. A part-time faculty member also reviewed Canel's portfolio and suggested that Canel be asked a pregnancy-related question during the interview. *Id.* ¶ 8.

---

[14] Though Canel criticizes SAIC for "ignoring" this comment in its summary of her admissions-related allegations, the comment's relevance to her Title VI claim is unclear. [152f] at 5. In her own words, Canel "thought little" of the comment. [145] ¶ 20. Nor does Canel allege that the comment offended her.

27

Two or three admissions interviewers were supposed to interview Canel in a panel-style interview on a Saturday. *Id.* ¶ 71. Yi was not among the three intended interviewers. *Id.* After Canel requested that the interview be moved to Saturday night to accommodate her observance of Sabbath, two of the three would-be interviewers were no longer able to attend, leaving only Professor Deb DelSignore. *Id.* DelSignore conducted the interview alone, despite SAIC's panel-interview policy. *Id.* DelSignore asked Canel a number of inappropriate nationality-based questions, including whether she would be able to interact with Palestinian students. *Id.* ¶¶ 73–74.

After Canel was denied admission to SAIC and appealed her denial, SAIC hired outside counsel to investigate her admissions process. *Id.* ¶ 77. During the investigation, Yi "supported" DelSignore's interview question about Canel's ability to interact with Palestinian students. *Id.* ¶ 84. The investigators concluded "from DelSignore's conduct during the interview that [Canel] was treated adversely based on her national origin," and "found the Committee discussion problematic" in its focus on Canel's nationality and, to some extent, religion. *Id.* ¶¶ 83–85. The investigators recommended Canel's admission and steps to ensure the admissions process was not compromised for other students. *Id.* ¶ 86. The investigators also recommended that SAIC "[i]mpose appropriate discipline on involved faculty," "[c]onduct discrimination training for all full and part time Art Therapy faculty and staff," and issue disciplinary letters containing "a strong reminder of SAIC's prohibition against

28

retaliation, and all faculty should understand that Ms. Canel must be treated the same as any other student." *Id.*

In response, SAIC admitted Canel. *Id.* ¶ 87. SAIC also disciplined three faculty members involved in Canel's admissions process: DelSignore, the faculty member who reviewed Canel's portfolio and suggested that Canel be asked a pregnancy-related question, and the Art Therapy Program Director, who commented that Canel's application "indicated a limitation in her cultural exposure because it was saturated with Jewish experience." *Id.* ¶¶ 8, 71–74, 79. SAIC also apologized to, and engaged in dialogue with, Canel. *Id.* ¶¶ 88–93. SAIC did not discipline Yi or conduct department-wide discrimination training. *Id.* ¶ 87.

### 2. Deliberate Indifference to Canel's Admissions Process

Canel alleges that SAIC's response was deliberately indifferent because SAIC (1) did not discipline all Admissions Committee members, (2) did not reveal the results of the investigation or the contents of the disciplinary letters to her, and (3) did not provide anti-discrimination training to the Admissions Committee members and Art Therapy department. *Id.* ¶¶ 7, 9, 87, 88, 188, 252, 262.

SAIC's responsibility under Title VI is not to satisfy Canel or the advice, to the letter, of its attorneys: Rather, SAIC's only obligation is to not act in a clearly unreasonable manner. *Moore*, 570 F. Supp. 3d at 607. Here, SAIC hired attorneys to investigate Canel's allegations, admitted her, apologized to her, and took some disciplinary measure upon three faculty members directly "involved" in the one-on-one interview and policy-violative interview questions. In other words, it acted

29

quickly and not unreasonably, in light of the known circumstances. *Jauquet,* 996 F.3d at 809. Those actions, as alleged, do not constitute an "official decision" to permit discrimination. *C.S.,* 34 F.4th at 543.

Though Canel complains that Yi was not disciplined, she alleges that Yi's only involvement in her admissions process was her status as an Admissions Committee member and "support" of DelSignore's question about Canel's ability to interact with Palestinian students. [145] ¶ 84. But as the Court reads Canel's complaint, Yi expressed her support for the question *after* the interview and *after* Canel's application had been denied. *See id.* (discussing Yi's "support" for DelSignore's interview question in the context of what investigators found and concluded). It is therefore not reasonable to infer that Yi had any involvement in Canel's botched admissions process. Even if she had some involvement—e.g., by supporting DelSignore's question before the interview—it is not clearly unreasonable for SAIC to elect not to discipline every faculty member who had any effect on Canel's admissions process. *Moore*, 570 F. Supp. 3d at 607.

### C. Yi's Classroom Conduct

The Court presumes, for purposes of this motion to dismiss, that Yi's classroom conduct constitutes actionable harassment under Title VI. The next question is whether Canel has plausibly alleged that SAIC acted with deliberate indifference towards the harassment of which it was aware.

The Court begins by describing the relevant factual allegations. The Court includes only those events which could plausibly constitute harassment of Canel and

30

of which SAIC was aware before the subsequent Title IX investigation. For example, Canel alleges that Yi emailed the authors of the Free Palestine letter, thanking them for crafting a "thoughtful email, which demonstrates what critical thinking skills look like in action." [146] ¶ 139. She also alleges that Yi "liked" a student group's Instagram post sharing details about a student walkout, which included images of stickers with the slogan "From the river to the sea, Palestine will be free." *Id.* ¶ 124. Canel does not allege that she or SAIC were aware of the email or Instagram "like" when they occurred and does not allege that these actions were at all targeted towards her. The discussion of the relevant allegations also includes some relevant procedural history.

### 1. Relevant Factual Allegations

On November 15, 2023, Professors Yi and DelSignore emailed their students to announce that they would host a joint class session to "create a communal space for all of us to hold each other accountable through art, writing and witness reading." *Id.* ¶ 140. Canel replied to the professors and class, saying that she would not attend and conveying her perspective on recent events. *Id.* The next day, Canel met with the professors, who assured her that the joint class would not be about "Middle East events," that they would remind the students that the joint class was not an opportunity to talk "politics," and that they would redirect any conversation regarding the same. *Id.* ¶ 150. Yi then emailed "admin" a "recap" of the meeting. [145] ¶ 168.

31

Also on November 16, 2023, Canel received an email from another student in Yi's class. [146] ¶ 151. The student informed Canel that, although they were supposed to make a joint presentation in class, Yi had agreed that this student and Canel could split up their presentation. *Id.* ¶ 152. The student explained that she was "simply unable to work closely with any individual who denies the genocide so clearly taking place before us." *Id.* ¶ 153. Canel then emailed Yi objecting to the splitting of the presentation. *Id.* ¶ 155. Yi did not respond. *Id.* After Canel made her (no longer joint) presentation, Yi gave Canel a failing mark for the "Professionalism: Collegial + Interpersonal Skills" aspect of her presentation and "adopted and applied scores" from Canel's "tainted peer evaluations," even though Yi should have known the critiques in the peer evaluations were false. *Id.* ¶¶ 163–165.

On November 17, 2023, Yi and DelSignore held the joint class. *Id.* ¶ 157. The class "spiraled" into students "airing all of their grievances" about Israel, with one classmate screaming "her hate and anger toward those who rejected her narrative of an ongoing genocide." *Id.* The professors did not intervene. *Id.* When Canel "expressed her anger about this," the professors told her that she needed to "hold space" for others' feelings. *Id.* ¶ 158. Canel left the class "sobbing." *Id.* DelSignore later emailed "admin" a "recap" of the joint class. [145] ¶ 168.

Also on November 17, 2023, Canel received an email from SAIC's Title IX office notifying her that SAIC had engaged a law firm to investigate her complaints of discrimination and harassment by Yi. [146] ¶ 171. On November 30, 2023, Canel met

32

with a Title IX investigator. *Id.* ¶ 172. Canel does not elaborate on what she shared with the investigator regarding Yi's class or treatment of her.

On December 7, 2023, Yi announced a change to the class's final assignment. *Id.* ¶ 173. The second part of the final assignment now asked students to review two groups of images drawn by children. *Id.* ¶ 175. The first group contained "depictions of genital, physical, verbal or sexual abuse, violence and trauma inflicted on children and youth." *Id.* ¶ 176. One image depicted a father saying, in Hebrew: "You are a bad boy!," as the son replied, also in Hebrew: "Stop, dad, that is insulting." *Id.* The second group contained "depictions of gun, violence, trauma, displacement and colonization from children's view." *Id.* ¶ 177. All of the drawings in the second group depicted Israelis engaged in violence against children. *Id.*

Sometime between December 7 and 17, 2023, Canel complained to SAIC about Yi's "retaliatory harassment in modifying the final assignment." *Id.* ¶ 181. Though SAIC initially suggested that Canel should request an accommodation from Yi, Canel refused and informed SAIC's attorneys that she would seek emergency legal relief if the new portions of the final assignment were not retracted. *Id.* SAIC then directed Yi to withdraw the new portions of the assignment. The complaint strongly suggests that Yi followed this directive; it alleges that on December 18, 2023, Yi emailed the class, thanked those students who had shared their disappointment that the new portion of the final assignment had been withdrawn, and apologized to those students who felt their learning had been compromised *Id.* ¶ 183. Yi also asked students to reach out to the department chair with their perspectives. *Id.* Sometime around

December 18, 2023, Yi gave Canel a 50 out of 100 on her final peer evaluation. *Id.* ¶ 184.

In January 2024, as the spring semester began, Canel began remote instruction with one-on-one tutors. *Id.* ¶ 200. Just before then, Canel initiated this litigation, [1], and shortly thereafter moved for a preliminary injunction, [9]. On March 6, 2024, Canel withdrew her motion for a preliminary injunction "[b]ased on SAIC's representations … regarding the remedial actions that the school [was] undertaking and has taken in response to the motion for preliminary injunction." [44] (listing remedial actions). Canel's withdrawal motion makes clear that she was not satisfied with the scope of the remedial actions and, in her view, their belated nature. *Id.*

On June 25, 2024, SAIC concluded its Title IX investigation of Yi, finding that it was "more likely than not" that Yi subjected Canel to unequal, adverse treatment because of Canel's status as an Israeli Jewish student. [145] ¶ 191. That same day,[15] SAIC placed Yi on unpaid leave and required her to take antidiscrimination training and to send an apology letter to Canel. *Id.* ¶ 235. Yi did not send the apology letter to Canel (via her attorneys) until around a year later. *Id.*

### 2. Deliberate Indifference to Yi's Classroom Conduct

Canel's allegations reflect that SAIC acted quickly, and not unreasonably, in light of the circumstances it knew about. *Jaquet,* 996 F.3d at 809. When Canel

---

[15] Canel also alleges that SAIC placed Yi on leave for the Spring 2025 semester. [145] ¶ 191. The Court infers that Yi was either placed on a different type of leave starting in the Spring 2025 semester or her unpaid leave continued between June 2024 and Spring 2025.

complained about Yi's treatment of her, SAIC brought aboard outside counsel and launched a Title IX investigation. Although Canel alleges that she waited "weeks" after first complaining about Yi but before SAIC began the investigation, [146] ¶ 171, even crediting this vague allegation does not change the Court's analysis. The fact remains that SAIC responded to Canel's concerns in a reasonable timeframe. It initiated a Title IX investigation before the end of the Fall 2024 semester, forced Yi to withdraw the planned assignment that Canel found offensive, offered to take remedial actions to address Canel's allegations within 11 days of the filing of her preliminary injunction motion, [44] at 1, and following a seven-month Title IX investigation that concluded with an adverse finding against Yi, placed Yi on unpaid leave. These are not the actions of an institution that has made an "official decision" to permit discrimination. *C.S.,* 34 F.4th at 543.

It is understandable that Canel hoped for quicker resolution of her complaints. But Canel does not sufficiently allege that a seven-month investigation of a full-time professor, proceeding in tandem with Canel's then-newly filed complaint and motion for a preliminary injunction, involving outside counsel, and concluding in the professor's immediate placement on unpaid leave, is clearly unreasonable under the circumstances presented. She does not allege, for example, that the seven-month investigation allowed Yi more opportunities to harass her. She does not allege any contact with Yi at all during the pendency of the investigation, while she was studying remotely. Nor does she plausibly allege that the investigation was inactive

35

for any significant portion of the seven-month period. Rather, she only alleges in a conclusory manner that the investigation "stalled." [146] ¶ 188.

Compare Canel's allegations to those in *Louis D. Brandeis Center for Human Rights Under Law v. President and Fellows of Harvard College,* No. CV 24-11354-RGS, 2024 WL 4681802, at *2 (D. Mass. Nov. 5, 2024). In *Brandeis,* Harvard argued that its response to alleged on-campus harassment was reasonable and therefore not deliberately indifferent because it launched an investigation. *Id.* at *5. But plaintiffs alleged that, although Harvard "purported to assign outside counsel to conduct an external investigation," there was no other action for more than three months until—prompted by a congressional letter—counsel scheduled an interview with the complainant. *Id.* Even then, counsel made no attempts to schedule interviews with the alleged perpetrators. *Id.* Harvard then failed to take any remedial action based on the investigation's results for more than a year. *Id.* Under these circumstances, Harvard could not avoid allegations of deliberate indifference. *Id.* Canel's allegations are distinct. She does not allege the "mere act of launching an investigation without any further follow-through." *Id.*

Nor do Canel's allegations concerning Yi's involvement in the admissions process move the needle. Canel alleges only that Yi was a member of the Admissions Committee during her botched admissions process. As previously discussed, she does not allege that Yi was one of the three faculty members directly involved in the discriminatory acts and SAIC's decision to issue disciplinary letters to only those three faculty members is not clearly unreasonable. *See supra* at 28–29.

36

### 3. Deliberate Indifference to Peer Conduct in Yi's Classroom

In tandem with Canel's allegations about what transpired in Yi's classroom, the Court discusses Canel's allegations that SAIC was deliberately indifferent to the behavior of her peers in Yi's classroom.

Canel alleges that, in Yi's class, her fellow students "boycotted" her by refusing to share supplies with her, engage with her, or otherwise socialize with her. *See* [146] ¶¶ 141, 160. From these barebones allegations, the Court cannot infer that this peer exclusion constituted "severe, pervasive, and objectively offensive" harassment. This is especially so, given that "the Supreme Court has interpreted … Title VI … to impose a demanding standard for holding schools and school officials legally responsible for one student's mistreatment of another." *Galster,* 768 F.3d at 613–14.

Nor does Canel allege, other than in a conclusory manner, that she reported this peer exclusion to any SAIC administrators. *See* [145] ¶ 269 (alleging that SAIC administrators "knew that [Canel] was being 'boycotted' by her classmates" because Canel "was highly communicative with SAIC administrators," and SAIC administrators "were also in contact with Yi" regarding Canel). But this allegation stops short of claiming that Canel or Yi reported the peer exclusion to SAIC officials. *Galster,* 768 F.3d at 618 (the "actual knowledge" standard is "not satisfied by knowledge that something might be happening and could be uncovered by further investigation," and is only satisfied if administrator witnesses an event, or an event is actually reported to an administrator). The Court therefore cannot infer that an SAIC administrator, with authority to institute corrective action on behalf of SAIC,

had actual knowledge of the peer exclusion Canel experienced in Yi's classroom.

Finally, even if Canel or Yi did report this peer exclusion to an SAIC administrator, and even if this type of peer-to-peer exclusion could constitute actionable harassment under Title VI, SAIC's obligation to correct peer-on-peer harassment is minimal. *See Galster,* 768 F.3d at 617 ("School officials are given broad latitude to resolve peer harassment."). Indeed, Canel only alleges that she experienced this peer exclusion in Yi's classroom. By the time that SAIC learned of the peer-exclusion allegations, the Fall 2023 semester may well have concluded, Canel may have been studying remotely, with one-on-one tutors, and corrective action may no longer have been necessary or appropriate. The Court cannot reasonably infer otherwise from Canel's allegations. For these reasons, Canel's allegations of peer exclusion in Yi's classroom do not drive forward her Title VI claim.

## III.    Canel's Intentional Discrimination Claim Under Title VI

To state an intentional discrimination claim under Title VI, Canel must allege facts satisfying two elements: (1) that she was intentionally discriminated against on the grounds of race; and (2) that SAIC is a recipient of federal financial assistance. *Khan v. Midwestern Univ.*, 147 F. Supp. 3d 718, 720 (N.D. Ill. 2015). SAIC does not dispute that it receives federal funding.

Canel's allegations of discrimination are indistinguishable from her hostile environment claims and are otherwise entirely reliant upon conclusory legal allegations. Canel only adds to her hostile environment claims that SAIC allowed these events to happen pursuant to its "unwritten policy of taking no action, or as

38

little action as possible, regarding anti-Israeli and anti-Jewish harassment and discrimination." [146] ¶ 261. The Court does not credit such a conclusory allegation. *Iqbal,* 556 U.S. at 680–81 ("These bare assertions amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim … namely, that petitioners adopted a policy 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.") (citations omitted).

Nor can the Court infer, from Canel's rehash of her hostile environment claims, that any SAIC decisionmaker intentionally discriminated against her because of her Jewish or Israeli background. As discussed above, SAIC had no obligation, under Title VI, to moderate or punish its students' protected speech. And in the case of Yi's conduct toward her, Canel alleges only that when she reported Yi to SAIC, SAIC responded quickly and reasonably to investigate the allegations and that, upon the investigation's conclusion, disciplined Yi. From these allegations, the Court cannot reasonably infer that any SAIC decision was made to intentionally discriminate against Canel on the basis of her religion or national origin.

Though Canel argues in her opposition to the motion to dismiss that she has "alleged she was treated differently in the admissions process than other applicants" and was "treated differently within Yi's classroom as compared to other students," she complains only of the actions of individual SAIC professors. [152] at 19. Title VI does not impose vicarious liability against a university for the actions of its professors. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 288 (1998) (a school district cannot be held vicariously liable for the actions of its teachers under

Title IX); *Galster,* 768 F.3d at 617 (a decision interpreting Title IX generally applies to Title VI). So, even assuming that Canel has successfully alleged that DelSignore treated her differently than other non-Jewish, non-Israeli applicants, or that Yi treated her differently than other non-Jewish, non-Israeli students, SAIC cannot be held liable for these professors' discriminatory acts.

Finally, Canel's allegation that "SAIC embraces anti-discrimination efforts for other protected groups" is entirely conclusory. [152] at 19. She does not allege which "other protected groups" SAIC treats preferentially, or how this preferential treatment manifested. *Id.* at 9. The Court therefore cannot plausibly infer that SAIC intentionally discriminated against Canel on the basis of her religion or nationality.

For these reasons, Canel's intentional discrimination claim cannot survive a motion to dismiss.

## IV. Dismissal With Prejudice

"[A] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,* 786 F.3d 510, 519 (7th Cir. 2015). Here, Canel has had two opportunities to amend her complaint. [113], [146]. Because Canel has had multiple chances to articulate a theory of liability to support her Title VI claim, but has failed to do so, the Court will not give her yet another opportunity. The Court therefore dismisses Count I with prejudice.

## V.      State Law Claims

Because the Court dismisses Canel's only federal claim for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6), it declines to exercise subject-matter jurisdiction over her remaining state law claims. Federal courts only have the power to hear cases over which they have subject-matter jurisdiction. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513–14 (2009). Federal district courts have original subject-matter jurisdiction over civil actions "arising under" the Constitution or laws of the United States, 28 U.S.C. § 1331, or involving more than $75,000 between "citizens of different States," 28 U.S.C. § 1332. *See Arbaugh*, 546 U.S. at 513.

District courts have supplemental jurisdiction over claims that are part of the "same case or controversy" as claims over which they have original jurisdiction, 28 U.S.C. § 1367(a), but they "may decline to exercise supplemental jurisdiction [if] … the district court has dismissed all claims over which it has original jurisdiction," *id.* at § 1367(c)(3). Then, it is "presum[ed] … that the court will relinquish federal jurisdiction over any supplemental state-law claims." *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012). Certain circumstances can displace that presumption: (1) the statute of limitations has run on the pendent claim; (2) sending the case to another court will cause a substantial duplication of effort; or (3) it is "absolutely clear" how the remaining claims can be decided. *Id.* at 480. Even so, the presumption "should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Id.* at 479.

Here, the Court dismisses Canel's Title VI claim, the only claim over which it has original jurisdiction, so the presumption is that the Court will relinquish supplemental jurisdiction over Canel's other four claims. *RWJ Mgmt. Co.*, 672 F.3d at 479. No circumstances rebut that presumption. The remaining claims raise complex issues of contractual interpretation, state statutory interpretation, and state common law, amplifying federal courts' already "substantial concern with minimizing federal intrusion into areas of purely state law." *Id.*

The Court therefore declines to exercise supplemental jurisdiction over Canel's state law claims in Counts II through V.

## VI. Conclusion

For the reasons set forth above, the Court dismisses Count I with prejudice. Because the Court declines to exercise supplemental jurisdiction over Canel's state-law claims in Counts II through V, the dismissal of those counts as to Defendant Art Institute of Chicago is without prejudice. The Clerk is directed to enter judgment in favor of Defendant Art Institute of Chicago. Civil case terminated.

_____
Georgia N. Alexakis
United States District Judge

Date: March 19, 2026